```
1              IN THE UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF TENNESSEE
2                     NASHVILLE DIVISION

3
   PATRICIO JARA,                    )
4                                    )
        Plaintiff,                   )
5                                    )
        v.                           ) 3:20-cv-00131
6                                    ) JUDGE RICHARDSON
                                     )
7  TENNESSEE STATE UNIVERSITY,       )
                                     )
8        Defendant.                  )
                                     )
9  ----------------------------------------------------------

10

11

12

13

14      BEFORE THE HONORABLE ELI J. RICHARDSON, DISTRICT JUDGE

15                  TRANSCRIPT OF PROCEEDINGS

16                      NOVEMBER 1, 2022

17

18                  TRIAL VOLUME I-B of IV

19

20

21

22 ----------------------------------------------------------

23 DEBORAH K. WATSON, RPR, CRR
   Official Court Reporter
24 713 Church Street, Suite 2300
   Nashville, TN 37203
25 debbie_watson@tnmd.uscourts.gov
```

```
 1   APPEARANCES:

 2

 3   For the Plaintiff:

 4              ROBERT CHARLES BIGELOW
                Bigelow Legal, PC
 5              4235 Hillsboro Pike
                  Suite 217
 6              Nashville, TN 37215
                (615) 829-8986
 7              rbigelow@bigelowlegal.com

 8

 9   For the Defendant:

10              E. ASHLEY CARTER
                Tennessee Attorney General's Office
11              P O Box 20207
                Nashville, TN 37202-0207
12              (615) 741-7932
                ashley.carter@ag.tn.gov
13
                JOHN W. DALTON
14              Tennessee Attorney General's Office
                P O Box 20207
15              Nashville, TN 37202
                (615) 741-3491
16              john.dalton@ag.tn.gov

17

18

19

20

21

22

23

24

25
```

I N D E X

                                                    Page

PRELIMINARY MATTERS                                    5

JURY IMPANELED (Transcription not requested)         49

PRELIMINARY INSTRUCTIONS TO THE JURY                 57

OPENING STATEMENTS (Transcription not requested.)64


                PLAINTIFF'S CASE IN CHIEF


TESTIMONY OF PATRICIO JARA

Direct Examination
By Mr. Bigelow                                       65




                E X H I B I T S

                                                    Page


Plaintiff Exhibit 1                                  76
     Color copy of Tennessee State
     University Employee Verification/Update
     Form  of Patricio Jara,
     Department-Math, Off. No. 140-D, signed
     by Patricio Jara, Date:  07/28/2009 (1
     page)

Plaintiff Exhibit 4                                  78
     Black and white copy of Oral English
     Proficiency (OEP) Screening (1 page)

Plaintiff Exhibit 5                                  80
     Black and white copy of Oral English
     Proficiency Screening, Academically
     Speaking (AS), Oral English Proficiency
     Screening Questionnaire (2 pages)

1                                                   Page

2   Plaintiff Exhibit 6                              102
        Black and white copy of e-mail
3       communication - To Glenda Glover, From
        Patricio Jara, Monday, February 5,
4       2018, 1:19 p.m., Subject - Serious
        repeated incidents with Interim Dean
5       Sharpe. (1 page)

6   Plaintiff Exhibit 23                             132
        Black and white copy of "TSU Policy
7       #_____", Name of Policy:
        Assignment and Term of Department
8       Chairs, Responsibility:  TSU Office of
        Academic Affairs (9 pages)
9
    Plaintiff Exhibit 26                             133
10      Black and white copy of Department
        Head-Physics and Mathematics -
11      HigherEdJobs, Institution: Tennessee
        State University, Location:  Nashville,
12      TN, Category -
        Faculty-Science-Mathematics and Faculty
13      - Science - Physics, Posted:
        01/05/2017, Type:  Full Time (5 pages)
14
    Plaintiff Exhibit 29                             142
15      Black and white copy of correspondence
        to Search Committee, Mathematical
16      Sciences Department, Tennessee State
        University, 3500 John A. Merritt
17      Boulevard, Nashville, TN  37209,
        January 2017, from Patricio Jara
18      regarding submission of application for
        the Department Head Position #086130 (6
19      pages)

20  Plaintiff Exhibit 30                             142
        Black and white copy of Official
21      Transcript of Patricio Jara from
        Louisiana State University and A & M
22      College (4 pages)

23

24

25

```
 1                        *   *   *
 2          The above-styled cause came on to be heard at
 3   8:45 a.m. on November 1, 2022, before the Honorable Eli J.
 4   Richardson, District Judge, when the following proceedings
 5   were had, to-wit:
 6
 7          THE COURT:  All right.  We are here for a jury
 8   trial in the case of Patricio Jara vs. Tennessee State
 9   University.  The case number is 3:20-cv-00131.  And we're
10   going to talk about some things before we call in the jury
11   venire.  Lots of things, actually, as is necessary.
12          If counsel could make their appearances, please.
13          MR. BIGELOW:  Good morning, Your Honor, Rob
14   Bigelow for the plaintiff.
15          THE COURT:  Good morning, Mr. Bigelow.
16          MR. DALTON:  John Dalton with the Office of the
17   Attorney General for defendant.
18          THE COURT:  All right.  Good morning, Mr. Dalton.
19   So Mr. Dalton, are you aware that a motion in limine was
20   filed this morning?
21          MR. DALTON:  Yes.  About an hour ago.
22          THE COURT:  All right.  Could I ask, Mr. Bigelow,
23   it seems to me this issue would have been apparent by
24   October 17th, right?
25          MR. BIGELOW:  One would think, Your Honor, except
```

1   the fact is on October 17th, frankly, I was very much focused

2   on the issue that we have briefed and rebriefed and all that

3   with regards to Ms. Jackson and also with, frankly, preparing

4   for this -- preparing for this trial.  It came to my

5   attention yesterday?  Yesterday.

6           **THE COURT:**  Mr. Bigelow, I have to say:  A huge

7   problem with the defendant's witness list is something you

8   are responsible for as part of trial preparation, right?  If

9   you're going to make -- this is a big motion in limine, and I

10  understand your grounds for it, believe me.

11          But I do think -- and I've tried a lot of cases

12  with -- you know.  And I know that they -- trying cases,

13  right, it's very difficult, it's a crushing thing.  I'm just

14  going to tell you, and I do want to make clear that I can be

15  in the shoes of trial counsel.  I'm just saying that is

16  absolutely something that is not explainable by "I had other

17  things to do."  It's not.  It's not, not, not.  And I'm going

18  to be very firm about that.

19          Now, how dispositive it is that it's not

20  explainable by "you had other things to do" is a different

21  question.

22          But I am going to say a huge problem with the -- I

23  just -- I -- you know, I don't know what to say about that.

24  Like, because the issue there, it's October 17th, there are

25  two weeks to go before trial, and a huge part of what you're

1   doing to prepare for trial is to prepare for addressing the

2   defendant's case in chief, and it can't be that you had too

3   much to do to focus on that, can it?

4          **MR. BIGELOW:**  Your Honor, I agree with what you're

5   saying.  Respectfully, though, I -- in the same vein, I had

6   years to prepare for this trial, years to prepare for this

7   trial.  And a month ago, I found out that one of my very main

8   premises of the trial was swept out from under me.  I'm not

9   saying what's good for the goose is good for the gander

10  necessarily, but I am saying, I mean, it does go -- I would

11  suggest it goes a little both ways.  I mean, I've had to

12  change my entire trial strategy from -- that's lasted three

13  years, almost, within the last -- within the last --

14         **THE COURT:**  Well, I do understand that.  I guess

15  what I'm saying --

16         **MR. BIGELOW:**  But no, you're correct.  You're

17  correct, Your Honor.

18         **THE COURT:**  You know, isn't it the nature of --

19  like, the thing about trials, is, and one of the reasons --

20  I'm not saying anything that counsel doesn't know, I don't

21  think.  One of the things that they're difficult, trials are

22  very difficult.  They're very difficult if they're done well

23  and prepared well.  They're very difficult for counsel.

24  They're very difficult for the Court.

25         And so, for example, I hope counsel would agree

that I'm not just sitting back in this case and waiting for stuff to happen. It's a roll up your sleeves, all hands on deck, difficult sort of thing. And the problem is, it absolutely requires doing 18 things at once. And I am concerned about the timing of the motion in limine.

I do think -- but, you know, I think the other thing is, you know, understanding how this could happen, right, because it is hard and, you know, maybe you didn't do everything that actually, as plaintiff that wants their day in court, you're responsible for doing. But I understand, you know, sometimes, people don't always do everything that they should do. I do understand that.

But sometimes, there are consequences for not doing what you should do even if it's understandable that you didn't do what you should do.

**MR. BIGELOW:** And, Your Honor, may I also add?

**THE COURT:** Yes, sir.

**MR. BIGELOW:** The last two weeks, I have been, in addition to preparing for all the rest of this trial, I have been obviously trying to prepare for cross-examination of the witnesses along with my client, and been digging deep into the four witnesses that I mentioned. I have not ignored them. In fact, I have all this stuff kind of prepared for cross-examination, and I came to the realization, why don't I know as much as I should about this? And how am I kind of

1  blindsided by this, and why only now am I -- and therefore, I

2  looked back and, yes, I should have done it two weeks ago.

3         But that's kind of how all this came about.  I

4  looked back last night and said, oh, where have these people

5  been mentioned before, where were they?  And they were not in

6  any disclosures.  And is it -- is it ideal?  As the Court

7  noted, of course not.

8         **THE COURT:**  Well, okay.  All right.  Thank you for

9  the words of explanation, Mr. Bigelow.

10         Mr. Dalton, what's your take on this?

11         **MR. DALTON:**  Your Honor, obviously, defendant

12  is -- had no opportunity to put together any sort of written

13  response on this given the timing of the motion as the Court

14  noted.

15         It is true that I probably should have included an

16  amendment to discovery answers because there was a question

17  about who defendant intends to call as a witness at trial,

18  and that was answered at the time.  And I concede that should

19  have been supplemented, and I did not, and that's a mistake

20  on my part.  That's what it is.

21         **THE COURT:**  Wouldn't be the first one here, right?

22  It's gone both ways?

23         **MR. DALTON:**  I wouldn't disagree with you on that.

24  That's correct.

25         I will say of the four witnesses at issue here,

1   they are going to be -- if allowed to testify, they are going

2   to offer testimony that is going to be very limited.  It's

3   going to be brief and it's going to be limited.  And I can

4   preview, if the Court thinks that that would be in any way

5   helpful.

6         Two of them are members or were members of the

7   search committee for the math department chair, which is a --

8   that's a main issue here, as to how that played out.  And as

9   the e-mail chain showed on defendant's response on the Motion

10   to Amend and allow for deposition testimony for Dr. Jackson,

11   I did, after the problem with Dr. Jackson was revealed -- and

12   again, I passed that on to opposing counsel as soon as I

13   knew.  I offered alternate members of the committee for

14   deposition at that time, and Mr. Bigelow did not want to

15   pursue that.

16         The other two members are -- or the other two

17   potential witnesses are also very limited.  Dr. Reed is the

18   new interim chair of the math department, but that's only

19   been, I believe, since September of this year.  That is

20   brand-new, so I didn't even know about that until very

21   recently.

22         Also, Dr. Kelly is a fellow, associate professor

23   in the math department.  His testimony is going to be --

24   would be extremely limited as to the issue of -- plaintiff

25   has raised the issue of salaries for American-born professors

1 | versus foreign-born, and that would be the nature of his

2 | testimony.  Again, it would be extremely limited.

3 |             THE COURT:  Yes, Mr. Bigelow?

4 |             MR. BIGELOW:  If I may, Your Honor.  Just for the

5 | record, and I know it doesn't give a lot of extra leeway:  I

6 | did notify defendant of this yesterday evening when I came to

7 | this realization, just for what it is worth.

8 |             THE COURT:  Okay.

9 |             MR. BIGELOW:  In addition to that, I believe that

10 | Global Force Entertainment, the opinion by Chief Judge

11 | Crenshaw that I attached today, is dispositive on this

12 | matter.  I mean, it almost tracks what defendant's arguments

13 | are exactly and what the defendant just argued.

14 |             And -- and with that said, I will sit down.

15 |             THE COURT:  Well, you know, I think it's a couple

16 | of things.  And I want to backtrack and make a broader

17 | remark.  And, you know, obviously this case didn't settle.

18 | And I don't know why; I can't say, not knowing what the

19 | lawyers know about the case, that it should or shouldn't

20 | have.

21 |             I will say this:  Going to trial and not settling

22 | is for parties that really got all ducks in a row, all ducks

23 | in a row.  Otherwise, everyone's courting trouble.  All the

24 | ducks gotta be in a row or you shouldn't feel that good about

25 | going to trial.

1     And, you know, there have been a couple of things

2  that I've seen that -- telling me maybe not all ducks are in

3  a row; probably going to talk about some more.  And what I

4  want to say here is I agree with Mr. Bigelow.  I mean,

5  listen, the defendant didn't have all their ducks in a row if

6  they're calling -- if they are putting, on their witness

7  list, a bunch of people that were never identified, if I

8  understand correctly, Mr. Bigelow, in any way, shape, or form

9  that they might be witnesses.  In like, any way at all?

10          **MR. BIGELOW:**  That's correct, Your Honor.

11          **THE COURT:**  That's very problematic.  Like, to the

12  point, like, well, a person that wants to call witnesses at

13  trial were never identified as potential witnesses, maybe

14  that's someone that doesn't need to be going to trial.

15          On the other hand, there is an issue with the

16  lateness of the motion in limine.  Maybe that's someone that

17  shouldn't be moving to exclude in limine when it's just

18  been -- it's just been so long while the -- that the

19  information has been obtained.

20          And by Mr. Bigelow's own admission, apparently he

21  didn't even know at first that they weren't disclosed.  It

22  was only later he figured out why there was a problem.  It

23  wasn't even front and center that he didn't know about these

24  witnesses apparently, because it didn't occur to him that

25  they hadn't been disclosed.  That's by his own statement.

1          So on this particular motion in limine, I'm not

2    going to rule on it right now.  I don't think I need to yet

3    because we haven't gotten to the defense case in chief.  If

4    the defendant wants to file something, they can.

5          I mean, here's the way I look at it.  You know,

6    there are real problems with both sides.  And, you know, I

7    understand that it's really, really a problem for the

8    defendant not to have identified them as witnesses.  I mean,

9    I suppose it helps the defendant that the testimony

10   purportedly would be pretty limited.  It is a big problem,

11   though, and it is grounds for exclusion.

12          But I don't know the effect of the lateness of the

13   motion in limine.  And I want to consider that and hear

14   anything anyone has to say about that piece of it.  Because

15   with the deadline for motion in limine passed, we get within

16   one day of trial, you know, the defendant may have gotten,

17   you know, understandably the signal that, well, however it's

18   building its case, it's going to use these witnesses and that

19   there's going to be no objection to that.

20          A late-filed motion in limine like this could be

21   prejudicial, unfairly prejudicial in a sense that requires,

22   you know, the motion to be defeated.  But I'm not sure.

23          So I'm not up here to sort of criticize counsel.

24   I am saying -- but I do need to point out the problems with

25   each side's position on various issues.  And as the one

1   responsible for this trial, I do want to note that, you know,

2   the expectation, anyone wants a day in court, ducks need to

3   be in a row.

4           Yes, Mr. Bigelow?

5           **MR. BIGELOW:**  Your Honor, the motions in limine

6   were due the exact same day as the motions for the witness

7   list, so it would have been impossible, I suggest to the

8   Court, for me to have been that good.  I'm not saying I was

9   great, but I couldn't have been that good.

10          **THE COURT:**  I agree.  It would have to be like to

11  have met that -- and that's a fair point.  To have met that

12  deadline, have to be like, well, you know, you would have had

13  to have seen it if it was filed before the motion -- you

14  know, if the witness list was provided before 11:59 p.m. on

15  the 17th, you would have theoretically had a shot, but I

16  don't expect that.

17          But I do think the fact that the deadline was the

18  17th is the kind of thing that indicates, well, you -- you

19  know, understanding that there is reason to -- and under

20  these circumstances, to have, you know, the motion come

21  thereafter, it would -- I think it would indicate a prudence

22  of being as quick as possible.

23          I do -- so again, I'm not here to sort of like

24  fuss at counsel.  But I think that there -- you know, there

25  are issues with both sides here, and obviously, the Court

1  will have to make a call on this.

2          You know, I had issued an order regarding

3  Dr. Jackson, and I do want to explain that.

4          And I was alluding to this when I said, well, you

5  know, these things have gone both ways.  As it turns out,

6  Mr. Bigelow has gotten some relief from his not listing a

7  witness on the witness list, which is a different error than

8  what the defendant has done with these four witnesses.

9          But the basis for the Court's ruling on

10  Dr. Jackson and the ability to read the deposition

11  transcripts is that it does look like under the applicable

12  standard, it's excusable neglect.  And, you know, I had had

13  some dialogue with Mr. Bigelow who, you know, ultimately had

14  to concede that, well, this -- you know, not designating

15  these deposition transcripts may be neglect, but it is

16  excusable.

17          And I think, and particularly in light of the lack

18  of contrary authority or written argument, after plaintiff

19  filed a supplemental brief on this issue, I am persuaded by

20  Mr. Bigelow's argument.

21          You know, as he notes in the case of

22  *Gardner v. Dye*, unreported case but it's out of this

23  district, and I think it's accurate:  There is a standard

24  here that I do think we are looking here at the standard of

25  excusable neglect.  That's the good cause standard.  That's

1  really the standard we use for this.

2          And in this particular case, we'd be looking at

3  several factors.  And I do think, you know, there's always

4  first factor, prejudice to the nonmoving party, which would

5  be the defendant.  There's always a certain amount of

6  prejudice in the sense that it's negative to them to have to

7  respond to a late designation.  But it's not that big of a

8  deal in terms of the sort of late or extra work required.

9          Another factor is the length of the delay and its

10  potential impact on judicial proceedings.  I do think that

11  the issue was raised at a time that wasn't -- that made the

12  delay not so long that it was sort of unrecoverable for the

13  defendant to respond to it.  And I do feel like the impact on

14  judicial proceedings of the late designation wasn't

15  particularly big.

16          The reason for the delay I think cuts in the

17  plaintiff's favor.  The delay in designating -- you know,

18  past the deadline for designating Dr. Jackson's deposition

19  testimony really, I think, from the record, makes clear that

20  although there should have been designation done by

21  plaintiff's side, that's sort of belt and suspenders.  The

22  reason was, you know, Mr. Bigelow, in good faith, was trying

23  to -- trying to figure out whether any designation would be

24  necessary at all or if there would be some other way to avoid

25  it, for example, by just allowing the plaintiff to testify to

what Dr. Jackson had said, a proposal that I think ultimately, understandably enough, the defendant didn't go along with.

But I think he was -- you know, the reason he didn't designate, which means the reason for the delayed designation, the reason he didn't designate initially was he was, in good faith, trying to figure out whether any designation would be necessary. And that cuts substantially in his favor; then, whether the delay was within the reasonable control of the moving party.

And I think it was in the sense that Mr. Bigelow could have, you know, just designated while he tried to figure out whether he'd have to actually rely on the designated parts of the deposition testimony. So that cuts against him.

But the fifth one, whether the late filing party acted in good faith, I certainly do think there is good faith here for the reasons I just alluded to. And also the other thing is, you know, it's not like Mr. Bigelow was trying to hide the ball that he was interested in getting Dr. Jackson's testimony or testimony about, you know, Dr. Jackson's statements to which she did testify in her own deposition.

You know, Mr. Bigelow, I think, was quite clear that he wanted this to come into evidence, and he was just trying to figure out, I think, how this might occur, whether

1  it would even need to be done via actually reading the

2  deposition transcript designation -- designations at all.

3         And then there's also the piece of it that he was

4  responding to a late disclosure that, you know, sort of

5  understandably -- it's understandable because even though it

6  would have been prudent, you need to designate anything you

7  want to rely on to be read as testimony at trial from a

8  deposition.

9         You do, but it was, I think, October 4th when he

10  learned of the issue here, and probably threw him for a bit

11  of a loop in a way that just makes it more excusable for not

12  handling everything about that late developing situation as

13  he should.

14         So that's why I overruled the defendant's

15  objection to these designated portions of the deposition

16  being read into evidence.  That is subject to any objections

17  the defendant may have, and the defendant is also counter

18  designated, and so we're going to talk about whether there

19  are any objections to the designated portions of the

20  testimony.

21         Now, I don't know what my analysis ultimately is

22  going to be on, you know, the failure to identify at all the

23  witnesses that the defendant now wishes to offer.  I don't

24  know what the analysis is.  And I think it behooved the

25  defendant to file something in that regard with their view.

| | |
|---|---|
| 1 | I would say it's possible that, you know, some of the factors |
| 2 | and standards that I had talked about are going to be the |
| 3 | same ones to apply to the plaintiff's motion in limine as to |
| 4 | those four witnesses, but we'll see. |
| 5 | All right.  So that motion in limine remains |
| 6 | pending.  Obviously, before the defense case in chief starts, |
| 7 | we'll need to have a resolution, but that doesn't have to be |
| 8 | today. |
| 9 | Now, regarding the designations from each side, at |
| 10 | least for now -- and I would take a later objection if need |
| 11 | be.  But I do want to know for now whether either side has an |
| 12 | objection to the other side's designation based on the |
| 13 | Federal Rules of Evidence. |
| 14 | Mr. Dalton, do you have any objections to, it |
| 15 | looks like we have 18 different specific designations by |
| 16 | Mr. Bigelow?  Any objections under the Federal Rules of |
| 17 | Evidence, understanding you object to this as, you know, |
| 18 | designated too late? |
| 19 | **MR. DALTON:**  Yes, Your Honor.  And that -- we have |
| 20 | filed that.  Of the 18, there are objections to four of them: |
| 21 | Designation 8, 10, 14, and 16. |
| 22 | **THE COURT:**  All right.  So that's the universe of |
| 23 | the objections? |
| 24 | **MR. DALTON:**  Yes, Your Honor. |
| 25 | **THE COURT:**  8, 10, 14, and 16.  Okay. |

1          **MR. DALTON:**  Yes.

2          **THE COURT:**  Now -- and I'm going to rule on those

3    objections before it's time to read those.

4          When did you anticipate reading those,

5    Mr. Bigelow?

6          **MR. BIGELOW:**  As the last witness of our proof,

7    Your Honor.

8          **THE COURT:**  Okay.

9          **MR. BIGELOW:**  And to make it a little bit easier

10   on the Court, if I may, Your Honor, --

11         **THE COURT:**  Yeah.

12         **MR. BIGELOW:**  -- we have no objections to 10 and

13   16.  In other words, we're more than happy to read more in to

14   get full context, which is what the defendant asked us to do.

15   We're fine with that.

16         The only counter -- the only arguments that we

17   have are with regards to No. 8, which is on page 44 of

18   Dr. Jackson's deposition where I ask Dr. Jackson about the

19   minimum qualifications of a successful candidate that will

20   have a record of scholarship and research includes

21   peer review and external funding.

22         And I asked if he had record of securing external

23   funding.

24         And she said:  "I did not actually look as to

25   whether or not he did."

1       And I said:  "Would it surprise you that his CV

2 has no mention of external funding?"

3       And she said:  "It would not surprise me because

4 it's difficult to get funding -- to get funding."

5       And we suggest that this is all just her personal

6 knowledge.  It's what she believed and what she knows or

7 didn't know, and that it's not hearsay.

8       **THE COURT:**  All right.

9       **MR. BIGELOW:**  As far as 14 is concerned, which is

10 page 79, lines 15 through 18, Dr. Jackson testifies that she

11 wasn't aware of people's backgrounds, but she said she did

12 know that he was an inter- -- "So I'll just say international

13 because I have no clue, and it doesn't matter to me."

14       We think that is not at all hearsay.  It's her own

15 statement as to what she knows and doesn't know and

16 specifically that Dr. Jara was a, quote, international.

17       **THE COURT:**  It's also -- it's also not hearsay

18 because it's not offered for the truth of the matter

19 asserted, right?  Everyone knows that -- you know, I think we

20 all would agree the reference to international means someone

21 who is of foreign national origin, right?

22       **MR. BIGELOW:**  Yes, Your Honor.

23       **THE COURT:**  It's not offered to prove that;

24 there's no dispute about that.  So I would agree it's not

25 hear- -- even if it was -- even if there was some

out-of-court statement that Dr. Jackson alluded to in her
testimony, which there is not, it certainly wouldn't be
introduced for the truth that Dr. Jara is a, quote,
international.  So I don't see a hearsay problem for a couple
of different reasons.

MR. DALTON, am I missing something?

**MR. DALTON:**  I understand, Your Honor.  Defendant,
in their response, also cited Federal Rule of Evidence 602 as
to lack of personal knowledge --

**THE COURT:**  Yeah, and let's talk about that.
Here -- here's the thing.  Would not that particular rule of
evidence, lack of personal knowledge, isn't that really
relevant to the context of when -- again, the -- well, let me
back up and say it this way.  The rule requiring personal
knowledge of a witness and the rule against a witness
testifying as to hearsay statements, statements introduced to
prove the truth of the matter asserted and the out-of-court
statement, they sort of have -- they're similar in many ways,
but they are technically very different in how you implement
them.

I do think that both of them really are directed
more at -- and I think they're both directed at not allowing
a witness to testify to something to convince the jury that
information is true when the witness lacks personal knowledge
that the fact is true.

1    Here, again, like -- let's say that Dr. Jackson
2  does lack personal knowledge of whether the plaintiff is an
3  international.  I think that's debatable.  I think that's
4  very debatable.  But since, you know, under the Rules of
5  Evidence, there just needs to have to be circumstances
6  sufficient for the jury to find that she had personal
7  knowledge.  That's the standard.  And on this record, I doubt
8  that it could be said that the jury would not have sufficient
9  information to conclude that she has sufficient information,
10 having dealt with Dr. Jara, to know that he was an
11 international.

12   But even if there was a lack of sort of personal
13 knowledge, would this objection even apply when, again, it's
14 not offered to prove the truth of the matter asserted?  It's
15 really about what Dr. Jackson believed, right?  Like, that's
16 the significance of what Dr. Jackson believes about the
17 plaintiff being an international because again, you know, the
18 plaintiff is not relying on Dr. Jackson to establish the fact
19 that the plaintiff is, in fact, an international.

20   And so I'm not sure how relevant the objection,
21 lack of personal knowledge, is when the import of the -- her
22 statement that plaintiff was an international, that she knows
23 plaintiff was an international is simply the fact that she
24 knows it, not that it's true.  The information that he is, in
25 fact, an international is going to come from somewhere else.

1           Do you see what I'm saying?

2           **MR. DALTON:** I do, Your Honor.

3           **THE COURT:** Okay. I -- and here's the thing. I

4 never begrudge a party an objection based on lack of personal

5 knowledge, because a lot of times, things come in at trial

6 where that objection could be made. I think a lot of times

7 the objection is missed, frankly. And so I never sort of

8 begrudge someone doing that.

9           And a lot of times, like in a deposition, the

10 basis for a witness's knowledge as to facts that they testify

11 about is not very clear. I understand that.

12           So, hey, it's fair game to make that objection.

13 Here, I do think that, you know, lack of personal knowledge

14 is not compelling because really, the significance is not the

15 truth of what she purports to know. It's simply that she

16 really claims to know it.

17           And I think the other reason is, if you read the

18 deposition transcript, I do think that she would have

19 demonstrated just enough knowledge about the plaintiff for a

20 jury to find that she knew that anyway. And so for that

21 reason, I'm going to overrule the objection to No. 14.

22           No. 8 is a little trickier, but before we do that,

23 10 and 16, you know, if Mr. Bigelow puts the designated

24 testimony more into context, does that resolve the objection?

25           **MR. DALTON:** Yes for defendant, Your Honor.

1          **THE COURT:** All right. Thank you.

2          Now, No. 8, let's talk about that. Is there

3 very -- like, very specifically, what in that exchange are

4 you objecting to? And I -- and I could see a basis for an

5 objection. But if you could describe, I think he's got

6 page 44, 13 through 24. There are various different things

7 in there. Is there anything in particular that you object to

8 more than others?

9          For example -- and believe me, at trial, I have

10 asked this kind of question and not got an objection, and

11 after the fact, I wondered why I didn't get an objection.

12 Here's what I'm -- I'm thinking of a particularly prominent

13 trial I had. And I asked of a prominent witness, "Would it

14 surprise you that," and when a question is phrased that way,

15 "would it surprise you that," it can really have an impact on

16 the jury. And I thought it was a fair question. I didn't

17 get an objection. Everything was fine.

18          After the fact, it occurred to me, is there any

19 independent relevance to whether that witness was surprised?

20 The question is, were you surprised, and arguably whether the

21 witness is surprised is actually not a fact of independent

22 significance even though it sort of leaves an impact on the

23 jury.

24          So part of that exchange is the question about the

25 were you surprised. There were other things that were going

1  on in that exchange.  Could you tell me what in particular

2  you're objecting to?

3          MR. DALTON:  I would say primarily, Your Honor,

4  the line 18, the question is did:  "Dr. McMurray have a

5  record of securing external funding?"

6          Dr. Jackson's answer is:  "There is a possibility.

7  I did not actually look at whether he had funding or not."

8          So she's saying she doesn't know or said she

9  didn't look at whether he had funding or not.

10         And then, as you mentioned, then there's the

11  question of:  "Would it surprise you the CV does not mention

12  securing external funding?"

13         And, in fact, she says:  "No, it would not

14  surprise me" because she knows funding is an issue.

15         I think primarily the objection was, she said she

16  did not look at whether he had funding or not.  She doesn't

17  have knowledge about it.

18         THE COURT:  The fact that she does not know

19  whether he had funding, are you asserting that that's --

20         MR. BIGELOW:  That's hugely significant.

21         THE COURT:  -- a fact itself of independent

22  significance?

23         MR. BIGELOW:  That's of huge independent

24  significance, Your Honor, which is in part why we fought so

25  hard for getting all this in.

As you know, Dr. Jackson was the chair of this committee. For her to testify that she didn't know whether the person who actually got the job met a minimum qualification for that job is hugely significant.

In addition to that, when I said, "Would it surprise you that there's no mention," not only did she earlier say, "Well, I didn't look, I don't know," but when I said, "Would it surprise you," she said, "Well, no, because not a lot of people have -- have -- have external funding."

That's hugely significant. In fact, that's the crux of so much of our case. As Dr. Jara will testify to later this afternoon, he had almost a million dollars of external funding. That's a big deal.

**THE COURT:** So the fact that she was surprised, I would say, is not independently significant, but the reason why she was surprised might be, right? The reason is -- well, the statement that follows: "Well, you know, not a lot of people have the funding."

**MR. BIGELOW:** I think both are significant. I mean, you would hope that -- I mean, if you're applying for a job at a law firm, Your Honor, and the person who runs that law firm, if you didn't have a law degree and I said, well, would it surprise you that Mr. Richardson at the time -- not Judge Richardson -- doesn't have a law degree, and he says, no, it wouldn't surprise me, I'd say, whoa, that's kind of

1  shocking.

2          **THE COURT:** Well, but I would say it's -- like,

3  the fact that the person like, yeah, I'm not surprised, and

4  the person doesn't go, gee, I'm surprised, I would say the

5  reason that it matters is why they aren't surprised.

6          But I hear what you're saying.

7          I do want to ask Mr. Dalton: Does she answer that

8  in the past tense or the present tense? Because I do think

9  that's a -- "I don't know" is very different, particularly no

10 one seems to dispute and both parties have had to -- both

11 parties have had to rely on the fact that there are current

12 memory problems with this witness -- first the defendant and

13 then Mr. Bigelow -- to establish the unavailability of the

14 witness so that the deposition transcript would be read.

15 There's no dispute that there have been memory issues.

16         I don't know if we've established memory issues at

17 the time of deposition. But the fact that there might have

18 been memory issues just highlights my concern which is that,

19 you know, if she's saying, well, you know, I don't know now

20 or I don't remember now, that is -- really is not the same as

21 saying that she didn't know at the time in question.

22         How does that read?

23         **MR. DALTON:** Well, Your Honor, the totality of her

24 language here, when questioned, "Did Dr. McMurray have a

25 record of securing external funding," there is a possibility,

1   "I did not actually look at whether he had funding or not,"

2   that's past tense.  And then the question, "Would it surprise

3   you," "It would not surprise me because it's very difficult

4   to get funding -- to get funding," which seems to be her

5   current impression.

6           **THE COURT:**  Okay.

7           **MR. DALTON:**  So it's both, it looks like.

8           **THE COURT:**  All right.  I do think she has that --

9   I do think that's important testimony, "I didn't look."

10  Right?  It's supposed to be a job requirement, isn't it, job

11  criteria?  And she unequivocally says, "I did not look," so I

12  think that's got to come in.

13          The part about the surprise, I'm not as bothered

14  with the surprise part coming in because she does state a

15  relevant fact that explains her surprise.  It dovetails fine.

16  And I don't want to strike the part about surprise to sort of

17  break up the testimony.

18          I do think, Mr. Dalton, that what we have there is

19  a witness saying -- and, you know, you're allowed to, you

20  know, to the extent you can, you know, sort of impeach this

21  testimony based on any memory problems if you have evidence

22  to support that.  Right?

23          But she says, I didn't look.  And, you know, then

24  she says, "Well, I wouldn't be surprised," which, to me, is

25  it's sort of like her saying, "Well, that's not particularly

1   unusual because," and then she states a very important fact I

2   think, you know:  "Well, most people don't have this."

3          So I think that that comes in, although I would

4   say this:  Does the question about surprise assume the fact

5   not in evidence?  Because I am sensitive to, you know, these

6   questions that say, well, if such and so were the case, and

7   then you premise your question on facts not in evidence.

8          Is this CV going to come into evidence?

9          **MR. BIGELOW:**  Absolutely, Your Honor.

10         **THE COURT:**  Uh-huh.  I figured.  So this

11  deposition is going to be read last, and you expect the CV

12  already to be in evidence, right?

13         **MR. BIGELOW:**  100 percent, Judge.

14         **THE COURT:**  All right.  So that would resolve that

15  concern.

16         So for those reasons, I'm going to overrule the

17  objection.  I've overruled two of these objections to 8 and

18  14.  I'm going to say I sustain the objections to 10 and 16

19  to the extent that Mr. Bigelow will have to put his

20  designated testimony in context.  That's the remedy for my

21  granting these objections.

22         The defendant's objections to the testimony there

23  in No. 8 and No. 14, of course, are preserved.

24         All right.  Let's talk next about the verdict

25  forms.  We did have revised verdict forms, and I wanted to

1   say a couple of things about these.

2          The plaintiff's second proposed verdict form, the

3   first thing I note, that question -- let me put it this way.

4   The questions here are based on the model which I invited to

5   say let's break out the verdict as to whether there was

6   discrimination against Dr. Jara based on race -- I mean

7   national origin.  Let's break it out -- or one possibility is

8   to break it out by adverse employment action.  Because to say

9   that someone is discriminated against really is to say that

10  they had an adverse employment action taken against them on

11  the basis of the protected class.

12         So that's an option, and we're going to talk about

13  that approach in a second.  I would say Question No. 1,

14  though, even if we're breaking out adverse employment action

15  separately, is -- my first point is that that would not be

16  warranted because I issued an order saying that as a matter

17  of law, I am saying failure to get an interview is not

18  independently an adverse employment action.  And here's why.

19         First thing is, you -- first thing I want to do is

20  compare the adverse employment action of not getting an

21  interview with the adverse employment action of not getting

22  the job for which the interview exists.  And there is a

23  difference, because the difference between someone just

24  merely not getting an interview -- the difference between

25  interview/no interview can be ultimately immaterial because

1    the person might not have gotten the job anyway, and if that

2    were the case, there really would be ultimately no difference

3    in the terms and conditions of employment between getting the

4    interview and not getting it.

5           There's only a difference in the terms and

6    conditions of your employment if the discrimination is the

7    difference between not getting the job and getting the job.

8    That's what makes a difference in the terms and conditions of

9    employment.  And that's why an interview is not -- failure to

10   give an interview is not an adverse employment action.

11          Now, let's talk about case law in this particular

12   point because there definitely is some.  And as I sometimes

13   do, take the load off the law clerks, went and found it

14   myself because I think this is an interesting issue.  And

15   here's what I found.

16          There are two Sixth Circuit cases.  They're both

17   unreported.  In that sense, they're not binding, but they are

18   persuasive.  One is *Cook v. Caldera*, 45 F. App'x 371.  And

19   this case stands squarely for the proposition -- and I'll add

20   one caveat at the end, though -- that a plaintiff cannot show

21   that his failure to be selected as one of the 14 applicants

22   to be interviewed for promotion was an adverse employment

23   action.

24          Now, the caveat here is, well, gee, if there are

25   only a few other applicants rather than 14 other ones, could

1    that make a difference, could it be a bigger deal not to get

2    the interview?  I suppose so.

3         Also, could Cook have been really making a

4    judgment based on the facts of that specific case rather than

5    a broader rule that failure to get an interview for a

6    promotion is not an adverse employment action?  It's

7    possible, but I don't think so.

8         I think it's taking the position that the nature

9    of a failure to get an interview is such that it is not

10   independently a change in the terms and conditions of

11   employment and therefore is not an adverse employment action.

12        *Cook v. Caldera* was, on the one hand, sort of paid

13   homage in the case of Siegner, S-E -- excuse me --

14   *S-I-E-G-N-E-R v. Township of Salem*, 654 F. App'x 223.  It was

15   alluded to and, you know, cited as good law.  Then Siegner,

16   though, then notes that for retaliation claims, which has a

17   broader definition of adverse employment action than general

18   discrimination claims, the rule may be different.

19        And they were unprepared to say that in the

20   context of the broader definition of adverse employment

21   action for retaliation claims, that a failure to get an

22   interview could not be an adverse employment action.  But to

23   me, it leaves intact Cook's holding.

24        There's also a case out of the District of

25   Maryland that makes the point that I was focused on and it

 1  makes it point-blank:  *Hall v. Bausch & Lomb*, B-A-U-S-C-H,

 2  and Lomb, L-O-M-B.  Those from my generation will recall them

 3  as sort of the pioneers in, like, soft contact lenses.  So

 4  it's that company who is the defendant.

 5          In this case, the Court makes a very clear

 6  distinction because there, the plaintiff's counsel, unlike

 7  Mr. Bigelow, had taken the unwise approach of claiming only

 8  the failure to get the interview as the adverse employment

 9  action.  Did not claim failure to get the promotion that was

10  associated with this interview as an adverse employment

11  action.

12          And Hall citing Cook says this makes all the

13  difference saying that the law is that lesser interlocutory

14  or immediate decisions do not affect the terms or benefits of

15  a plaintiff's employment the way final decisions do.  And

16  they put this failure to grant an interview into that

17  category.  Of course, if you don't get an interview, you

18  can't get the job, and I do understand that.

19          But again, what changes the terms and conditions

20  of employment is the difference between not getting the

21  promotion and getting the promotion versus not getting the

22  interview and getting the interview.

23          The Court here also notes that it concludes:  By

24  choosing to contest only her non-selection for the interview

25  rather than her ultimate lack of promotion, Ms. Hall has

1  failed to demonstrate that she suffered an adverse employment

2  action.

3      And before that, the Court said:  Here, Ms. Hall's

4  failure-to-interview claim lacks such a tangible employment

5  action circumscribing her claim to focus only on the

6  company's decision not to interview her rather than its

7  decision not to promote her.  Ms. Hall fails to identify any

8  significant detrimental effect stemming from this

9  interlocutory decision.

10      And so what I'm saying is that -- I'm going to say

11  as a matter of law, on the law as I read it, failure to

12  interview does not itself constitute an adverse employment

13  action.  But Mr. Bigelow does have the failure-to-promote

14  claim that he can assert before the jury.

15      Failure to interview is obviously part of the

16  process of failure to promote.  But they are different, and

17  Mr. Bigelow will need to proceed under failure to promote and

18  not failure to interview.

19      So that's one thing.  All right.  The --

20      **MR. BIGELOW:**  Your Honor?

21      **THE COURT:**  Yes, sir.

22      **MR. BIGELOW:**  May I address it just for a second?

23      **THE COURT:**  Yep.

24      **MR. BIGELOW:**  Just in the category of for what it

25  is worth, and I did not bring this to the Court's attention

1   and I probably should have.  Under Proposed Jury Instruction

2   No. 6, you may or may not have -- and it's not going to

3   obviously trump anything you just said.

4           THE COURT:  Sure.

5           MR. BIGELOW:  But I did include two cases that

6   have allowed for the failure to interview, one being

7   *Aboubaker v. County of Washtenaw*, which is out of the Eastern

8   District of Michigan.  It's just a non-published case.  And

9   the only reason I say is this because we talked about it a

10  couple days ago.

11          THE COURT:  Sure.

12          MR. BIGELOW:  And the second is *Drews v. Social*

13  *Development Commission* which is out of the Eastern District

14  of Wisconsin.  Frankly, that case was super convoluted and

15  just made things -- made things difficult.  It allowed it.

16  The Court ultimately allowed it and they had some twisty kind

17  of reasons as to what ultimately happened and how the -- how

18  a jury calculated it.  But just kind of for a --

19          THE COURT:  Sure.

20          MR. BIGELOW:  I didn't just come up with it and

21  drop the ball.

22          THE COURT:  Well, you know, I mean, I think -- you

23  know, I -- and I do understand that.  And even without the

24  case citations, it's good that you cite a case for that.

25          You know, the fact that the Sixth Circuit says we

1  can't say it wouldn't apply in the retaliation context would

2  tend to indicate it's not the most ridiculous assertion, even

3  in the general discrimination context.

4       And again, you know, there's not Sixth Circuit

5  case law that's binding on point, but the nonbinding

6  authority, which I think is sound, particularly given the

7  definition of adverse employment action, you know, it's

8  something that effects a material change in the terms and

9  conditions of employment.  The difference between getting the

10  promotion and not does that.  The difference between getting

11  an interview and not, I would say, really doesn't.

12  Retaliation context, it's broader, and that's why I think the

13  Siegner case came out the way it did.

14       But understanding that you had -- you know, you

15  had some cases that sort of support your position, I'm not

16  sure if they were exclusively in the general discrimination

17  context or not, but certainly if they were, you know, you

18  weren't pulling out of thin air, and I understand that.

19       The next thing that I want to talk about is this.

20  The revised proposed verdict form then talks about, you know,

21  pay being withheld and also talks about, you know, him --

22  Dr. Jara receiving more credit hours to teach.  So those are

23  two additional assertions of adverse employment action.

24       What's the defendant's position on whether those,

25  as a matter of law, would constitute adverse employment

1    action, or are you disputing that they are, at least in this

2    case?  Because like this jury, the way the questions are

3    written, this assumes that they are.

4              **MR. DALTON:**  I agree, the way it is written.  I

5    would -- I believe defendant would dispute that those are, in

6    fact, adverse actions.

7              **THE COURT:**  Because you would -- I mean, you

8    realize that docking someone's pay is an adverse employment

9    action, but you might say, well, withholding pay may not

10   be -- like withholding pay for -- you know, I don't know if

11   the proof will show one paycheck or whatever.  But you're

12   saying that that would not be substantial enough to qualify?

13             **MR. DALTON:**  That's correct, Your Honor.  It

14   amounted to -- and I think the proof will show -- there was a

15   delay in payment, but it was not withheld indefinitely.

16             **THE COURT:**  Okay.  All right.  So one of the

17   things is, I think if it's disputed -- and, you know, I think

18   it's reasonable to dispute it.  I don't think it should be

19   built in via an assumption into the question that it is.  And

20   it is.  That's how these questions are written.  Not to say

21   that Mr. Bigelow can't rely on them.  I mean, he's allowed to

22   argue them to the jury, Mr. Dalton?

23             **MR. DALTON:**  Oh, he certainly can argue.

24             **THE COURT:**  Argue that they are adverse employment

25   actions.

1    So it seems to me, Mr. Bigelow, what we have is

2  three adverse employment actions here, right: failure to

3  promote, we have receiving more credit hours to teach, and

4  that withholding of pay.  Those three, right?

5    **MR. BIGELOW:**  Yes, Your Honor.

6    **THE COURT:**  Now, I did some research also on sort

7  of the issue of adding work to an employee.  And the Sixth

8  Circuit case law, it's a little bit all over the place on

9  this if you ask me.  But I think if you distill the case law,

10  it says, look, adding more work, like just more things to do,

11  is not a change in the terms or conditions of employment.

12  But adding more hours, more total cumulative hours to work,

13  would or could be.

14    Is the evidence here going to show that, well,

15  unlike some cases where someone's actually given more to do,

16  it actually doesn't increase the total number of hours.

17  Think about, let's say there was a security guard sitting at

18  the front desk.  And he or she just kind of sits there and

19  watches the door.  Then the employer says, well, you know, we

20  want you to get up and walk the halls.  That's actually more

21  to do, but it doesn't increase the total number of hours of

22  their eight-hour shift.

23    It's that sort of thing where the Sixth Circuit

24  would say, look, that's not a change in the terms or

25  conditions of employment.  It's not a big deal to have to now

1  walk around.  You don't increase the total number of hours.
2  And it's certainly not additional work outside the scope of
3  your original job as a security guard.

4  In your case, is the evidence going to show that
5  by having more credit hours to teach, there was actually more
6  hours of work done by Dr. Jara?

7  **MR. BIGELOW:**  What we're going to show, Your
8  Honor, is that by adding more hours for Dr. Jara and other
9  foreign-born professors, it diminished their options for
10  advancement which, of course, is an adverse employment action
11  under Title VII.

12  It didn't necessarily mean -- necessarily it meant
13  that they had less hours because, of course, being a
14  professor is a salaried position, it's a total different
15  deal.

16  **THE COURT:**  Yeah.

17  **MR. BIGELOW:**  But it's the equivalent of saying to
18  an associate in a law firm:  "Hey, you don't ever get to talk
19  to clients.  You don't ever get to do anything.  Go in this
20  room and tell me when these words are on pieces of paper and
21  highlight it and hand it to me."  Well -- which, that's the
22  argument.  "It's going to be really hard for you to make
23  partner, and if you make partner, it's going to be really,
24  really hard for you to make equity partner."

25  That's the argument is that by saying to the

1  foreign-born professors, "Hey, you have 12 hours of classes."
2  That gives significantly less opportunity for them to do
3  really important things like get grants, write publications,
4  do things like that.
5       THE COURT:  All right.
6       MR. BIGELOW:  I mean, I could kill more credit
7  hours.  I could say more likely than not that his national
8  origin was a motivating factor in diminished options for
9  advancement.
10      THE COURT:  Sounds like that's more your theory,
11  and him giving more credit hours is part of why you say he
12  had diminished options.
13      MR. BIGELOW:  Yes, Your Honor.
14      THE COURT:  Yeah.  All right.  I could comment
15  more about this proposed jury verdict form and also the
16  defendant's, or -- I want counsel's thought on this -- could
17  we not just really ask the question whether there was what
18  I'm calling general discrimination on the basis of national
19  origin and the parties just argue it rather than trying to
20  break it out?  I think I probably could break it out.
21      But would either side feel prejudiced that, you
22  know, the question for them is, was there discrimination.
23  They'll be instructed as to what that means, the three
24  elements.  Not going to be a dispute about at least the first
25  one.  And then there's an argument about the other two

1    elements with respect to each adverse employment action. But

2    the jury question just asks about discrimination.

3           On balance, I'm thinking maybe that's the way to

4    go, but what do you think, Mr. Bigelow?

5          **MR. BIGELOW:**  Frankly, Your Honor, I did this

6    because the Court invited it.

7          **THE COURT:**  Well, it's been --

8          **MR. BIGELOW:**  And I actually like this.  You kind

9    of convinced me that this is the route to go as opposed to

10    just, here are two questions, which is why I like it broken

11    down -- which is why I like it broken down like this.

12          I think if we change the -- obviously No. 1 is

13    gone, which, you know, is the ruling.  If we change it to the

14    not getting promoted and then, second to that, instead of

15    saying received more credit hours, diminishing options for

16    advancement, which is clear under Title VII is allowed, that

17    could be what -- you know, that seems pretty clear, and I

18    like the fact that it's broken down.

19          And then as a third option, I do think that -- I

20    mean, I could be more clear as to his pay being withheld, but

21    I would suggest in any line of work, when people's pay is

22    withheld, that's an adverse employment action.

23          **THE COURT:**  Well, I think you probably argue it,

24    you know, to the jury, you know, "Hey, here's the definition,

25    and wouldn't you agree that this sounds like a change in the

conditions of employment?"  Because the conditions are you get paid X date and he got paid Y date, and this is a material change, so I think you can argue it.

Part of the reason I suggested doing this was to help clarify things, and it's certainly served that function.

I'm not against breaking it out by adverse employment action.  I think both sides get something out of it, doing it that way.  But, you know, it means, you know, it's a more complicated verdict form.  I will draft a proposal consistent with this, but it's going to have to reflect the fact that except for failure to promote, the element of adverse employment action is disputed on these options.  Right?

**MR. BIGELOW:**  Yes, Your Honor.  And honestly, with Question No. 1 being knocked out, all it is, is four questions.  So we're not talking about, you know, 15, 20, 30 questions.  There are only four questions.

**THE COURT:**  All right.  Understood.

All right.  Mr. Dalton, you know, to an extent in your revised version, sort of like your first one, you had sort of done likewise.  You know, in at least one place, you had broken out an adverse employment action separate: Failure to appoint him, that's Question 3, to the chair position.  So in that sense, you broke it out, an adverse employment action separately.

1      But in Question No. 1., you actually asked the

2  question -- excuse me, Question No. 2., you asked the

3  question in the broad way that was not broken out by adverse

4  employment action.

5      Question No. 1 -- I think I might have touched on

6  this earlier -- I don't know that -- whether plaintiff was

7  the best qualified candidate is appropriately asked as a

8  separate question.

9      My question to you, rather than going through all

10  that individually is:  What about the possibility of me

11  proposing a jury verdict form that is based on adverse

12  employment action by adverse employment action?

13      **MR. DALTON:**  Yes, Your Honor, defendant would be

14  open to that.  I do think, given we have the issue of two --

15  potentially two separate types of damages, which will be

16  compensatory and back pay, that there does need to be some

17  distinction made as to the specific findings of the jury as

18  to if they were to find discrimination, discrimination in

19  what area.

20      **THE COURT:**  Uh-huh.  I think that makes sense.

21  I'll try and craft a verdict form that, you know, is along

22  the lines of what we just discussed that's fair to both

23  sides, not prejudicial, includes some language in the jury

24  instructions that would account for this as well.

25      And that way, it will be sort of, you know, keep

everyone focused on what the alleged adverse employment actions are. It will help tie, you know, I think, damages to particular claims. I think it's a good idea, and I'll make a proposal and then, of course, counsel can comment on it and can, you know, approve of it or object to it or whatever. So we'll do it that way.

All right. Next thing: On the summaries of the case, the thing I wanted to note was this: I'm assuming that these were shared with each other and there are no objections; is that right? Counsel share the statements with each other? Summary of the case to be read to the jury?

**MR. BIGELOW:** Your Honor, I don't -- I think that we shared the initial, but I don't believe we shared the new filings. That's just an oversight. But we did obviously share the initial theories, but when the Court asked that I change some of it to make it kind of more in tune with what -- per the Court's instructions, I just filed that frankly.

**THE COURT:** All right.

**MR. BIGELOW:** My apologies.

**THE COURT:** All right. And I thought I had said to share it. Maybe I wasn't clear or whatever.

But let me ask you, Mr. Dalton, any objection to the plaintiff's proposal there?

**MR. DALTON:** No, Your Honor, and I think what

```
1    Mr. Bigelow stated is correct as to the sequence of that.
2    But no objection.
3              THE COURT:  All right.  Then thank you.
4              Mr. Bigelow, any objection to the defendant's
5    theory?
6              MR. BIGELOW:  No, Your Honor.  Thank you.
7              THE COURT:  All right.  The second paragraph that
8    you have, Mr. Bigelow, I think there's an issue in the second
9    sentence because I think you're going back and forth between
10   the passive tense and the active.  I would rephrase that
11   second sentence to avoid confusing the jury in terms of the
12   defendant allegedly, of course, discriminating against
13   Dr. Jara in a number of manners, and then frame everything in
14   terms of what the defendant did.
15             As it is right now, if you look, you say:  "And
16   that he was discriminated against in a number of manners
17   including but not limited to being asked," so that's in the
18   passive voice.  It's talking about without saying whose --
19   let me frame it this way:  If you look at the sentence
20   structure:  "Defendant discriminated against him in a number
21   of manners including but not limited by."  Sentence structure
22   says we need to talk about what the defendant did to the
23   plaintiff, not in terms of what was done to the plaintiff.
24             So -- or let's back up and look at your original
25   sentence structure.  "That he was discriminated against in a
```

1  number of manners," is what you wrote, "including but not

2  limited by being asked to take an Oral English Proficiency

3  screening." Okay. All right. He was discriminated against

4  in that manner. But then you say "failing to pay him." We

5  need to switch to the active voice. "He was discriminated

6  against by failing to pay him." Do you see what I'm saying?

7          So I was -- I've handwritten some changes to

8  phrase everything you have exactly as it is except putting it

9  all in the passive voice about what defendant allegedly did

10 to the plaintiff rather than what kind of happened to the

11 plaintiff. Does that make sense?

12          **MR. BIGELOW:** My parents, who were both teachers,

13 would be ashamed of me, but yes, that makes sense, Your

14 Honor.

15          **THE COURT:** All right. Well, thank you. You

16 would not be the first, Mr. Bigelow, to go back and forth

17 between active and passive voice.

18          I was a little concerned, though, because when

19 this is read, the jurors are going to be new to the case, so

20 if I was to say that he was discriminated against in a number

21 of manners including, dot, dot, dot, failing to pay him, they

22 may be like, well, who is doing the failing? Did this happen

23 to the defendant or was he the one failing, that sort of

24 thing.

25          All right. I'm going to proceed accordingly.

1      We will get you a proposed revised verdict form
2  and jury instructions which, we needed this discussion before
3  we propose a draft jury instruction, but I'm aiming for first
4  thing tomorrow.

5      All right.  As far as I'm concerned, we've gone
6  much later than I thought.  I always try and estimate how
7  long this sort of thing might take, but we could take a
8  break, call the jury up, and we'll start with the jury, and
9  we'll proceed with voir dire as I had mentioned earlier.

10      Anyone have anything else before we break?  No?

11      **MR. BIGELOW:**  Your Honor, and my guess is I hate
12  to stand up and make an argument that I have a feeling will
13  be summarily dismissed, but I have to ask.  The more I've
14  gotten into voir dire and kind of a lot of the intricacies of
15  this case, is there any way that the Court would allow an
16  additional just 30 minutes for each side?  At 30 minutes,
17  it's going to be really, really hard to parse the feelings of
18  a jury with regards to a national origin case.

19      **THE COURT:**  So you want 33 minutes?

20      **MR. BIGELOW:**  No, an additional 30 minutes.

21      **THE COURT:**  Oh, I thought you said an additional
22  three.

23      **MR. BIGELOW:**  To go from 30 to an hour each.

24      **THE COURT:**  Boy, an hour --

25      **MR. BIGELOW:**  Or even 45.  Just, I feel as though

1  half an hour is going to be a tough way to get people's

2  feelings on an issue that is a difficult issue for some

3  people, frankly.

4          **THE COURT:** I'll make you a deal. We're going to

5  go 30 minutes. If you can persuade me after 30 minutes that

6  you need more time -- and maybe you won't -- then I'll

7  consider it.

8          **MR. BIGELOW:** Thanks, Judge.

9          **THE COURT:** Fair enough?

10         **MR. BIGELOW:** Fair enough.

11         **THE COURT:** All right. We'll do it that way.

12 We'll call up the jury. We'll take a . . .

13         All right. Figuring out how long it makes sense

14 to take a break for. We'll say ten minutes, and we'll go

15 from there.

16         All right. Thank you. We stand in recess.

17         (Recess 9:56 a.m. to 10:10 a.m.)

18         **THE COURT:** All right. We're going to call in our

19 venire, and we will go from there.

20                       *   *   *

21         *(WHEREUPON, a jury was impaneled. Transcription*

22 *was not requested. When and if transcribed, jury selection*

23 *will be Volume I-A.)*

24                       *   *   *

25         (WHEREUPON, the jury was excused from the

1  courtroom, with matters being heard in open court as

2  follows:)

3          **THE COURT:**  All right.  Thanks, counsel.

4          You may be seated.

5          All right.  If we have any additional matters, we

6  can take them up when we return.  Anything that occurs to

7  anyone prior to going to instructions and opening statement?

8          **MR. BIGELOW:**  Nothing from me, Your Honor.

9          **THE COURT:**  Mr. Dalton?

10          **MR. DALTON:**  No, Your Honor.

11          **THE COURT:**  All right.  Very well.  No one needs

12  to stand as I leave, but I'm going to leave the bench.

13  You're welcome to keep, of course, everything here, and we'll

14  see you about, let's say, 1:15.

15          (Lunch recess 12:18 p.m. to 1:21 p.m.)

16          **THE COURT:**  All right.  Do we have any preliminary

17  matters we need to take up?

18          **MR. BIGELOW:**  Nothing from the plaintiff, Your

19  Honor.

20          **MR. DALTON:**  Your Honor, for defendant, first we

21  want to make clear we wish to invoke the rule for purposes of

22  the trial.

23          **THE COURT:**  All right.

24          **MR. DALTON:**  And I'm -- this is not going to work.

25  You know, when Mr. Bigelow mentioned he wanted to use a

1    whiteboard for the -- his opening with the jury, he mentioned

2    one, not three.  This blocks our view of the jury, and we

3    cannot -- we're not going to be able to see what he's

4    writing.

5            **THE COURT:**  Well, you bring up an interesting

6    point, Mr. Dalton.  I don't know as I've ever seen three

7    different things on easels blocking opposing counsel's view.

8            What's the response to that?

9        **MR. BIGELOW:**  Two responses, Your Honor.  First

10   is, whether it was -- whether it was one or three, defendant

11   would still have the same view, which is none.

12           Second, defense counsel is more than welcome to

13   sit on over here and watch what I do.  I have no issue with

14   that whatsoever if that's the issue.

15           **THE COURT:**  Well, I understand that that can be a

16   remedy.  On the other hand, tends to make opposing --

17   honestly, it tends to make opposing counsel look sort of like

18   lackeys when they do that.  And I'm not even being facetious

19   about that.  That's my concern, you know, just have to -- you

20   just kind of have to sort of make do or sort of schlep over

21   there.  I am a little concerned about that.

22           Is there any way you can put it in the corner over

23   there?  Put those three over in the -- slant them that way?

24           **MR. BIGELOW:**  Yeah, I could do that if you'd like,

25   Judge.

1          **THE COURT:**  You know, I think that, you know, that

2      if you want to take a minute, satisfy yourself that you can

3      move them that way, you know, have them propped so that

4      generally speaking, opposing counsel can see them when you

5      write on them.  I mean . . .

6          **MR. BIGELOW:**  I'm not sure how -- I suppose I

7      could do that and then they could see them, Your Honor.

8          **THE COURT:**  Yeah, I think -- you know, it doesn't

9      have to be pointed to them, but if it's just sort of tilted

10     enough, you know.  I don't want to get too hung up on the

11     difference between one and three as long as counsel can see,

12     but I do want them to be able to see.

13         Do you really think you need three?

14         **MR. BIGELOW:**  I do.

15         **THE COURT:**  All right.

16         **MR. BIGELOW:**  Does that work, Judge?

17         **THE COURT:**  Yeah.  I think you can see that,

18     right?  That wouldn't block your view, Mr. Dalton, right?

19         **MR. DALTON:**  Yes, Your Honor.

20         **THE COURT:**  Okay.  All right.  Let's do that.

21         Regarding the rule, you know, I'll say it now,

22     I'll say it later, just a general announcement to the

23     courtroom.  If you are here scheduled to testify or expected

24     to testify as a witness, please depart the courtroom at this

25     time.  And counsel should be in a position to -- and be

1  expected to police the rule, as they will know better than I
2  who in the courtroom might be one of the persons expected to
3  testify.
4           All right.  Anything else, Mr. Dalton?
5           **MR. DALTON:**  No, Your Honor.  Thank you.
6           **THE COURT:**  All right.  Mr. Bigelow?
7           **MR. BIGELOW:**  Nothing from me, Judge.
8           **THE COURT:**  All right.  Then we'll call in the
9  jury, and we'll go from there.  Thank you.
10          (Respite.)
11          **THE COURT:**  May be a minute while we retrieve the
12  jury.  One of the things that we're dealing with here is, due
13  to a heavy training schedule today for courtroom security
14  officers, Ms. Jackson is having to do double duty.  It's not
15  quite the court security help to help move jurors from where
16  they need -- where they are to where they need to go, and so
17  that's slowing us down a little bit.  Nothing we can really
18  do about it.
19          Mr. Bigelow, any further estimate or additional or
20  different estimate on the length of any opening?  30 minutes?
21  Is that what you're thinking?
22          **MR. BIGELOW:**  Yes, Your Honor.
23          **THE COURT:**  Something like that?
24          **MR. BIGELOW:**  Hopefully less.  I surprised myself
25  and got voir dire done in 30, so . . .

1          THE COURT:  You did, on the nose.

2          Mr. Dalton, same estimate for you which was

3    certainly no more than 30 minutes, as I recall?

4          MR. DALTON:  Oh, that would be quite adequate,

5    yes.

6          THE COURT:  All right.

7          MS. CARTER:  Judge, while we have a minute, I

8    don't know which exhibits Mr. Bigelow will get to today, but

9    we had raised an issue about the fact that some of the

10   exhibits have reference to retaliation in them, and, of

11   course, that's not a claim that continues to exist.

12         THE COURT:  All right.  What is the response to

13   that, Mr. Bigelow?

14         MR. BIGELOW:  I don't believe any of the exhibits

15   that I will ultimately ask to be entered into evidence have

16   any reference to retaliation.

17         THE COURT:  All right.  Then here's what I'll do.

18   When an exhibit is offered, I'll ask, "Any objection?"  If

19   you need to take a minute to satisfy yourself on that point,

20   then please do so.  And if there is an objection because you

21   think that that objection or, for that matter, any other

22   objection is raised, we'll take it up.

23         MR. BIGELOW:  Opposing counsel had asked that I

24   redact -- there's, I think, only one exhibit that we intend

25   to enter into evidence that has the word "retaliation," and

```
 1   they asked that I redact that word, and I did just that.  And
 2   it's in there.  It's --
 3              THE COURT:  Perfect.  In your copy?
 4              MR. BIGELOW:  Yeah, it's in their copy as well,
 5   yes, Your Honor.  It's in Exhibit 7.
 6              MS. CARTER:  Okay.  I'm -- I'm looking at
 7   Exhibit 10.
 8              MR. BIGELOW:  Oh.  I'm not going to enter 10, so
 9   there's no worry.
10              THE COURT:  So while we have a minute, do you have
11   any preliminary thoughts, Mr. Bigelow, about whether you have
12   any objections to defendant's designation of excerpts from
13   Dr. Jackson's deposition?
14              MR. BIGELOW:  I have no objection, Your Honor.
15              THE COURT:  Okay.  All right.  It's good to know
16   for when we reach that point.
17              MS. CARTER:  Thank you, Judge.
18              THE COURT:  Thank you, Ms. Carter.
19              MR. BIGELOW:  One small point, Your Honor, and I
20   believe that this was already agreed upon, is that we,
21   neither plaintiff nor defendant, to confuse the jury is going
22   to offer anything about why Dr. Jackson is not here.
23   Correct?
24              THE COURT:  Yeah.  My impression was, of course,
25   that everyone's agreed that the unavailability piece of this
```

1    is satisfied.  I don't think I need to say anything about

2    that except to say, hey, testimony can be offered -- under

3    certain circumstances, testimony can be offered by

4    deposition, and you should treat the testimony as if it was

5    coming straight from this witness stand, that kind of thing.

6            Did you plan to put someone up on, like, the Q&A,

7    read the Q and then the A?

8            **MR. BIGELOW:**  I was just going to read it in, Your

9    Honor, if that's all right.

10           **THE COURT:**  You can do it whichever way you like.

11   Just be clear what is the question and what's the answer.

12   You can read it yourself:  Question, Answer, if you want to

13   do it that way.

14           **MR. BIGELOW:**  Absolutely.

15           **THE COURT:**  And, you know, this would sound like

16   a -- you know, it would sound like a picky point, but

17   sometimes it's not.  You know, inflection that meets -- and I

18   don't think it will be an issue in this case, but sort of

19   inflecting the testimony in a way that's a little bit slanted

20   is something we want to avoid.

21           **MR. BIGELOW:**  So the surprise thing, I shouldn't

22   say, "I was shocked"?

23           **THE COURT:**  Yeah.

24           **MR. BIGELOW:**  Okay.  I won't do that.

25           **THE COURT:**  Yeah.  I mean, a little bit of that

1  can be appropriate to sort of match what's being said, but

2  I've seen it be abused.

3          **MR. BIGELOW:**  I'm with you, Judge.

4          **THE COURT:**  Yeah.  I would imagine that, you know,

5  Dr. Jackson's testimony was, in terms of the manner in which

6  it was presented, probably fairly dry anyhow.

7          **MR. BIGELOW:**  That's a good guess, Your Honor.

8          **THE COURT:**  Fair to say?  All right.

9          (WHEREUPON, the jury re-entered the courtroom,

10  with matters being heard in open court as follows:)

11          **THE COURT:**  All right.  Thanks for your continuing

12  service, folks.  And I told you a little bit about how we'll

13  proceed.  But as I indicated, the next step is to give you

14  some preliminary instructions about how to serve as jurors.

15  This will help guide you in your participation in the trial.

16          I'm going to talk about the duties of the jury.

17  And as jurors, it will be your duty to find from the evidence

18  what the facts are.  You and you alone will be the judges of

19  the facts.  You will then have to apply to those facts the

20  law as the Court will give it to you.  You must follow that

21  law whether you agree with it or not.

22          Nothing the Court may say or do during the course

23  of the trial is intended to indicate or should be taken by

24  you as indicating what your verdict should be.

25          The evidence from which you will find the facts

will consist of the testimony of witnesses, documents, and other things accepted by this Court as exhibits, and any facts that the parties have agreed to or, in other words, stipulate to, or that this Court may instruct you to find.

Certain things are not evidence and must not be considered by you. I will list them for you now. First, statements, arguments, and questions by lawyers are not evidence.

Second, objections to questions are not evidence. Lawyers have an obligation to their clients to make objections when they believe evidence being offered is improper under the rules of evidence.

If the objection is sustained by me, ignore the question. If it is overruled, treat the answer that comes like any other.

If you are instructed that some item of evidence is received for a limited purpose only, you must follow that instruction, meaning you must consider it only for the limited purpose identified by the Court.

As you may know from TV or books or prior jury service, the way our system works at trial is that the parties offer evidence by either asking that an exhibit be admitted into evidence or by asking a question they hope will generate evidence in the form of an answer from the witness.

When the lawyer for one side offers evidence in

1  this way, the lawyer for the other side may object to the

2  offer of evidence or may not object.  If there is no

3  objection, typically the evidence is accepted by the Court.

4  The term used is that the evidence is admitted.

5         So we say an exhibit or a witness's answer is

6  admitted into evidence, but if an objection is made, the

7  Court must decide whether to sustain the objection and,

8  therefore, exclude the evidence rather than admitting it.

9         Testimony or an exhibit that the Court has

10  excluded or told you to disregard is not evidence and must

11  not be considered.  In fact, ideally the Court would stop you

12  from ever seeing or hearing this evidence so that there would

13  be nothing for you even to consider.  But if you have gotten

14  a sense of the substance of evidence that I'm excluding, you

15  should disregard and not consider it.

16         Anything you may have seen or heard outside the

17  courtroom is not evidence and must be disregarded.  You are

18  to decide the case solely on the evidence presented here in

19  this courtroom.

20         There are two kinds of evidence: direct and

21  circumstantial.  Direct evidence is direct proof of a fact

22  such as the testimony of an eyewitness.  Circumstantial

23  evidence is proof of facts from which you may infer or

24  conclude that other facts exist.

25         I will give you further instructions on these as

well as other matters at the end of the case.  But keep in mind that you may consider both kinds of evidence.  During the trial, you may hear the terms "deposition" and also perhaps "interrogatory."  A deposition is the testimony from a witness taken under oath at a previous time.  Certain deposition testimony may be admitted into evidence and read to you or played on video.

Interrogatories are written questions asked by one party that are answered by another party under oath.  Certain interrogatory answers also may be admitted into evidence.  It will be up to you to decide which witnesses to believe, which witnesses not to believe, and how much of any witness's testimony to accept or reject.  Based on your consideration of the testimony, you may believe all, some, or none of a witness's testimony.  This is for you to decide.  I will give you some guidance for determining the credibility of witnesses at the end of the case.

Let's talk about burden of proof.  This is a civil case.  The plaintiff has the burden of proving his case by what is called a preponderance of the evidence.  That means that the plaintiff has to produce evidence which, considered in light of all the facts, leads you to believe that what the plaintiff claims is more likely true than not true.  To put it differently, if you were to put the plaintiff's and the defendant's evidence on opposite sides of the scales, the

plaintiff would have to make the scales tip somewhat on his side, even if only very slightly. If the plaintiff fails to meet this burden, the verdict must be for the defendant.

Those of you who have sat on criminal cases, although I suppose we may not have had any on this particular group, may have heard of proof beyond a reasonable doubt. That requirement does not apply to a civil case. The requirement here is preponderance of the evidence. Therefore, you should put the beyond-a-reasonable-doubt standard out of your mind.

So I want to say a couple of things about what you found in your chair. Looks like you have been provided a folder there that has a notebook and a writing implement, and these are for your use to take notes if you wish to do so.

One thing about taking notes: They are really used, if they are used, as a memory aid for you. Taking notes is appropriate to refresh your recollection at the end of trial about what witnesses said or didn't say, and this is important because you won't have a written transcript of what witnesses said. You'll have to remember it. Notes can aid you in remembering such things.

But it's important to keep in mind that the notes are not the evidence; rather, they are an aid to you to help your memory, and you need to be guided by your memory and rely on your memory as refreshed by notes, if you take notes,

1 as to what the witnesses said.

2        At the conclusion of each day of trial, please

3 place your notes and anything else that may be given to you,

4 although we may not have anything else in the folder, and put

5 them in the jury room when you leave. And remember, your

6 notes are only for your own personal use. There is a --

7 intended as an aid to refresh your own memory.

8        If it happens that for some reason, you are unable

9 to hear or perhaps even see a witness for some reason, please

10 raise your hand and let us know, and we'll resolve the issue.

11        So the trial is about to begin, and here's how

12 it's going to proceed. First, each party can make an opening

13 statement. An opening statement is not evidence or argument.

14 The purpose of an opening statement is for counsel to explain

15 to you what he thinks the evidence will show in this case.

16        So it's sometimes described as counsel's roadmap

17 for what the evidence will show. Its purpose is not to

18 present evidence or argue anything to you again. It's

19 supposed to be a description of what they believe the

20 evidence will show.

21        Then, after opening statements, the plaintiff will

22 present his witnesses, and the defendant then may

23 cross-examine each plaintiff's witness.

24        After that, the defendant has the option of

25 presenting its witnesses, and then the plaintiff's counsel

1   may cross-examine the defendant's witnesses.  The way our

2   system works, since the plaintiff has the burden of proof,

3   the plaintiff does have an opportunity, if he wishes to do

4   so, to then have another round of witnesses called rebuttal

5   witnesses to respond to what the defendant put on.

6          Then after all the evidence is in, the attorneys

7   will make their closing arguments to summarize from their

8   perspective what the evidence showed and then to make

9   argument to you as to what your verdict should be based on

10   the evidence and the applicable law.

11          Then you'll be excused to begin your deliberations

12   after I do give you instructions about what the law is.

13          So that's how we will proceed.

14          At this time, Mr. Bigelow, are you ready to

15   deliver your opening statement?

16              **MR. BIGELOW:**  Yes, Your Honor.

17              **THE COURT:**  All right.  You may proceed.

18              **MR. BIGELOW:**  Thank you, Your Honor.

19              **THE COURT:**  One thing we'll want to do, it occurs

20   to us, Mr. Bigelow, before we begin opening statements,

21   certainly before testimony but we'll do it before opening

22   statements:  Let's have our jurors stand and raise their

23   right hand, and we will give them their separate oath as

24   sitting jurors.

25          It's a little bit different from the oath you gave

1    when we gave it to you earlier because now you are the

2    sitting jurors deciding this case.

3            Thank you.

4            (WHEREUPON, the jury panel was sworn.)

5            **THE COURT:**  Thank you.

6                          *   *   *

7            ***(WHEREUPON, opening statements were given by***

8    ***counsel for the parties.  Transcription was not requested.***

9    ***Further proceedings were had, as follows:)***

10                          *   *   *

11           **THE COURT:**  All right.  Thank you, Mr. Dalton.

12           Okay.  The rule has been invoked.  Looks like

13   everyone is okay with it at each counsel table.

14           All right.  Mr. Bigelow, if you would wish to call

15   your first witness.

16           **MR. BIGELOW:**  Yes, Your Honor.  I would call to

17   the stand Dr. Jara.

18           **THE COURT:**  All right.  He may come forward.

19           (The witness was sworn.)

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

```
 1                      *    *    *
 2                   PATRICIO JARA,
 3   was called as a witness, and after having been first duly
 4   sworn, testified as follows:
 5                   DIRECT EXAMINATION
 6   QUESTIONS BY MR. BIGELOW:
 7   Q.     Good afternoon, Dr. Jara.
 8   A.     Good afternoon.
 9   Q.     How are you, Patricio?
10   A.     Good.
11   Q.     Good.
12   A.     Doing good.
13   Q.     If you would, could your introduce yourself to the
14   jury.
15   A.     Good afternoon.  My name is Patricio Jara.  I was born
16   almost 50 years ago in Chile.  I been doing mathematics ever
17   since I went to college.  My mom got me through it.  I got a
18   full tuition award to do my master's degree.  I got a
19   master's degree.
20         I came to the United States about 20 years ago, and I
21   got a teaching assistant position at LSU.  I went for my
22   Ph.D.  I got my Ph.D.  And then during this time, I was
23   instructor and a teaching assistant three, four different
24   universities.  And then once you get your Ph.D., then you can
25   apply to a professor position which I did.
```

1    And then I got a tenure track position at TSU.  Came to

2  Nashville, met my wife.  We have a family.  We got grown kids

3  and 5-years-old twins that they had the best day of their

4  life yesterday because next year, I'm going to have to start

5  wearing a costume.  They were disappointed that I wasn't

6  wearing a costume, so I guess from now on, I have to do that.

7    And, yeah.  That's about me.

8  Q.    And when did you start working at TSU, Professor?

9  A.    I started in 2009, August 2009.

10 Q.    You said you had received your Ph.D.; is that correct?

11 A.    Yes.

12 Q.    And you got it at LSU?

13 A.    Yes.

14 Q.    In case someone doesn't -- can you explain what a Ph.D.

15 is?

16 A.    Well, it depends in the area that you're getting, but

17 usually mathematics, in order to get a Ph.D., you obviously

18 need a certain minimum amount of hours.  Then you gotta pass

19 what is called a general exam which is grilling in front of

20 five professors for two or three hours, that they can ask you

21 anything about whatever class you've been taking.

22    After that, you're qualified sort of to start doing

23 some original research.  And the standard, usually

24 mathematics, even though over the last years, that standard

25 has been going down a little bit in certain cases, usually is

1    to prove, make a significant contribution to the area.  And

2    usually, the way that's measured is by having a publication,

3    an original result, something that nobody has ever done, and

4    you get it published.

5    Q.    And were you teaching at LSU while you were getting

6    your Ph.D.?

7    A.    Yes.  I was -- like I say, I was -- I'm originally from

8    Chile, and I got a teaching assistant position.  So every

9    department with a Ph.D. program which has a lot of students,

10   they usually have a small amount of what they call teaching

11   assistant positions which is sort of like instructor

12   positions, but they call them teaching assistants because not

13   only you are required to teach, but you're also required to

14   be a student.  So you're a teaching assistant.

15        And during that time, usually what happens is

16   obviously, a university, especially with foreign students, in

17   which case mathematics department all over the United States

18   is a very, very, very diverse environment.  You get to meet

19   people from all over the world.  And in that case, there are

20   requirements.  The university makes sure that you have to

21   satisfy some English requirements, that you pass these

22   courses, because you are from abroad, right?  So they make

23   sure that you satisfy those English requirements.

24        And I lost track.  Where were we?

25             THE COURT:  Yeah, maybe break these questions down

1    a little bit more.

2              **MR. BIGELOW:**  Absolutely.

3    **BY MR. BIGELOW:**

4    Q.    Can you tell the jury what your thesis was for your

5    Ph.D.?

6    A.    Russian approximation schemes for the abstract culture

7    problem.

8    Q.    Okay.  I won't ask you what that is, but it's -- that's

9    beyond me.

10         So what was your position that you were initially hired

11   for at TSU?

12   A.    I was hired as an assistant professor.

13   Q.    And have you ever been promoted?

14   A.    Yes.  I was promoted to associate professor.

15   Q.    And did you ever receive raises?

16   A.    I received one merit-based raise from that promotion,

17   and the rest of the raises have been the cost-of-living

18   raises that happen across the board.

19   Q.    What courses did you originally start teaching at --

20   when you started as TSU?

21   A.    I started the -- the director at the time, Dr. Sandra

22   Scheick, brought me and a group of professors because they

23   wanted to increase the number of the students in the graduate

24   program.  They actually have gotten a big grant at the time.

25   It was a million-dollar grant, and then they wanted to start

1    increasing the numbers of graduate students.

2         The very first semester I got there, they give me basic

3    courses after I guess I passed the -- paid my dues or

4    whatever.  They immediately put me to teach more advanced

5    courses including graduate courses.

6    Q.    Do you like teaching upper-level courses?

7    A.    Absolutely.  That's what we -- that's what we do for a

8    living.  I mean, it's -- the idea is that when you want to do

9    research is, sure, you want to do higher-level stuff.  But

10   then in order for you to polish yourself, to polish your

11   ideas, you want to teach these high-level courses, these

12   courses that are challenging, these courses that students get

13   challenged and they challenge you back, because their

14   questions are actually not -- they start connecting between

15   all the courses.

16   Q.    Can you give me -- can you give me some examples of

17   higher-level math and what it's used for?

18   A.    What it's used -- oh, yeah.  We live in very, very,

19   very interesting times.  For example, you've seen -- we know

20   we have rockets for a long time, right?  But nowadays, we

21   have a rocket that actually can land itself back.  That has

22   never happened except during the last couple of years.

23   That -- even the owner of the company admitted that that's

24   just calculus.  It's heavy, hard-core calculus, but it is

25   calculus.

          Another example, industry, they use it all the time.

For example, in a -- similar to this, in a Coke can.  In a

Coke can, you have a tremendous amount of mathematics in it.

The Coke can is built so you can stack things up.  It has

very thin walls so it's cheap.  It has a little sphere, a

little bubble at the bottom; I don't know if you've noticed.

That's designed so that the Coke can, whenever it's frozen

for any reason -- you put it in the freezer when you're not

supposed to, right -- when it explodes, it doesn't shatter

everything, right, so it gets like a little ball, and then --

so it has a lot of math.  It has a lot of physics too.

          And in addition to that, we live in very exciting times

to do mathematics.  Everybody nowadays have a cell phone

which is like ten times more powerful than the computer it

was used to go to the moon.  For a few hundred bucks, you can

buy hardware that can resemble what I used to use as an

undergraduate as a super computer that I had to apply for

hours.  Now you can just buy for a couple of hundred bucks

and put it in your machine.

          So it's very exciting times to do mathematics, to do

research, to teach, you know, students.

Q.    What -- in an academic setting, what are publications?

A.    So a publication is generally something that you -- you

can publish your thesis.  You can publish your work.  You

publish original research, you submit it.  This was --

1    actually was initiated in Europe by Heva Cite [phonetic].

2    They didn't trust his writings in the London Mathematical

3    Society, British Mathematical Society, so then they started

4    introducing the system of peer review.

5         So what happens is that you do original research, you

6    claim it's original.  You send it over to an editor of a

7    journal.  This editor picks up professors across the globe --

8    they can be from the United States, they can be from

9    somewhere else -- send them the document, verify that this is

10   actually original, has never been done before, make the

11   comments, and suggest if they're going to publish in a

12   certain journal or not.

13   Q.   And why does it matter at all in a university setting?

14   A.   Well, that demonstrates that you actually are at the

15   top of your field, that you're doing new things, that you're

16   contributing to the area in which you're actually supposed to

17   be teaching.

18        So it's one of the most challenging things to do.

19        Actually, the first thing that is your first bar when

20   you get a Ph.D., you just want to get a publication, right?

21   It's like -- it's that thing that you want to accomplish.

22   Then you get there, and then the next thing is, oh, can I

23   publish a paper by myself?  Because that's another bar.  I

24   mean, you get in groups and then, of course, you work faster.

25   But then the next thing is can I publish a paper by myself,

1  get only my name on it, because that means I did this all on

2  my own.

3  Q.    So you go through four years of college, correct?  And

4  then you get -- did you get your master's?

5  A.    Yeah.  Along the way, I got a master's degree at LSU.

6  I had a master's degree from Chile.  I got my tuition award

7  for that.

8  Q.    And then how long until you got your Ph.D.?

9  A.    Since the master's, probably two or three years.

10 Q.    So it's eight or so years of higher education?

11 A.    Uh-huh.

12 Q.    So you could try and publish a paper that no one knows

13 about?

14 A.    Yes.  That's usually the case.

15 Q.    Okay.  And hopefully, impress your peers, correct?

16 A.    Right.

17 Q.    Yeah.  What is a grant?

18 A.    So a grant is, you want to -- the American system to

19 support universities is not like in Europe, for example.  In

20 Europe, a university just gets a chunk of money from the

21 government.

22       So in the United States, you apply for grants.  And

23 then it's competitive.  And then if you get that grant, for

24 example, you get that grant from a federal institution like

25 the National Science Foundation or the Department of

Education, then not only they give you the money that you
asked for to do whatever it is that you want to do after you
went through a process, of course.  And on top of that, they
throw at it double the money for the university to use it in
any way, shape, or form the university wants to use it.

So -- and that's the way that the federal government
supports American universities by using these grants.

Now, of course, it's not only the federal government
that give grants.  It is the local government, there are
companies that give grants.  So in general, what we try to do
is to bring this money into the university so we can use it
for more research to support students, right?

And usually, in grants, the same way that publications,
there are different categories.  So, for example, you can get
a million-dollars grant for giving scholarships.  Right?  And
then the million dollars sounds very impressive, but what
you're doing is administering these scholarships that you
pass along.

Those are great grants, and we have done some education
grants too.  In our case, we didn't ask for scholarships; we
asked for trying to do something with the students, some
research, right?

And there are another type of grants which is, for
example, the hard-core one, for example, are the National
Science Foundation, Division of Mathematical Sciences,

1   because that is 100 percent a grant that may be little in

2   terms of money, but it is supporting your research.  And when

3   you get that award, that's like, that's a big deal.

4   Q.    Are they required for advancement?

5   A.    Not usually.

6   Q.    Are grants required to advance in levels of being a

7   professor?

8   A.    Let me put it this way.  If you get a grant, you

9   advance.  But it's not a requirement.  So people can advance

10  if you don't have a grant.  But once that you get a grant,

11  it's like you get grants on papers and you move up.

12  Q.    Are they usually requirements in your experience to get

13  chair positions?

14  A.    Yes, absolutely.  So the idea of a chair is not longer

15  being yourself and your group of students.  The idea of a

16  chair becomes help the department.  Support the people in the

17  department.  Support all these professors and all these

18  students.  So if a professor is writing a grant, the chair

19  has to make sure that it gets provided with the support

20  necessary for the grant.

21       If the students are pursuing degrees, then the chair

22  must ensure that those students that are pursuing these

23  degrees have all the necessary tools for them to succeed.

24  Q.    Have you secured any grants before you started working

25  at TSU?

```
1    A.    Yes.
2              MR. BIGELOW:  Okay.  I'm going to ask that the
3    court reporter hand to you the -- what's marked as Exhibit 1,
4    if I may, or -- oh, I'm sorry.
5    BY MR. BIGELOW:
6    Q.    You have a binder up there.  If you would, please grab
7    that binder.  Fantastic, thank you.
8              Dr. Jara, if you would, please look at what has --
9    under Tab 1, and I'm going to show it on the board so that
10   the jury can watch along.  My apologies for not warming up
11   the machine earlier.
12             Do you recognize what I just handed to you, sir?
13   A.    Yes.
14   Q.    And it's the -- it's a Tennessee State University
15   employee verification form, correct?
16   A.    Yes.
17   Q.    And did you fill that out?
18   A.    Yes.  That's my handwriting.
19   Q.    Okay.  And it says your date of birth is February 27th,
20   1975?
21   A.    Yes.
22   Q.    And your highest degree is Ph.D., correct?
23   A.    Yes.
24   Q.    And under home country, what did you write?
25   A.    Chile.
```

1  Q.    And under ethnicity, what did you check?

2  A.    Hispanic.

3        **MR. BIGELOW:** Okay. I ask this be admitted into

4  evidence as Plaintiff Exhibit 1.

5        **THE COURT:** Any objection?

6        **MS. CARTER:** No objection.

7        **THE COURT:** No? Will you, Ms. Carter, be doing

8  cross-examination?

9        **MS. CARTER:** Yes, Your Honor.

10       **THE COURT:** Okay. Very well, thank you.

11       All right. Exhibit 1, without objection, will be

12 admitted into evidence.

13       (Plaintiff Exhibit 1 was marked and admitted into

14 evidence.)

15 **BY MR. BIGELOW:**

16 Q.    Dr. Jara, I'll ask you to please turn to Tab 4 --

17 A.    Uh-huh.

18 Q.    -- which is a cover for -- what is that? Is that an

19 e-mail that you were sent, a cover for an e-mail that you

20 were sent?

21 A.    Yes. We received an e-mail asking us to fill out -- to

22 follow up the instructions on this.

23 Q.    Okay. And the front of it, the top of it says Oral

24 English Proficiency or OEP Screening, correct?

25 A.    Yes.

1  Q.    And underneath it, it says:  "The ability to

2  communicate effectively is an essential skill necessary for

3  all academic personnel to perform successfully in the

4  college."

5       You'd agree with that, wouldn't you?  You need to

6  communicate effectively to teach?

7  A.    Yes.

8  Q.    And then it says -- underneath that it says:  "Who?

9  All faculty in the College of Life and Physical Sciences.

10       "When?"  It gives a time period.

11       And then it says "How," and it says "3-minute telephone

12  screening," correct?

13 A.    Yes.

14 Q.    When you first saw that, did you have any idea what

15 this was about?  Well, first of all, did you see this?  You

16 do recognize it, correct?

17 A.    Yes.

18 Q.    You received this, correct?

19 A.    Yes, I received it.

20 Q.    Okay.  Did you recognize what it was for or have any

21 idea what it was about?

22 A.    None when I received it.

23       **MR. BIGELOW:**  Okay.  Your Honor, I ask that

24 Plaintiff Exhibit 4 be admitted into evidence.

25       **THE COURT:**  Any objection?

1     **MS. CARTER:** No objection at this time.

2     **THE COURT:** All right. Exhibit No. 4 will be

3 admitted into evidence.

4     (Plaintiff Exhibit 4 was marked and admitted into

5 evidence.)

6 **BY MR. BIGELOW:**

7 Q. Dr. Jara, underneath Plaintiff Exhibit 4, it says "OEP

8 Screening Link." Do you see that?

9 A. Yes.

10 Q. Right there where I'm pointing?

11 A. Uh-huh.

12 Q. And it says, underneath that: "For more information,

13 contact Dr. Lonnie Sharpe or Dr. Iris Johnson-Arnold,"

14 correct?

15 A. Yes.

16 Q. I ask that you turn to the very next tab which is

17 Plaintiff's Exhibit 5. And what this is is, there was a link

18 you could click on in that last part, correct?

19 A. Yes.

20 Q. And this was the link when you clicked on it; is that

21 correct?

22 A. Yes, that was the link.

23     **MS. CARTER:** Objection, Your Honor. If we can not

24 show the jury what this is until he addresses --

25     **THE COURT:** Fair enough. No publishing in advance

1   of admission.

2               **MR. BIGELOW:** That's fair.

3   **BY MR. BIGELOW:**

4   Q.    Do you recognize seeing this?

5   A.    Yes.

6   Q.    And you clicked on a link and you saw this, correct?

7   A.    Yes.

8               **MR. BIGELOW:** Okay. Your Honor, I ask that this

9   be admitted as Plaintiff's Exhibit 5.

10              **THE COURT:** Okay. All right. Any objection?

11              **MS. CARTER:** Yes, Your Honor. This -- I'm not

12  sure what this goes to or when he did this or how he became a

13  part of this, but this is not linked to any e-mail or to

14  Exhibit -- is it 4?

15              **MR. BIGELOW:** Okay. I'll take it slower, if I

16  may.

17              **THE COURT:** Is your microphone on, Ms. Carter?

18              **MS. CARTER:** Now it is.

19              **THE COURT:** Perfect. All right. Okay.

20              So it sounds like the offer of admission was

21  withdrawn as you seek to lay an additional foundation; is

22  that right?

23              **MR. BIGELOW:** Sure.

24              **THE COURT:** All right. You may continue.

25  ///

1  BY MR. BIGELOW:

2  Q.   Dr. Jara, if you would, look at the upper right-hand

3  corner of this document.  It says HTTPS.  And it says

4  tnstate.edu; is that correct?

5  A.   Yes.

6  Q.   So it's from Tennessee State University; is that

7  correct?

8  A.   Yes.  That is the survey software that the university

9  uses.  So when people write surveys and they want to send

10  them, they use Qualtrics which is the Qualtrics.com, and the

11  tnstate.edu is the server that Qualtrics associates the

12  university so they can write surveys.

13  Q.   And was this linked to the Oral English Proficiency

14  screening page that you just testified to that was just

15  admitted into evidence?

16  A.   Yes.  After you click on it, that's what pop up.

17  Q.   Okay.

18          MR. BIGELOW:  Your Honor, I ask again that this be

19  admitted into evidence as Plaintiff's Exhibit 5.

20          THE COURT:  All right.  Any objection?

21          MS. CARTER:  No, Your Honor.  No objection.

22          THE COURT:  All right.  Exhibit 5 will be admitted

23  into evidence.

24          MR. BIGELOW:  Thank you.

25          (Plaintiff Exhibit 5 was marked and admitted into

1   evidence.)

2   **BY MR. BIGELOW:**

3   Q.   Dr. Jara, I want to go over this for a moment, actually

4   longer than a moment, frankly.

5        At the top of it, it states academically speaking, AS,

6   correct?

7   A.   Yes.

8   Q.   And then underneath it, it states it's an Oral English

9   Proficiency screening questionnaire.  And it says:  "Once you

10  complete the survey, you will be provided with the

11  instructions and call-in number to complete the telephone

12  screening."  Is that correct?

13  A.   Yes.

14  Q.   When you first saw this, what was your understanding as

15  to why this was even given out?

16           **MS. CARTER:**  Objection, Your Honor.  It's been

17  asked and answered.

18           **THE COURT:**  Response?

19           **MR. BIGELOW:**  I don't think he answered it, but I

20  don't --

21           **THE COURT:**  Well --

22           **MR. BIGELOW:**  I can just -- it's fine.  I can just

23  ask the question -- continue to ask --

24           **THE COURT:**  Well, do you want to withdraw the

25  question?

```
 1              MR. BIGELOW:  Yeah, I'll withdraw it.  That's
 2   fine.
 3              THE COURT:  We'll do that, yeah.  Whether it was
 4   answered is probably debatable.  So the question is withdrawn
 5   and you may ask another.
 6              MR. BIGELOW:  Okay.
 7   BY MR. BIGELOW:
 8   Q.    I'm going to highlight something for you, okay?
 9   A.    Uh-huh.
10   Q.    Okay.  The survey asks you what your native
11   language/dialect was; is that correct?
12   A.    Yes.
13   Q.    Do you see why TSU would ask you what your native
14   language or dialect was?
15   A.    No.
16   Q.    Okay.  The survey also asks you -- now at this point,
17   you were already teaching at TSU, correct?  When you saw
18   this, you were teaching there, correct?
19   A.    Yes.
20   Q.    You had already been hired?
21   A.    Yes.
22   Q.    In fact, you had tenure, correct?
23   A.    I believe so.
24   Q.    Okay.  Now, it says -- it asks for your country of
25   origin.  Do you see -- why would TSU ask for your country of
```

1    origin?  Do you know?

2              **MS. CARTER:**  Objection, Your Honor.

3    **BY MR. BIGELOW:**

4    Q.    Do you know why they asked?  I'm just asking what your

5    knowledge --

6              **THE COURT:**  Well, hold on.  We have an objection.

7    It sounds like you kind of withdrew that question and now

8    you'll be laying a foundation; is that right?

9              **MR. BIGELOW:**  That's correct.

10             **THE COURT:**  All right.  So the question to which

11   an objection was made was sustained, but you may ask

12   questions to lay a foundation.

13   **BY MR. BIGELOW:**

14   Q.    Do you think your country of origin is relevant to

15   whether you can teach at TSU?

16   A.    No.

17   Q.    I'm going to turn to the second page.  I'll highlight

18   another thing for you.

19        The survey asked:  "How long have you lived in the

20   USA?"

21        Do you think that is relevant for your teaching

22   abilities at TSU?

23   A.    No.

24   Q.    How did that make you feel when you read that?

25   A.    That it's a very uncomfortable question because

1  usually, that type of question is thrown at you whenever you

2  are being told that you're not from here, that you should go

3  back. So that question there makes anybody feel

4  uncomfortable and it singles you out immediately, because it

5  makes no sense to ask somebody who has been born here, "How

6  long have you lived here?" Ain't got no relation with the

7  proficiency in English.

8  Q.    Did it upset you?

9  A.    Yes.

10  Q.    Did it embarrass you?

11  A.    Yes, a little. Like I say, it's one of those things

12  that when somebody tells you that type of thing, it's like

13  you know what you're being told. You know that it -- it's a

14  question that is to tell you you're not from here.

15  Q.    Did you complete this examination or this

16  questionnaire, I'm sorry, and send it in?

17  A.    No. I stopped. I started it, but I stopped. I did

18  not complete this.

19  Q.    Who asked you to do it?

20  A.    At the time, the interim dean of the college, Lonnie

21  Sharpe.

22  Q.    Did you feel degraded at all?

23  A.    Yes, absolutely. I actually immediately wrote an

24  e-mail to, at the time, my department chair, Dr. McMurray.

25  And I told him that I thought that this was inappropriate,

1  and I request that the information, if it was a requirement,

2  to be filled out.

3        **THE COURT:**  Let's do this, Dr. Jara.  What we'll

4  do is if you could answer the question asked -- and I know

5  that sometimes there's an urge to provide more information

6  than what is asked for.  But Mr. Bigelow, if you would answer

7  his question.  If he needs to follow -- to ask and follow up

8  with requests for additional information, he can do that.  I

9  don't want you to feel like you sort of need to provide a

10  further explanation beyond just answering the question.

11        Does that make sense?

12        **THE WITNESS:**  Yes, Your Honor.

13        **THE COURT:**  All right.  Thank you.

14  **BY MR. BIGELOW:**

15  Q.   Dr. Jara, how many college students have you taught?

16  A.   Over the course of the years, probably over 6-, 7,000.

17  Q.   And of those 6-, 7,000 students, have you ever received

18  a complaint about anyone being unable to understand you?

19  A.   No.

20  Q.   Who did you interview with when you got the job at --

21  when you got your job at TSU?

22  A.   The interview process is a long one.  It's a whole day.

23  Usually starts in the morning when the chair of the hiring

24  committee picks you up from wherever you are staying

25  overnight.  Usually you want to arrive there the day before.

```
 1          I met, in this case, Professor Sathananthan.  We went
 2     out for breakfast.  That, in and of itself, I took it as part
 3     of my interview.  He is after all, the -- he was at the time,
 4     sorry -- after all, the chair of the hiring committee.
 5     Q.    And when you interviewed, did you interview with
 6     multiple people?
 7     A.    Absolutely.
 8     Q.    Did anyone ever say to you, "I can't understand what
 9     you're saying"?
10     A.    No.
11     Q.    Okay.  Has anyone ever said that to you?
12     A.    Yeah, it has happened, yeah.
13     Q.    It has?
14     A.    Yeah.
15     Q.    But it hasn't happened with your students?
16     A.    No.
17     Q.    And it hasn't happened with your colleagues?
18     A.    Maybe every now and then, you know.  A word here, what
19     you said, something like that.  But nothing that is like you
20     can't be understood.
21     Q.    And after you interviewed at -- for TSU, you were
22     offered a job, correct?
23     A.    Yes.
24              MS. CARTER:  Your Honor, --
25     ///
```

1  **BY MR. BIGELOW:**

2  Q.    And you took that job, right?

3              **MS. CARTER:**  -- I'm going to object to the

4  continual leading questions.

5              **THE COURT:**  I think that's fair.

6              **MR. BIGELOW:**  I'm trying to speed it up.

7              **THE COURT:**  Yeah, understood.

8              **MR. BIGELOW:**  That's all I was trying to do.

9              **THE COURT:**  Here's -- you know, I think if we

10  looked at that, here's kind of what I think.  You know,

11  the -- and I'm going to take a little bit of time with this

12  to help counsel understand where I may be coming from in the

13  future.  I do think that probably the objection -- and, in

14  fact, I am going to overrule it.  I think it's a close call.

15              Here's the thing:  Leading questions are generally

16  not allowable for what, you know, the rules kind of indicate

17  are preliminary matters, leading questions are appropriate.

18  I do think that for a totally undisputed fact like that, a

19  leading question is appropriate as a preliminary matter, so

20  I'm going to overrule the objection.

21              On the other hand, I do understand that some

22  leading questions are improper, and Mr. Bigelow, if he leads,

23  could be facing additional objections.  We'll see.

24              All right.  Thank you.

25              **MR. BIGELOW:**  Thank you, Judge.

**BY MR. BIGELOW:**

Q.    Dr. Jara, if you would, turn to Plaintiff's Exhibit 2. And do you recognize that?

A.    Yes.

              **MS. CARTER:**  Objection, Your Honor.

              **THE COURT:**  What's the objection?

              **MS. CARTER:**  This has no date on it and . . .

              **THE COURT:**  Well, let's do it this way.  You know, at an appropriate time, once it's offered, we'll see what your response is.  And that could -- what you just mentioned could play into opposing the offer.  But let's allow the foundation to be laid first, and then we'll go from there. And you can respond if and when it's offered.

              All right.  So I think the question on the floor: "Would you turn to Plaintiff Exhibit 2.  Do you recognize that?"

              So Dr. Jara indicated he had recognized it, and you may go from there.

**BY MR. BIGELOW:**

Q.    Do you recognize this, Dr. Jara?

A.    Yes, I do.

Q.    And what is it?

A.    It's the policy of the university concerning the affirmative action and equal employment opportunity.

Q.    And it has "Tennessee State University, the Office of

1  Human Resources" on top of it, correct?

2  A.    Correct.

3  Q.    And at the bottom of it -- well, actually the second

4  page, I'm sorry, it has a bunch of different things in

5  reference including TBR policy numbers, affirmative action

6  plan, fair employment practices, and so forth, correct?

7  A.    Correct.

8  Q.    And there's also a link to what's -- looks like it's an

9  EO/AA complaint form; is that correct?  On page 2 at the top.

10 A.    Yes, I see it now.  Sorry.

11 Q.    That's okay.

12        Have you ever submitted an EO/AA complaint?

13 A.    Yes, I have.

14 Q.    Okay.

15        **MR. BIGELOW:**  I will ask again that this be

16 admitted into evidence as Plaintiff's Exhibit 2.

17        **THE COURT:**  All right.  Response at this time?

18        **MS. CARTER:**  Yes, Your Honor.  There's been no

19 testimony or foundation laid as to when this existed or what

20 the form is that was submitted that's attached that's linked.

21 There's no date on the document, so . . .

22        **THE COURT:**  All right.  I -- I'll see whether we

23 need to have counsel approach.  I understand you'll probably

24 be offering this on the grounds that this is relevant because

25 it is a document in effect at a time relevant to this

1    lawsuit, right?

2              **MR. BIGELOW:**  That is correct, Your Honor.

3              **THE COURT:**  All right.  Do we have a basis for a

4    fact finder to conclude that that, in fact, is the case?

5              **MR. BIGELOW:**  Have you -- I mean, I would think so

6    inasmuch as he testified that while he was working at TSU, he

7    has seen this and that he filed a complaint according to what

8    they asked to.

9              But, frankly, I don't even need this into

10   evidence, Your Honor.  It's fine.  I can just move on.  I

11   mean --

12             **THE COURT:**  Well, here's the thing.  You could

13   withdraw the offer or I can call counsel up and we can talk

14   about it, your choice.

15             And I don't mean to imply one way or the other how

16   you should seek to establish your case.  I would say you

17   could withdraw it, Option A.  Option B, counsel can approach.

18   Do you have a preference?

19             **MR. BIGELOW:**  I'll withdraw it.

20   **BY MR. BIGELOW:**

21   Q.    I'll just say based on things that you've read from

22   TSU, you've already testified, and that you've submitted

23   what's called EO/AA complaints; is that correct?

24   A.    Yes.

25   Q.    Okay.

```
 1              THE COURT:  All right.  Sounds like the offer of

 2    Plaintiff's Exhibit 2 is withdrawn in any event, so I think

 3    that resolves that.  You may proceed.

 4    BY MR. BIGELOW:

 5    Q.    In the time relevant to this lawsuit, did you have to

 6    submit time sheets to TSU?

 7              MS. CARTER:  Objection, Your Honor.  Can we define

 8    the relevant time?

 9              THE COURT:  And the way the -- yeah.  I see what

10    you're saying.  In the time relevant to this lawsuit, and

11    you're thinking that that's kind of an indeterminate thing.

12              Are you able to nail down the time period you're

13    asking about?

14              MR. BIGELOW:  Sure.

15    BY MR. BIGELOW:

16    Q.    In 2007 and 2008 and 2009, did you have to submit time

17    sheets to TSU?

18              MS. CARTER:  Objection, Your Honor.  Can we

19    approach?

20              THE COURT:  You may.

21              (WHEREUPON, a bench conference was had out of the

22    hearing of the jury, as follows:)

23              THE COURT:  All right.

24              MS. CARTER:  I thought our relevant time frame was

25    2016 to 2022.
```

1          **THE COURT:**  Yeah, you said 2007 to 2009.

2          **MR. BIGELOW:**  I did.  I misspoke.

3          **THE COURT:**  You meant '17 to '19?

4          **MR. BIGELOW:**  Yeah, I did.  I simply misspoke,

5     that's all.

6          **MS. CARTER:**  Sorry.  I just want the record to be

7     clear.

8          **MR. BIGELOW:**  I just didn't think it was --

9          **THE COURT:**  Yeah, I had the same reaction and I

10    was like, well, maybe --

11         **MR. BIGELOW:**  No, that's on me.

12         **THE COURT:**  Okay.  All right.  Thank you.

13         (WHEREUPON, the bench conference concluded, and

14    the following took place within the presence and hearing of

15    the jury:)

16         **THE COURT:**  All right.  Fair to say, Mr. Bigelow,

17    that any prior question referring to the years 2007 to 2009

18    is withdrawn?

19         **MR. BIGELOW:**  '17, '18, '19.

20    **BY MR. BIGELOW:**

21    Q.   In 2017, 2018, 2019, did you submit time sheets to TSU,

22    sir?

23    A.   Yes, that sounds right.

24    Q.   And is it odd to you that professors are asked to

25    submit time sheets?

1    A.    It was very odd.  Ever since I started working at TSU,

2    we were never required to submit time sheets.

3          In addition to that, the policy of the university

4    clearly states that the only person who submit the time for

5    employees is the department chair.  During those times, the

6    policy was that as well, the written policy.

7    Q.    And did you have to -- or actually, have your time

8    sheets always been accepted?

9    A.    No.

10   Q.    Dr. Jara, I ask that you turn to what's marked as

11   Plaintiff's Exhibit 6, and could you explain to me what that

12   is?

13         **MS. CARTER:**  Objection, Your Honor.

14         **MR. BIGELOW:**  Your Honor, I'm trying to either

15   make it quick and lead him and make it easier, or set up

16   everything.  And I just am trying not to have to deal with

17   objection after objection.  I just asked him what it is,

18   Plaintiff's Exhibit 6.

19         **THE COURT:**  You know, the question on the floor at

20   the time was, "Could you explain to me what that is?"  As

21   framed, it's either yes or no; yes, I can explain, no I

22   can't.

23         What's the basis for the objection?

24         **MS. CARTER:**  Your Honor, I'm sorry.  I may be

25   premature.  I believe this calls for hearsay.

1       THE COURT:  Okay.  Well, here's how we'll proceed

2  in this regard.  You know, if Mr. Bigelow's sort of laying a

3  foundation for admission, if you think that any of his

4  questions by which he's seeking to lay a foundation are

5  improper, you're welcome to object.  I think it would be most

6  efficient to reserve any objection to the admission of the

7  document based on, for example, hearsay until the time it is

8  offered.  We'll proceed that way.

9       All right.  I take it the objection is withdrawn.

10  The question on the floor was, "Are you able to explain what

11  Plaintiff's Exhibit 6 is?"

12       And are you able to do so?

13       THE WITNESS:  Yes, I am.

14       THE COURT:  All right.

15  BY MR. BIGELOW:

16  Q.    Could you please explain?

17       THE COURT:  You may ask the next one.

18       THE WITNESS:  Yes.  After I complained about

19  several incidents with -- about the time sheets, I decided

20  that because I complained to the equal employment office,

21  because I complained to human resources, and it seems that

22  nobody -- nothing was happening, I decided to send an e-mail

23  directly to the president of the university and explain to

24  her the incidents that have happened ever since I started

25  having issues.

1           And among this is because when you follow the

2    chain of command at TSU, you're supposed to complain to your

3    department chair and then to your dean.  Since this was about

4    the dean, you're supposed to complain to the vice president

5    of academic affairs, which I did.

6           Among that, then I did human resources, equal

7    employment, and nobody was doing anything, so I decided to

8    send an e-mail to the university president.

9    **BY MR. BIGELOW:**

10   Q.    And I would like to take this line by line if I may.

11   You write -- and Glenda -- it's two --

12         **THE COURT:**  Wait one moment.

13         **MR. BIGELOW:**  I'm sorry.

14         **THE COURT:**  Now, keep in mind, I do think that if

15   you were to read line by line, wouldn't it be sort of like

16   publishing the thing before it's admitted?

17         **MR. BIGELOW:**  That's fair, Your Honor.  Let me

18   follow up by this.

19   **BY MR. BIGELOW:**

20   Q.    Did you attach anything to this e-mail that you sent?

21   A.    Yes.  I included a chronological list of some of the

22   incidents that I went through.

23   Q.    And is that chronological list listed as Plaintiff's

24   Exhibit 8?

25   A.    Yes.

1          **MR. BIGELOW:** Your Honor, I ask that Plaintiff

2    Exhibit 6 and Exhibit 8, which is an e-mail that Dr. Jara

3    sent to President Glenda Glover on Monday, February 5th,

4    2018, be admitted into evidence.

5          **MS. CARTER:** May we approach, Your Honor?

6          **THE COURT:** You may.

7          (WHEREUPON, a bench conference was had out of the

8    hearing of the jury, as follows:)

9          **MS. CARTER:** Okay. He's got the witness here. He

10   can ask him what he recalls. And if he needs the document to

11   refresh his memory, he can testify to that. I mean, he can

12   look at it. But, you know, this is hearsay in terms of the

13   document itself coming into evidence and, as we had talked

14   about, it's retaliation and the . . .

15         **THE COURT:** Okay. Response?

16         **MR. BIGELOW:** It's an e-mail that he wrote.

17         **THE COURT:** To?

18         **MR. BIGELOW:** To Dr. Glover.

19         **THE COURT:** Okay.

20         **MS. CARTER:** There is no foundation that

21   Dr. Glover received it. There is no --

22         **THE COURT:** Well, let's see. I mean, is the

23   objection authenticity or is it hearsay or both?

24         **MS. CARTER:** It's hearsay.

25         **THE COURT:** All right. Hearsay. I don't think we

1 | have an authenticity, it sounds like. But what's the
2 | response on the hearsay objection?
3 |      **MR. BIGELOW:** If -- I think that -- I don't
4 | believe it's hearsay. I think if he wrote -- if he says, as
5 | he did, that he wrote the document that he is sending, and he
6 | sent it to President Glover, then it's his own writing, his
7 | own what he did. And if nothing else, it goes to state of
8 | mind, it goes -- I mean, there's --
9 |      **THE COURT:** Well, here's -- you know, we have to
10 | peel back the analysis. First thing, is it hearsay? And the
11 | fact that he wrote it doesn't change the fact, right, it's an
12 | out-of-court statement. Out-of-court statement is not
13 | hearsay. Before we even get to whether it's subject to an
14 | exception, right, out-of-court statement is not hearsay
15 | unless it's introduced for the truth of the matter asserted.
16 |      For what purpose is this document being offered?
17 |      **MR. BIGELOW:** To show that he complained.
18 |      **THE COURT:** Okay.
19 |      **MR. BIGELOW:** And to show what happened and what
20 | he believed at the time.
21 |      **THE COURT:** Okay. Now, a couple of things. One,
22 | it is to the extent his complaining to the university
23 | president is a relevant fact, that is, a legitimate
24 | non-hearsay purpose, absolutely. But there is always the
25 | danger it can be taken for a hearsay purpose which, to me, is

1    where a limiting instruction comes in.

2            So let's take this one by one.  Is the fact that

3    he complained, in your view, relevant?  Seems to me it would

4    be.

5            **MS. CARTER:**  Yes, but he can testify to that.

6    This is also the best evidence, one that he's here to

7    testify.

8            **THE COURT:**  Is there -- okay.  But listen, there

9    are two competing things here.  One is it's, I think, very

10   legitimate for Mr. Bigelow to get out that he complained to

11   the university president.  I don't think you dispute that.

12   But you're saying, well, why do we run -- essentially, you're

13   saying why do we run the risk of this being taken for the

14   truth of the matter asserted when we can, you know, avoid

15   that somehow.

16           Here's what I'm inclined to do.  The first thing

17   is that, as regards the attachment, I think if the main

18   document, No. 6, comes in, you don't need No. 8 because No. 6

19   tells you what it is.  Right?  It's a list of incidents.

20           And there is a -- you know, I think the jury will

21   get the point.  He complained about particular incidents.  I

22   think that the danger of it being taken, even with a limiting

23   instruction, the attachment being taken for the hearsay

24   purpose of the out-of-court statements about what happened

25   are true, maybe does substantially outweigh the probative

1  value of actually attaching the attachment when the e-mail

2  tells you the nature of the attachment.

3          I do think that as regards this itself, this

4  e-mail itself, the purpose of it is to say, yeah, I

5  complained to the president herself.  I don't know that him

6  testifying about it is as strong on this point as the e-mail

7  itself.

8          So what I'm going to do is admit this with a

9  limiting instruction, a very strong limiting instruction that

10  this is introduced to show that he complained about a series

11  of events that he purported to have happened.  This is not

12  evidence of anything as to what actually happened.  It's

13  being introduced to show that Mr. Patricio Jara made

14  complaints about alleged events, and this is not any proof at

15  all that the alleged incidents happened.  All right?

16          **MS. CARTER:**  Thank you.

17          **MR. BIGELOW:**  Absolutely, Your Honor.  And with

18  regards to 8, are you saying no 8?

19          **THE COURT:**  I am saying no 8 under 403.  I think

20  the potential prejudice in terms of being taken for an

21  improper hearsay purpose substantially outweighs the

22  probative value because the face of this e-mail itself tells

23  you, look, makes the valid point, I'm attaching a

24  chronological list of some of the incidents.

25          You, of course, can establish from the witness

1   stand and, you know, as far as I'm concerned, whatever you

2   want to do to get out the fact that those incidents in his

3   view occurred, you can ask him on the witness stand.  But

4   introducing the list itself, I won't do.

5           But they're going to know that the complaint

6   included notification about alleged instances.  They'll know

7   it from Plaintiff Exhibit 6.

8           **MR. BIGELOW:**  I only ask this because I want to be

9   careful not overstepping bounds with the Court's 403.  If I

10  ask him what he complained about, is that --

11          **THE COURT:**  I think you --

12          **MR. BIGELOW:**  -- or is that fair --

13          **THE COURT:**  I think you can ask him what he

14  complained about.  Yeah, I think that's right.

15          **MR. BIGELOW:**  Without publishing to the jury.  And

16  if I need to refresh his recollection saying, well, did

17  you --

18          **THE COURT:**  You could refresh his recollection

19  with that document too.

20          **MS. CARTER:**  Well, and I'm going to -- I want to

21  be careful here, Judge, because this is the double hearsay

22  document.  There's hearsay within hearsay, so I don't want

23  him to blurt out when he's looking at this, --

24          **THE COURT:**  Yeah.

25          **MS. CARTER:**  -- Dr. So and So told me this or --

1          MR. BIGELOW:  I'm not going to --

2          THE COURT:  You'll make sure that if the document

3    is shown to him, that you give him the instructions, hey, I'm

4    going to hand this to you.  Don't say anything about it, but

5    look at it.  And after you're done looking at it, let me

6    know, and I'm going to ask you if your memory is refreshed.

7    That way, he'll know not to blurt anything out.

8          MR. BIGELOW:  Perfect.

9          THE COURT:  All right.

10          MR. BIGELOW:  So we can say that 6 is admitted and

11   8 is not?

12          THE COURT:  Exactly, yeah.

13          (WHEREUPON, the bench conference concluded, and

14   the following took place within the presence and hearing of

15   the jury:)

16          THE COURT:  All right.  So folks, Plaintiff's

17   Exhibit 8 will not be admitted.  Plaintiff's Exhibit 6 will

18   be admitted, and you will see it momentarily.

19          But I'm going to give you one of those limiting

20   instructions that I had mentioned to you in my preliminary

21   instructions might be coming your way, which is I may tell

22   you that a document is admitted for a particular purpose and,

23   if so, should be considered for that purpose only and not

24   other purposes.

25          This Exhibit 6 is being admitted for a limited

purpose.  The purpose is to show that the plaintiff made a
complaint to the university president.  It's just to show the
fact of the complaint.  It is important for you not to take
what the plaintiff wrote in this document, the -- any
assertions made in this e-mail as proof that the assertions
are true.

So in other words, it's one thing for an e-mail to
be introduced to show that he complained about incidents he
says happened.  It's another thing to take that e-mail as
proof that those incidents actually happened.  This document
is being admitted for the limited purpose of showing that he
complains about instances he said happened, not to be taken
as evidence that the incidents actually happened.

All right.  So with that limiting instruction,
Exhibit 6 is admitted and may be published to the jury.

(Plaintiff Exhibit 6 was marked and admitted into
evidence.)

**MR. BIGELOW:**  Your Honor, a bit of
semi-housekeeping if I may, and I apologize.  There is --
there are two words, with permission of defense counsel, in
Plaintiff's Exhibit 6 that I would like to redact if that --
if there is no objection.  And if I may approach the witness
and do just that, Your Honor, before I publish to the jury?

**THE COURT:**  So do you want to show it to him
before you redact it?  Or --

1          MR. BIGELOW:  It's fine either way, Your Honor.  I

2   don't think -- the opposing counsel -- may I approach, Your

3   Honor?

4          THE COURT:  You may.

5          MR. BIGELOW:  You know what I'm talking about,

6   right?

7          MS. CARTER:  Yeah, exactly.

8          THE COURT:  So two places you want to redact it

9   and then you'll publish?

10          MR. BIGELOW:  Yes, Your Honor.  May I approach the

11   witness, Your Honor?

12          THE COURT:  Yes, sir.

13          MR. BIGELOW:  Thank you.

14          (Respite.)

15          THE COURT:  So in terms of housekeeping, what

16   we'll do, then, Mr. Bigelow:  On a break maybe, let's make

17   sure we have an exhibit sticker that Ms. Jackson can use to

18   replace her unredacted version with your version right up

19   there as the original.  Does that make sense?

20          MR. BIGELOW:  Absolutely, Your Honor.

21          THE COURT:  All right.  Thank you.

22          MR. BIGELOW:  So Exhibit 6 has already been

23   admitted into evidence, correct, Your Honor?

24          THE COURT:  Yes.

25          MR. BIGELOW:  Okay.

1  **BY MR. BIGELOW:**

2  Q.   Dr. Jara, this, I have published to the jury what is

3  previously marked Exhibit 6.  And you testified a moment ago

4  as to what this is.  One of the things that you -- well,

5  actually, explain what you complained about in this.

6  A.   I contacted her because, like I was saying, that there

7  were no action taken by TSU.  So I told her that basically, I

8  have been subjected to discrimination and harassment, and

9  despite having human resources made clear to Interim Dean

10  Sharpe that he should accept the way I signed my document,

11  then he continued to not accept them.  And --

12  Q.   And in it you state that:  "It was particularly harsh

13  for Interim Dean Sharpe to withheld my full November 2017

14  paycheck during 14 days."  Is that correct?

15          **MS. CARTER:**  Objection, Your Honor.  Can we

16  approach?

17          **THE COURT:**  Let me see if I can eliminate the need

18  for that.  If not, you tell me.

19          Mr. Bigelow, you would agree that if Dr. Jara said

20  anything here about supposedly his paycheck being withheld,

21  that should not be taken as evidence by this jury that, in

22  fact, the paycheck was withheld, right?  Do you see what I'm

23  saying?  In other words, any language in here about the

24  paycheck being withheld is to be considered by the jury only

25  for the purpose of noting that he complained about this, not

1  that it's actually true that his paycheck was withheld.

2           MR. BIGELOW:  That's correct.

3           THE COURT:  Fair to say?

4           MR. BIGELOW:  Yes.

5           THE COURT:  Okay.  All right.  Let me ask the

6  question this way and see if this eliminates the objection.

7           Dr. Jara, I'm not asking you whether your paycheck

8  was withheld.  Perhaps this will come up in later testimony.

9  But in this e-mail, did you say to the university president

10 that your paycheck had been withheld?

11          THE WITNESS:  Yes, I did.

12          THE COURT:  Okay.

13          All right.  With that, how are we doing on your

14 objection?  Does that resolve it?

15          MS. CARTER:  That's good.  Thank you.

16          THE COURT:  All right.  Thank you.

17 BY MR. BIGELOW:

18 Q.    In August of 2018, did you file another complaint with

19 TSU?

20 A.    I may have.  I mean, I'm assuming that is correct, yes.

21 Q.    Okay.  If you would, just to refresh your recollection,

22 turn to Plaintiff's Exhibit 7.

23 A.    Yes.  August 22nd, I believe.

24 Q.    Okay.  And who did you make that complaint to?

25 A.    The equal employment office at TSU.

```
 1            THE COURT:  One moment.  If we're going to be
 2   using that to refresh --
 3            MR. BIGELOW:  Yeah.
 4   BY MR. BIGELOW:
 5   Q.    If you would, now, shut -- it's kind of awkward a
 6   little bit.  But now shut that exhibit, please.  Just turn
 7   away from that exhibit.  And if you need help, I'll ask you
 8   to do it again, to open it up.
 9        What did you complain about in that letter?
10   A.    Complained about a number of things.  Among them was
11   the department chair position was conducted search, and that
12   I did not get the position despite being qualified.
13        I complained about the time sheets, that they continued
14   to happen.  I complained about being given Monday afternoon
15   and evening courses.
16        Yeah.  Complained about a number of things.
17   Q.    Did you complain about the Oral English Proficiency
18   Screening Program?
19   A.    Yes, I included the complaint about the Oral English
20   Proficiency Screening Program.
21            THE COURT:  One moment, Mr. Bigelow.
22            Is this a good time to stop, Mr. Bigelow?  If not
23   now, maybe in a couple of minutes?
24            MR. BIGELOW:  Yeah, this is a fine time to stop,
25   Judge.
```

1          THE COURT:  All right.  So ladies and gentlemen,

2    folks, we will take our midafternoon break.  We'll shoot to

3    start back up with the continued examination of Dr. Jara at

4    3:30.  All right?  So the jury may step down and we'll all

5    stay here while you step out.

6          (WHEREUPON, the jury was excused from the

7    courtroom, with matters being heard in open court as

8    follows:)

9          THE COURT:  Thank you.  Please be seated.  All

10   right.  Anything we need to discuss before we take about 15

11   minutes?  Mr. Bigelow?

12          MR. BIGELOW:  Not with me, Your Honor.

13          THE COURT:  All right.  Ms. Carter, Mr. Dalton?

14          MS. CARTER:  No.

15          MR. DALTON:  No, Your Honor.

16          THE COURT:  All right.  We'll see you in about 15.

17   Thank you.

18          (Recess 3:16 p.m. to 3:35 p.m.)

19          THE COURT:  All right.  Before the jury comes in,

20   I want to give some additional thoughts about my view about

21   this issue about these defense witnesses.  And, you know, I

22   think Mr. Bigelow's complaint, you know, is -- you know, it's

23   spot-on.  We can't have witnesses showing up who weren't

24   identified.

25          Now, I had stated my, you know, major concern

1  about this being brought up when it was, but sometimes I

2  think technical things actually matter.  Sometimes we tend to

3  pooh-pooh them and just focus on substance.

4          The motion was styled as a motion in limine.  By

5  definition, a motion in limine is a motion requesting an

6  evidentiary ruling before trial.  And "limine" means at the

7  threshold, it's a request for an evidentiary ruling at the

8  threshold of trial rather than the movant having to wait at

9  trial to see whether an objection would be well-taken.

10  That's the nature of the motion that was filed here.

11          Now, as it happens, as a motion in limine, the

12  motion has effectively been denied based on the timing of the

13  ruling.  And so here's what I think:  Technically, the

14  motion in limine is denied.

15          Sixth Circuit case law is clear that objections

16  actually generally speaking, are -- even though -- let me

17  back up and say it this way:  There's no question that

18  motions in limine can be well-taken by courts.  They can have

19  a valuable function in helping folks prepare for trial and so

20  forth.  There's no question, parties need to, in their own

21  view, file them, then so be it.  But Sixth Circuit case law

22  is pretty clear.  It's like, look, the general idea is that,

23  well, you know, we -- you know, we wait and see at trial when

24  evidence is offered, whether to sustain objections to it.

25          That is to say a motion in limine is never, ever

1    required to object to evidence, it's just not, and, you know,

2    absent some court order which may or may not be appropriate,

3    absolutely insisting that if an objection is made, it gets

4    made before trial.

5              That's the first point I want to make, and I'm

6    going to bring us around full circle on this is a minute.

7              The second thing is, my timing was a little bit

8    off.  We had already established that Mr. Bigelow actually

9    could not have made a motion in limine on this as a practical

10   matter prior to the deadline because, you know, the deadline

11   of October 17th coincided with the deadline for the

12   disclosure of the witness list.

13             So in any event, even though I think he took

14   longer than would have been ideal to realize the problem, he

15   couldn't have met that deadline.  And, in fact, it's even

16   clearer than that.  October 17th was the deadline for

17   responding to motions in limine.  October 10th was the

18   deadline for making them.  We had already covered the point

19   that it wasn't that he's to blame for missing the

20   motion in limine deadline.  It is to say that waiting two

21   weeks, you know, after discovering the problem is late for a

22   motion in limine.

23             And as a motion in limine, this was effectively

24   denied anyway, and that is technically going to be the

25   Court's ruling.  But that's only a ruling on the request for

1    a motion in limine before trial.

2            There is no question that at trial, the defendant

3    calls these witnesses, Mr. Bigelow's going to jump up and

4    down at trial.  Means after the "in limine" part, after the

5    "in limine" stage, at trial, he's going to jump up and down.

6    And that is the question.  The defendant is free to brief

7    this as to why, when the objection is made again at trial, as

8    it will be, why the witnesses should be allowed to testify

9    when, as I understand it, they were never disclosed.

10           And so, you know, from Mr. Bigelow's perspective,

11   if he's really seeking an order in limine, he wants to move

12   quicker than that.  But he is allowed to make the objection

13   even once trial starts.  He's going to do that.  There's no

14   question.  His objection remains pending, and I do need to be

15   convinced why that objection is not well-taken.  Defendant

16   has an option to file something before I make a final ruling.

17           All right.

18           **MR. BIGELOW:**  Your Honor, a very small part of me

19   thought I would wait until trial and just do exactly what you

20   said, and I just figured that wasn't playing fair, frankly.

21   But just for what that is worth, which could be nothing,

22   but --

23           **THE COURT:**  Yeah, and I -- and, you know, I kind

24   of thought that that could have been going through your head.

25   And it's this odd thing where sometimes motions in limine,

1   they're kind of at times preferred, but they're never

2   required, and now there's case law saying, well, gee, as a

3   general matter, motions in limine are hard to rule on because

4   the Court doesn't have a context in which the evidence is

5   offered.

6           You know, here, the grounds for keeping the

7   evidence out really is not dependent on what goes on at

8   trial.  It's based on what happened before trial; another

9   reason why this would have been a good reason for a

10  motion in limine.

11          I do think, though, that the fact that it wasn't

12  made as a motion in limine does not waive the objection

13  because motions in limine are not required to object to

14  evidence.  They are required if you want your ruling before

15  trial starts.

16          **MS. CARTER:**  Your Honor, may I just ask for the

17  Court's clarification?  To be clear, if these witnesses were

18  to be called at trial, solely for impeachment purposes, that

19  would be a different issue before this Court and with

20  opposing counsel, because --

21          **THE COURT:**  I would tend to agree with that, that,

22  you know, the general idea being on a defense case in chief,

23  if the witness is called to provide extrinsic evidence to

24  impeach the plaintiff's witnesses called on case in chief,

25  that is something that was actually not required to be

1    disclosed.  It can be in response to what comes out at trial.

2            Of course, if that's the rationale, the Court

3    would scrutinize that rationale closely if it found that for

4    other purposes, the witnesses couldn't be called.  But it is

5    fair to call them for what is real impeachment purposes

6    despite their not being disclosed.  I think that that's

7    accurate.

8            And I don't know if there's going to be any

9    impeachment.  You're welcome to file anything you want on

10   that point.  But as a general matter, you know, the way we do

11   trials, it's kind of a back and forth.  A lot of things you

12   can, particularly in the civil context, you can script these

13   things up front, and that's what we try and do.

14           But I do think there's still enough of -- you

15   know, of trial being sort of a back-and-forth.  And I mean

16   this only figuratively, and I'm serious when I make that

17   point: punch, counterpunch, right?  That's what trial is.

18   And if someone's got otherwise admissible extrinsic evidence

19   that serves a legitimate impeachment purpose, to me, that can

20   be done on the fly, it can be offered on the fly.  So that's

21   where I am on that point.

22           All right.  Anything else of a preliminary matter

23   before we proceed with Dr. Jara, who may take the stand if he

24   likes?

25           **MR. BIGELOW:**  Your Honor, and I'll write up on

1   this obviously, but as you might imagine, our position would

2   be that it's just a back end way to get around not putting

3   them on the witness list.  And you could do that with

4   anything, and, of course, the question becomes, well,

5   impeachment of what?

6               THE COURT:  Well, and I --

7               MR. BIGELOW:  For what purpose?

8               THE COURT:  And that's why I would want to

9   scrutinize it closely.  Because, you know, impeachment, you

10  know, it's -- first of all, it has to be on a -- extrinsic

11  evidence to impeach has to be on a noncollateral matter.  But

12  impeachment means not just sort of generally offering an

13  alternative version of the facts, right?  It's a more narrow

14  notion than that.  And I would scrutinize.  And if this comes

15  up, and assuming that my initial thought, that these

16  witnesses would generally have to be excluded as defense

17  case in chief witnesses, if that view holds, I'm going to

18  want to hear up front the legitimate impeachment purposes

19  that do need to be more specific than kind of telling a

20  generally different narrative than what plaintiff witnesses

21  say.

22              So I agree with the concerns about sort of

23  backdoor.  I'm going to want it to be real impeachment

24  evidence.

25              MR. BIGELOW:  Because as you might imagine, Your

Honor, they're going to obviously testify or have some people

testify, well, discrimination didn't take place.

Well, I'm sure they would jump up and say whoa,

whoa, whoa if I said, well, I'm going to now bring in the

rest of Dr. Jara's department to our non- -- you know, who

are foreign-born professors and say, yes, discrimination,

it's impeaching them for saying no.  I'm sure that would be a

huge issue, right?

THE COURT:  Well, you know, I think a couple of

things.  The testimony, it can't be, as I say, just too

general in sort of combating what the plaintiff witnesses

say.  It's got to be more specific.

The other thing is, if it's offered for

impeachment purposes, I'm going to give a very strong

limiting instruction, and it's not to be taken as substantive

evidence.  It is to be taken only as evidence suggestion that

what the plaintiff's witness said should not be believed.

So that's kind of where I am on it now.  People

can file whatever they want on this issue.  You know, real

impeachment evidence is welcome on the fly, even if not on a

witness list, but it does need to be real impeachment

evidence.

MR. BIGELOW:  Thank you, Judge.

MS. CARTER:  Thank you, Judge.

THE COURT:  Yes, sir.

1          Ms. Carter, do you have anything further?

2          **MS. CARTER:**  I do not.  Thank you.

3          **THE COURT:**  All right.  Thank you.

4          So I'm thinking, Mr. Bigelow, that really, the one

5   that you've used to sort of publish to the jury, that really

6   should be the one for Ms. Jackson's stack.  I know you had

7   raised the issue of switching it out.

8          **MR. BIGELOW:**  Yes, Your Honor.

9          **THE COURT:**  Yeah.  But I think we need to go with

10  the one that was used just to be as accurate as possible.

11         Dr. Jara, you may come up and take the stand.

12         **THE WITNESS:**  Thank you, Your Honor.

13         **THE COURT:**  Yes, sir.

14         (The witness resumed the stand.)

15         **MR. BIGELOW:**  Your Honor, may I just give that to

16  the Court, the one that I published?  It has it blacked out

17  or whatever, redacted.

18         **THE COURT:**  Yes.  And I think if you give it to

19  her, she'll be happy just to put the appropriate exhibit

20  sticker and put it in the court stack, yes, sir.

21         **MR. BIGELOW:**  Thank you, Judge.

22         **THE COURT:**  Yes, sir.

23         (WHEREUPON, the jury re-entered the courtroom,

24  with matters being heard in open court as follows:)

25         **THE COURT:**  All right.  Thank you, folks, for your

1    continued attention.  At this time, we'll proceed with the

2    examination of Dr. Jara.

3    **BY MR. BIGELOW:**

4    Q.    Dr. Jara, to your knowledge, have you ever received a

5    response from President Glover regarding your complaint?

6    A.    No.

7    Q.    Dr. Jara, have you ever been -- failed to be paid on

8    time?

9    A.    Yes, I have.

10   Q.    What is your understanding as to why?

11   A.    My understanding is that first, somebody didn't like my

12   signature or the way I signed the document the first time.

13   And the second time, it's even written that I printed my name

14   instead of using cursive.  And I even got in between,

15   somehow, an e-mail from Interim Dean Sharpe explicitly

16   requiring me to have -- to sign with my name.

17   Q.    Did anyone -- well, let me ask you a different

18   question.

19        Did you work the hours you were supposed to work to get

20   paid?

21   A.    Yes, I did.

22   Q.    Did you complain about this more than once to TSU?

23   A.    I believe so, yes.

24        **MR. BIGELOW:**  Your Honor, just a bit of

25   housekeeping, as we discussed before.  Exhibit 6, which is

1  admitted into evidence already, I would like to hand to Julie

2  if that's possible and have her include it within --

3  　　　　　THE COURT:  All right.  Why don't we have

4  Ms. Jackson take that, and you can put our exhibit sticker on

5  the back and mark it accordingly.  Thank you.

6  　　　　　MR. BIGELOW:  Thank you very much.  Appreciate it.

7  　　　　　COURTROOM DEPUTY:  Thank you.

8  BY MR. BIGELOW:

9  Q.　　Dr. Jara, did you file a compliant with the EEOC in

10  2018?

11  A.　　Yes, I did.

12  Q.　　Okay.  I want to turn your attention in a minute to

13  this -- to an application to what's called a mini-grant.  Do

14  you remember applying for a mini-grant?

15  A.　　Yes.  I applied twice.

16  Q.　　Okay.  And what was the difference between the first

17  time you applied and the second time?

18  A.　　In terms of the grant, there was no difference.

19  Q.　　Okay.

20  A.　　But when I was applying, there was no difference.

21  Q.　　Okay.

22  A.　　I had a colleague from another university, and we were

23  applying to this grant to start sort of like a mini-research

24  group with students, of course.  And the money was entirely

25  for the students, to get them some funding so they could do

1  some research while doing this.

2  Q.   Did you have to get a letter in support of that grant

3  from anyone?

4  A.   Yes.  I was supposed to -- part of the application

5  process needed a letter of recommendation which is something

6  that's standard that all grants require and administrators

7  usually provide as part of their duties, basically.

8  Q.   And did you receive the letter the first time?

9  A.   Yes.  I received a letter from Dr. Lonnie Sharpe, the

10  interim dean of the college at the time.

11  Q.   And did you receive a letter the second time?

12  A.   No, I did not.

13  Q.   Did you follow up as to why not?

14  A.   After I didn't receive the letter?

15  Q.   No.  Did you -- I'm sorry.  Did you ask to get the

16  letter the second time?  I'm sorry.  I should have asked

17  that.  I apologize.

18  A.   Yes.  Yes, I asked.  I sent an e-mail basically

19  forwarding the response from the previous year asking for the

20  same letter again and mentioning that, oh, what needed to be

21  done this time was just change the date basically.

22  Q.   And that wasn't done, correct?

23  A.   No, it was not.

24  Q.   Okay.  Was there a job opening at TSU in 2017 for the

25  position of chair of the department of math?

```
1   A.    Yes, there was.

2   Q.    And how did you learn about that position?

3   A.    I had a graduate student in previous years -- well, we

4   had one of the grants, we supported some graduate students.

5   And then they were asking me if I had any, you know, way to

6   support them.  I told them that at the time I didn't have

7   any, but I got him to the university where they publish all

8   the jobs basically, the openings.  And then as I'm doing

9   that, by my surprise, I found out that there was an opening

10  for the chair position of the department.

11  Q.    I'm going to ask you to turn to what has previously

12  been marked as Plaintiff's Exhibit 23.  At the top of it, it

13  says "TSU Policy, Name of Policy, Assignment and Term of

14  Department Chair."  Do you recognize that?

15  A.    Yes, I do.

16  Q.    And a few lines underneath, it says --

17            THE COURT:  Why don't we, instead of getting into

18  what it says, you know, maybe --

19            MR. BIGELOW:  I'm just establishing that it's

20  relevant before asking for it to be admitted, Your Honor.  I

21  just wanted to make sure basically because I know what's

22  coming up.

23            THE COURT:  Okay.  All right.  So if this can be

24  authenticated, do you anticipate a relevance objection?

25            MS. CARTER:  If it can be authenticated.  At this
```

1    time, I do not anticipate a relevancy objection.

2            **THE COURT:**  Okay.  All right.  Let's -- okay.

3    Thank you.  We'll do it this way:  After taking a -- have you

4    been able to review this document?  Are you familiar with it?

5            **THE WITNESS:**  Yes, I am.

6            **THE COURT:**  All right.  Thank you.  You can

7    inquire to authenticate.

8    **BY MR. BIGELOW:**

9    Q.    And at the bottom of this document on each page, it

10   says "Faculty Handbook Appendix, page 6 of 1062, July 2nd,

11   2022," correct?

12   A.    Yes, it does.

13   Q.    And then in the following pages, it's different pages,

14   page 7 of 1000 and so on and so forth, correct?

15   A.    Yes, it does.

16           **THE COURT:**  So, Mr. Bigelow, were you referring

17   to -- going to refer to the adoption date to establish the

18   relevance in terms of time?

19           **MR. BIGELOW:**  Yes, Your Honor.

20           **THE COURT:**  Which is fair enough.  Sounds like

21   there's no objection, though, on that basis.

22           **MS. CARTER:**  Oh, there is an objection,

23   Your Honor.

24           **THE COURT:**  Pardon?

25           **MS. CARTER:**  Yes, there is an objection.

1          THE COURT:  Oh, there is?  Okay.

2          MS. CARTER:  Yes.

3          THE COURT:  All right.  Is the objection that

4    we're not talking about a relevant time period?

5          MS. CARTER:  Well, sort of.

6          THE COURT:  All right.  Why don't we approach on

7    this.

8          (WHEREUPON, a bench conference was had out of the

9    hearing of the jury, as follows:)

10          THE COURT:  All right.

11          MS. CARTER:  So if you look at the last page of

12   the exhibit, you see down here where it says revised,

13   revised, revised?  Yep.  So there is -- I know of at least

14   one that is closer in time to this one.

15          THE COURT:  Okay.

16          MS. CARTER:  And he doesn't -- he's not

17   established that this is the policy that was used during the

18   time for the '17, '18, '19.  This says 2020 at the bottom, so

19   maybe they brought an old one back.  But I know there is one

20   between these.

21          MR. BIGELOW:  He is going to testify that it's his

22   understanding that at the time he applied, this policy was in

23   effect.  That was his understanding.  And if defendant wants

24   to bring up someone and says, no, it totally wasn't, it was

25   this other thing, they're certainly welcome to.  It was such

 1    and such.  But he's going to testify this is what he believed

 2    was in effect at the time.

 3            THE COURT:  So you would say that's sufficient for

 4    the jury to find that this was the version in effect at the

 5    time.  And if it's sufficient for the jury to find, it

 6    doesn't mean they should find or need to and that defendant

 7    can assert that they shouldn't find that, but you're saying

 8    it's sufficient evidence for the jury to find that this was

 9    in effect at the time in question?

10            MR. BIGELOW:  And that that was his belief.  And

11    they're welcome to say your belief is wrong, what about this

12    document.

13            THE COURT:  They can also cross-examine him on it.

14            MR. BIGELOW:  All day.

15            MS. CARTER:  Okay.  But then we have a string of

16    testimony, if he is going to be asked about this document and

17    what it says, that could be in conflict and contrary to what

18    the actual policy for that time frame was.

19            THE COURT:  Well, and I think if you could

20    persuade the jury of that, kind of dent the plaintiff's

21    credibility, so you would have a pretty good remedy if you

22    have some ammunition on that front, right?  Do you see what

23    I'm saying?  Well, Mr. Bigelow is kind of going out on a

24    limb, and if he's off base and makes a big deal about this

25    policy and you have a good argument that it's the wrong

1  policy, you know, then you've got a pretty good remedy in
2  front of the jury, right?  Kind of destroy the credibility of
3  the plaintiff.
4          So I think that may go more to sort of responding
5  to the weight to be given this admitted document and maybe
6  disregarding the admitted document altogether on the grounds
7  that it's the wrong document.
8          **MS. CARTER:**  But there's no --
9          **THE COURT:**  Don't you think?
10         **MS. CARTER:**  Well, maybe.  There's no policy
11 number here.  This is not -- it's not signed by anybody as
12 being approved.  It's not an actual document of TSU.
13         **THE COURT:**  Sounds to me, though, like it's going
14 to be a document that this witness will testify under oath
15 was -- you know, his belief is yes, testifying to my best
16 knowledge and recollection, this was the one in effect at the
17 time.  Now, maybe he's right and maybe he's wrong, but he's
18 allowed to testify to that.  And you're allowed to -- you
19 know, you're allowed to attack him any way you want.
20         But I do think generally, a witness's testimony,
21 hey, listen, as to this relevant document, yeah, I believe
22 that this is the one in effect.  I suspect Mr. Bigelow will,
23 you know, ask him, well, why he believes that or the basis
24 for believing that.
25         **MS. CARTER:**  We don't -- okay.

1          THE COURT:  Right?  I mean, if --

2          MS. CARTER:  We don't know.  I mean, it hasn't

3     been authenticated.

4          THE COURT:  Well, that's what I'm saying, though.

5     He's allowed to try and authenticate it just based on the

6     testimony of the plaintiff who says that they have knowledge

7     of that, you know.  And he's allowed to do that.  You're

8     allowed to -- you know, you're allowed to challenge that.  If

9     I find that it's been authenticated so a jury could believe

10    the testimony that this is the one in question, then it comes

11    into evidence.

12         And you're welcome to do all kinds of things on

13    your case in chief or otherwise to frankly make him look bad

14    if they're wrong.

15         MS. CARTER:  Okay.  Okay.  And I'd also raise

16    foundation just because there's no --

17         THE COURT:  Well, you can -- we'll allow him to

18    lay the foundation.  When he offers it again, we'll take up

19    any objection.  But I am saying, like, there's no requirement

20    that there be, you know, particular things on the document

21    itself.  It's a more general requirement of -- authenticity

22    is a more general requirement than that.  It can be satisfied

23    in numerous ways.  Authenticity, even if acceptable for

24    purposes of admissibility, though, can certainly be

25    challenged in terms of weight to say well, may have come in

1  as being the document in place at that time, but we have

2  evidence showing that, in fact, it was not the document in

3  place at that time.

4          So we don't really have an objection on the table

5  now.  But I think we can see what's coming.  You can lay your

6  foundation and we'll go from there.

7          **IN UNISON:**  Thank you.

8          **THE COURT:**  Thank you.

9          (WHEREUPON, the bench conference concluded, and

10  the following took place within the presence and hearing of

11  the jury:)

12  **BY MR. BIGELOW:**

13  Q.    Dr. Jara, to get back on track, you testified there was

14  a job opening in 2017 for the position of a chair of the math

15  department, correct?

16  A.    Yes, I did.

17  Q.    What was your understanding as to the policy and

18  procedure for finding a chair?

19  A.    The university president had signed, the previous year,

20  a new policy for finding chairs across the university.  This

21  was given to me by the then faculty senate chair, which the

22  university has a --

23          (Reporter clarification.)

24          **THE WITNESS:**  The faculty senate chair, Michael

25  Catanzaro, C-A-T-A-N-Z-A-R-O -- because we had a meeting with

1   the president concerning the 2015 department chair election

2   in which Dr. Mirani won the votes, yet Dr. Jackson was

3   appointed to be the interim chair.

4   **BY MR. BIGELOW:**

5   Q.    So what was your understanding at that time of what the

6   policy was specifically with regards to internal searches?

7   A.    Well, the description of the policy, which is what I

8   have in front of me, is published in the faculty handbook.

9   That's the handbook for all faculty of the university.  You

10  can find it online.

11       And my understanding is, it describes very clearly that

12  when looking for a department chair, first there must be an

13  internal search.  And this internal search starts by

14  announcing to the faculty of the department that there is a

15  need to fill out this position.  And in that way, they allow

16  faculty of the department to throw their name in the hat,

17  right?

18       And then it actually specifies how the chair of the

19  committee has to be elected which, in this case, is a member

20  of the college tenure promotion committee that does not

21  belong to the department, and then it describes the process

22  of the internal search that must be performed before one goes

23  to an external search.

24  Q.    If you would, Dr. Jara, read over page 6 and 7.  Just

25  kind of look over pages 6, 7, and 8.

```
 1    A.    Uh-huh.
 2              THE COURT:  Are you referring to the upper
 3    right-hand number or the bottom left number?
 4              MR. BIGELOW:  I'm referring to -- thank you, Your
 5    Honor -- the upper right-hand number.
 6              THE WITNESS:  Oh, okay.  Thank you.  Okay.
 7    BY MR. BIGELOW:
 8    Q.    Just read that over if you would.
 9    A.    If it --
10    Q.    No, not aloud, just to yourself.  Just read it over,
11    please.
12    A.    Okay.  I'm sorry.
13    Q.    That's okay.
14    A.    (Witness complies.)  Okay.
15    Q.    Does that accurately reflect your understanding at that
16    time?
17    A.    Yes, it does.
18              MR. BIGELOW:  Your Honor, I ask that this be
19    admitted into evidence as Plaintiff's Exhibit 23.
20              THE COURT:  All right.  Objection or not?
21              MS. CARTER:  We'll just put on the record our
22    objection regarding the authenticity of the document.  And
23    then . . .
24              THE COURT:  Okay.  I hate to do this, but if
25    counsel could approach briefly.
```

```
 1              (WHEREUPON, a bench conference was had out of the
 2   hearing of the jury, as follows:)
 3              THE COURT:  I do think for now, I'm wondering
 4   whether we got anything clear enough along the lines of, you
 5   know, this was the document in effect at the time in question
 6   and here's how I believe I know.  Here's why I believe I
 7   know.  I don't think we got anything quite that specific, do
 8   you?  What do you think?  I'm not sure I heard anything quite
 9   like that.
10              It was more like he was kind of assuming it based
11   on it being put in front of his face -- I understand that --
12   that this must be the policy.  Are you able to -- I'll
13   sustain the objection for now, but if you can sort of
14   inquire.  Because there needs to be a basis for him, you
15   know, stating why he believed it was the one in effect at the
16   time in question beyond the --
17              MR. BIGELOW:  Sure.
18              THE COURT:  -- you know, the mere fact that you
19   put it in front of him.
20              MR. BIGELOW:  Absolutely, Judge.
21              THE COURT:  All right.  Thank you.
22              (WHEREUPON, the bench conference concluded, and
23   the following took place within the presence and hearing of
24   the jury:)
25   ///
```

1   **BY MR. BIGELOW:**

2   Q.    Dr. Jara, how did you get ahold of the Plaintiff's

3   Exhibit 23?

4   A.    No. 23, the contents of --

5   Q.    No, the actual policy itself.

6   A.    Policy itself.  You can download it.  It's online.

7   It's a current faculty handbook.

8   Q.    Did you -- do you know that this was the policy at the

9   time?  Did you get it at that time?

10  A.    Yes.  The previous page to this has the signature of

11  the president and the vice president of academic affairs at

12  the time, Dr. Michael Hardy, the late Dr. Michael Hardy.  So

13  that was signed --

14  Q.    Are you confident that this is the policy that was in

15  effect at the time?

16  A.    Yes.

17  Q.    And how do you know --

18          **THE COURT:**  And just to be clear, what time are we

19  talking about?  Are we talking about a particular time in

20  2017?

21          **MR. BIGELOW:**  In 2017, yes, Your Honor.

22  **BY MR. BIGELOW:**

23  Q.    When the decision was made to put Dr. McMurray, hire

24  Dr. McMurray as the chair, was this policy in effect, in your

25  understanding?

1  A.    Yes, it was.

2          THE COURT:  How do you know that or why do you

3  believe that it's this particular version?

4          THE WITNESS:  Because the previous page with the

5  signature of President Glover and the late Dr. Hardy states

6  that.

7  BY MR. BIGELOW:

8  Q.    What previous page?  I don't know what you're talking

9  about.

10 A.    Page No. 5.

11        So there is a -- this is part of the appendix of the

12 faculty handbook, and basically in which they describe all

13 the documents after the faculty handbook with all the rules

14 are written.

15        So when you go back, then there is a page where it says

16 that the faculty senate, which has senators for all -- from

17 all the departments and colleges of the university approve

18 this hiring policy and then submit it to the president to see

19 if she will accept it or not.  And then the president signs

20 that she's accepting it and the late vice president of

21 academic affairs sign it as well.  And I believe that to be

22 in 2016.

23 Q.    Do you believe that you saw this exact policy in 2017?

24 A.    Yes, I did.  Professor Catanzaro, the chair of the

25 faculty senate, e-mailed me a copy, the same person who

1  provided to the president, and say the president has signed

2  this.  This is in place.  So before you -- before the

3  department hires a new chair, this is the policy in place.

4  And this was before I even found out that the department was

5  actually looking for somebody.

6  Q.    Okay.

7            **MR. BIGELOW:**  Your Honor --

8            **THE COURT:**  Are you offering it?

9            **MR. BIGELOW:**  Yes, Your Honor.

10           **THE COURT:**  All right.  Is the objection being

11  made again?

12           **MS. CARTER:**  Yes, it is, Your Honor.

13           **THE COURT:**  All right.  Based on this testimony

14  and also the fact that, you know, on its face, there is a

15  date that would indicate that it was treated as in effect in

16  July of 2020 -- not to say it was, but that's an

17  indication -- and that the adoption date was July of 2011,

18  that would bolster the testimony, which the Court does not

19  accept as true or untrue, but does say, for purposes of

20  admissibility, that this was in effect in between July of

21  2011 and July 2nd of 2020.

22           Therefore, there is a basis for accepting this as

23  the version in effect at the time in question, although the

24  defendant is free to dispute that however they want, but it

25  can be admitted on that theory.

1          **MR. BIGELOW:**  Thank you, Your Honor.

2          **THE COURT:**  Yes, sir.  All right.  So Exhibit 23

3    is admitted.

4          (Plaintiff Exhibit 23 was marked and admitted into

5    evidence.)

6          **THE COURT:**  And I do want to instruct the jury:

7    The fact that I've admitted it as evidence of the policy in

8    effect at the time in question is not conclusive on that

9    question.  If the defendant wants to argue or introduce

10   evidence suggesting that it wasn't in effect, they're free to

11   do so, but you are allowed to consider that, this document,

12   for what the plaintiff says it is, which is the version in

13   effect at the time in question.  But whether it is the

14   version in effect at the time in question is a decision for

15   you and you alone.

16         All right.  Mr. Bigelow, you may proceed.

17         **MR. BIGELOW:**  Thank you, Your Honor.

18   **BY MR. BIGELOW:**

19   Q.    Dr. Jara, if you would, please turn to Plaintiff

20   Exhibit 26.

21   A.    (Witness complies.)

22   Q.    Do you remember seeing this post?

23   A.    Yes, I do.

24   Q.    And do you remember seeing it in 2017?

25   A.    Yes, I do.

1    Q.    And is it a post for a position as the department head

2    of the physics and math department at Tennessee State

3    University?

4    A.    Yes, it is.

5              MR. BIGELOW:  Your Honor, I ask this be entered

6    into evidence as Plaintiff's Exhibit 26.

7              THE COURT:  Any objection?

8              MS. CARTER:  No objection at this time, Your

9    Honor.

10             THE COURT:  All right.  Thank you.  Exhibit 26

11    will be admitted.

12             (Plaintiff Exhibit 26 was marked and admitted into

13    evidence.)

14             THE COURT:  Dr. Jara, is it your understanding

15    that the idea of department head, which is what this document

16    refers to, is the same thing as a chair?  Is that fair to

17    say?

18             THE WITNESS:  Yes, it is.

19             THE COURT:  Chair and a head are two different

20    objects, but when we're talking about the top person in the

21    department, they're the same thing; is that right?

22             THE WITNESS:  Exactly.

23             THE COURT:  All right.

24    BY MR. BIGELOW:

25    Q.    Dr. Jara, I'm going to turn your attention -- try to

1   make this as easy as possible on the jury here -- to the top

2   of the page.  This position says -- at least this document

3   says it was posted on the 5th of January 2017; is that

4   correct?

5   A.    Yes, it is.

6   Q.    And then it has a paragraph about job summary, correct?

7   A.    That's correct.

8   Q.    Okay.  And this is an important document that I want to

9   go over with you kind of line by line, frankly.

10         And the job summary says:  "The chair must be able to

11  provide strong leadership to promote a powerful vision for

12  the advancement of the department's mission and goals."

13         Do you believe that you're qualified to provide strong

14  leadership and promote that powerful vision?

15  A.    Yes, I do.

16  Q.    It says:  "The department is seeking to increase its

17  stature and reputation nationally and internationally while

18  maintaining its culture of instructional excellence."

19         Do you see that?

20  A.    Yes.

21  Q.    Were you ready and qualified to increase the stature

22  and reputation nationally and internationally?

23  A.    I was.

24  Q.    In fact, you've traveled internationally, haven't you?

25  A.    Yes, I have.

1  Q.    As a professor?

2  A.    No.  As a graduate student.

3  Q.    As a graduate student?

4  A.    Yes.

5  Q.    Okay.  What do you do as a graduate student?

6  A.    Well, I won an award, traveling award, at the end of my

7  studies; and it allowed me to spend around six months

8  traveling around Europe, visiting different universities that

9  I was invited to.  So I went to give talks in the University

10 of Tübingen.  I went to even talk in the University of Aalen,

11 I went to talk at the University of Karlsruhe.  Those are all

12 universities in Germany.  Then I went to the Delft Institute

13 of Technology; I gave a talk there as well.

14        I participated in a couple of seminars in Blaubeuren.

15 And then I went to Italy, and I participated in a seminar as

16 well.  And I was invited by different departments to present

17 my research and my results of my dissertation before I

18 defended it.

19 Q.    While we're talking about international travel -- and I

20 should have asked this, but it seems like something that it's

21 so obvious that it was nowhere in my preparation for this:

22 You are fluent in Spanish, correct?

23 A.    Yes, I am.

24 Q.    So you could teach a class in Spanish if you wanted to?

25 A.    I have.

1    Q.    Okay.  I want to go to the second line or the third

2    line:  "The chair will be responsible for working effectively

3    with the departmental faculty in an open and participatory

4    manner."

5         And it continues:  "In collaboration with the

6    department faculty, the chair will oversee recruitment

7    efforts, assist in the development of curricula and new

8    programs including a graduate program, make recommendations

9    to the dean regarding all personnel matters, including the

10   evaluation of faculty and staff, and administer all

11   departmental budgets."  Is that correct?

12   A.    That's correct.

13   Q.    I would turn your attention to this right here which

14   says "including a graduate program."  Is that of particular

15   import to you, importance to you?

16   A.    Absolutely.  I was hired at TSU to actually increase

17   the number of the students in the graduate program,

18   especially because of the need of the state of Tennessee to

19   have more qualified teachers, because that's sort of common

20   knowledge that math teachers, you know, it's hard to find.

21        So unfortunately, during this process of department

22   chairs, the university decided to close the program.  And at

23   the time, we had a -- the department had million-dollar

24   grants for students to support them; and at the same time,

25   during this period of time, I actually had the chance to

1    direct two graduate students' theses in which one of them

2    actually obtained a new result.

3    Q.    Okay.  After that, it states at the bottom of the job

4    summary:  "This is a 12-month tenure track position with the

5    possibility of tenure upon appointment."  Is that correct?

6    A.    Yes, that's correct.

7    Q.    Okay.  Now --

8                THE COURT:  Let me ask you -- jump in with a

9    question about that.  You had talked about how there had been

10   a requirement to seek a candidate first internally to fill

11   the position of chair; is that right?

12               THE WITNESS:  That's correct, Your Honor.

13               THE COURT:  Now, for internal candidates to your

14   understanding, would they be really selected from only people

15   that already had tenure?

16               THE WITNESS:  I am not 100 percent sure, Your

17   Honor, but if it is, it's described in the policy.

18               THE COURT:  Okay, gotcha.  Because it sounded like

19   someone was eligible for this job even without tenure, but

20   you already had tenure; is that correct?

21               THE WITNESS:  Yes, I did.

22               MR. GANT:  Okay.  All right.  Thank you.

23               MR. BIGELOW:  And to your point, Your Honor, it

24   does say here, "with the possibility of tenure upon

25   appointment."

1    BY MR. BIGELOW:

2    Q.    Is that -- it does say that, correct, Dr. Jara?

3    A.    Yes, it does.

4    Q.    Okay.  Thank you.  Sorry.

5         I want to hit on -- and this is really important.  I

6    want to hit on the minimum qualifications.  Okay?  But before

7    I hit on it, when you applied for this position, what do you

8    submit to the committee?

9    A.    I submitted the documents requires, which included a

10   cover letter; a CV; transcripts, I believe; a research

11   statement; and another statement like a vision, kind of.

12   Q.    Okay, thank you.  Here we go.  Minimum qualifications

13   and experience, right here:  "The successful candidate must

14   have an earned doctorate or the foreign equivalent or its

15   equivalent in training, ability, and/or experience in

16   mathematics or closely related field and have sufficient

17   experience and achievement to qualify for the rank of

18   professor."

19        You had that at that time, did you not?

20   A.    Yes.

21   Q.    Okay.  So that's one of the qualifications, minimum

22   qualifications.  It does say minimum qualifications, correct?

23   A.    (Nodding head affirmatively.)

24   Q.    What does that mean to you, minimum qualifications?

25   A.    Means that every applicant who does not satisfy those

1    minimum qualifications shouldn't be considered.

2    Q.    If the minimum qualification to be a U.S. District

3    Judge would be to have graduated from a law school, would you

4    have to have graduated from law school in order to be a U.S.

5    District Judge?

6    A.    You should, yes.

7    Q.    You should or you must?

8    A.    You must.

9    Q.    Okay.

10   A.    Yes.

11   Q.    Second:  "The successful candidate will have a record

12   of scholarship and research that includes peer-reviewed

13   publications and securing external funding."

14        Did I read that correctly?

15   A.    Yes, you did.

16   Q.    So that's really two parts, though, isn't it, Dr. Jara?

17   It's record of scholarship and research that includes

18   peer review publications, correct?  And then there's an

19   "and," right?

20   A.    Yes.

21   Q.    So the second thing you have to have:  "Will have a

22   record of scholarship and research that includes

23   peer-reviewed publications."  So that's the second minimal

24   qualification.  And then:  "And securing external funding,"

25   correct?

1    A.    Correct.

2              THE COURT:  Is the question whether he agrees that

3    those are the second and third --

4    BY MR. BIGELOW:

5    Q.    Do you agree that those are the second and third

6    minimum qualifications?

7    A.    I do.

8    Q.    Okay.  I want to focus on the third minimum

9    qualification.  When it states "securing external funding,"

10   is that kind of a commonplace adjective for securing grants,

11   bringing in grants?

12   A.    Yes.

13   Q.    Okay.  And you talked about the importance of grants

14   earlier, correct?

15   A.    I think so, yes.

16   Q.    It also states that "The candidate should provide

17   evidence of effective leadership experience, exceptional

18   communication and interpersonal skills, and ability to work

19   productively with faculty and students from diverse

20   backgrounds," correct?

21   A.    Correct.

22   Q.    Okay.  Now, that last -- well, let me hit on each of

23   those actually.  Let's take that one by one.  "The candidate

24   should provide evidence of effective leadership experience."

25   Did you provide evidence of effective leadership experience?

1  A.     Yes, I did.

2  Q.     Okay.  Did you provide exceptional communication,

3  evidence of exceptional communication and interpersonal

4  skills?

5  A.     Well, my colleagues all knew me.

6  Q.     No, but did you provide evidence to the --

7  A.     Sure, yes.

8  Q.     And also, did you provide evidence in your packet of an

9  ability to work productively with faculty and students from

10  diverse backgrounds?

11  A.     Yes, I did.

12  Q.     Okay.  Now, again, these are minimum qualifications,

13  correct?

14  A.     Yes, they are.

15  Q.     Okay.  On the third page, on the third page, it says:

16  "Please upload the following documents: résumé, cover letter,

17  philosophy statement, transcripts, and list of references."

18        Did you submit that?

19  A.     Yes.  I submit all of them.

20  Q.     Okay.  If you would, Dr. Jara, please turn to

21  Exhibit 29.  And just to make it easier, also look at

22  Exhibit 30 as well.  Dr. Jara, what is -- well, 29 is what

23  you submitted as your application for this position, correct?

24  A.     Yes, that's correct.

25  Q.     And that includes a cover letter, a philosophy

1  statement, and your CV, correct?

2  A.    That's correct.

3  Q.    And page 30 is your official transcript from LSU,

4  correct, Louisiana State University?

5  A.    Yes.

6            MR. BIGELOW:  Okay.  Your Honor, I ask that these

7  be admitted as Plaintiff's Exhibit 29 and 30.

8            THE COURT:  Any objection?

9            MS. CARTER:  No objection.

10            THE COURT:  All right.  29 and 30 will be

11  admitted.

12            (Plaintiff Exhibits 29 and 30 were marked and

13  admitted into evidence.)

14            THE COURT:  I did want to ask one thing, Dr. Jara.

15            THE WITNESS:  Yes, Your Honor.

16            THE COURT:  Plaintiff's Exhibit 29, you say:  "TBR

17  does not demand a full professor to serve as department

18  chair."  Do you see that?

19            THE WITNESS:  Yes, I do.

20            THE COURT:  And "TBR" means what?

21            THE WITNESS:  Tennessee Board of Regents.

22            THE COURT:  Okay.  And they are the ones that sort

23  of set the rules for Tennessee State University?  Would that

24  be fair to say, to your understanding?

25            THE WITNESS:  I believe it was at the time ever

since there was a change in the legislature; and now state
universities, each one of them have their own board.  So I am
not sure about the timing but I -- if I wrote TBR, it
probably was because we were under TBR so, you know, at that
time.

       **THE COURT:**  Okay.  Let me ask you this then:  It
sounds like you had tenure but someone could actually fill
this job without having tenure; is that right?

       **THE WITNESS:**  Yes, that's right.  But it's a --
the thing is that the tenure is given by the Tennessee Board
of Regents.  So if you are not a professor from -- in a
university of Tennessee, then there is no way that you could
have had tenure.

       Does that make sense?

       **THE COURT:**  Yes, uh-huh.  And then what I was kind
of getting at was, did you view this as a promotion even
though you already had tenure?

       **THE WITNESS:**  Yes, indeed, because as it happened,
once that you get the position, then you not necessarily have
to be a full professor before, but as you take the position,
then you become a full professor.  So you effectively move
from being an associate professor to an -- to a full
professor, as it actually happened with the candidate who was
given the position.

       **THE COURT:**  Okay.  Thank you, Dr. Jara.  I'll just

1   leave it there.

2           Mr. Bigelow, you may continue.

3   **BY MR. BIGELOW:**

4   Q.    And if you get the position, you actually become a

5   chair of a department, correct?

6   A.    Yes.

7   Q.    Is that a pretty big deal?

8   A.    Yes, it is.

9   Q.    It's prestigious to be a chair of a department?

10  A.    Yes.

11  Q.    Okay.  In your philosophy statement, at the very bottom

12  of it, you wrote that "I believe no matter the role that one

13  plays in university, one has to keep in mind that behind

14  every student, there is hope, and behind every faculty, there

15  is a person and perhaps a family."

16          What did you mean by that?

17  A.    During this time at TSU, like I previously mentioned,

18  there was a department chair position being given to a

19  faculty member of the department who did not get the majority

20  of the votes.  And --

21  Q.    I just want to know what you mean by "behind every

22  student, there is hope."  What do you mean by that?

23  A.    Well, when you deal with college students, you -- you

24  have all kinds of college students.  You have the college

25  student who actually somebody's paying for their education,

1   but you have some others that actually go to great lengths to
2   try to get their education.

3       So whenever you have a student, you have to think of
4   them, that yes, some of them may have no problem, but some of
5   them may be struggling.

6   Q.   And are you helping provide hope for that person?

7   A.   Of course.  That's why you need to treat those students
8   accordingly.  One of the hardest parts, for example, of
9   teaching a freshman course is to actually let them know that
10  this is -- that it's no longer free education.  Even at a
11  state university, tuition is expensive.  And no matter where
12  the money comes from, they are paying customers.

13  Q.   I want to focus on your CV for a few moments, actually
14  more than a few moments because it's important.

15           **MR. BIGELOW:**  Can the jury see that okay?  Okay.

16  **BY MR. BIGELOW:**

17  Q.   At the top, it says your name, Ph.D., correct?

18  A.   Yes.

19  Q.   And then underneath that, it states:  "Education, Ph.D.
20  in Mathematics.  Louisiana State University - USA (2008)."
21  Then it says:  "Dissertation:  Rational approximation schemes
22  for solutions of the abstract Cauchy problem and evolution
23  equations."

24       Did I read that correctly?

25  A.   Yes, you did.

1    Q.    It sounds complex.  Is it complex?

2    A.    Perhaps.  That's a matter of opinion.  I don't know.

3    Q.    Okay.  Fair enough.

4          Underneath that, it says you have your M.Sc.  Was that

5    your master's?

6    A.    Yes.

7    Q.    In math from Louisiana State, and then another master's

8    degree from the University of Santiago, Chile, correct?

9    A.    Yes.

10   Q.    And you did a thesis at the University of Santiago; is

11   that correct?

12   A.    Yes, I did.

13   Q.    And that's spectral invariance of integral operations

14   in Lorentz spaces?

15   A.    Close enough.

16   Q.    Okay, I'll take it.

17         It talks about your research interests.  Trying to do

18   your best in less than 30 seconds, could you tell the jury

19   kind of generally what some of those interests are about?

20   A.    Sure.  So I'm mainly focused on two big areas.  One of

21   them is called functional analysis.  So as you may recall

22   from algebra, you study functions, right, and then you go

23   into calculus and you study more functions; and then you go

24   to Calculus II, more functions; Calculus III, more functions;

25   differential equations, there's more functions.  So this

1  keeps growing.

2          (Reporter clarification.)

3          **THE WITNESS:**  I am sorry.  I apologize.  So where

4  were we?

5  **BY MR. BIGELOW:**

6  Q.    There are lots of functions, and it gets more and more

7  difficult as you go higher.

8  A.    So as you continue, the world of functions seems to be

9  it is a big deal in mathematics.  So I study things that are

10  related to that work and their approximation.  That's the

11  other side of the coin which is basically what we call the

12  Merigon analysis.

13          So just classical examples, what you see in the

14  weather, whenever they show you the projection of the

15  weather, that is a functional analysis together with a

16  Merigon analysis combined that produces this picture of how

17  the weather, how they predict the weather.

18  Q.    Okay.  Thank you.

19  A.    Things like that.

20  Q.    Thank you.

21          Under your academic employment section, it states that

22  you're a tenured professor, correct?  Right there.  I just

23  highlighted it.  Yes?

24  A.    Yes.

25  Q.    And it also states that you are assigned to teach nine

1    credit hours per academic semester; is that correct?

2    A.    That's correct.  At LSU.

3    Q.    Yeah.  I want you -- I want to spend some time on your

4    funding awards.  Now, when you say funding awards, to kind of

5    put things into place, in the minimum qualifications when it

6    says secured external funding, is this what it's talking

7    about?

8    A.    Yes.

9    Q.    Okay.  So your funding awards, you noted five, correct?

10   A.    Correct.

11   Q.    Now, the first one -- first of all, what is a PI?  It

12   says -- some of this says co-PI, sole PI, and all these kind

13   of things.

14   A.    It's a technical term for principal investigator.  So

15   basically you can submit a grant by yourself, which is very

16   rare to be awarded a grant by yourself.  Usually you have a

17   group of people.  And technically, you need to name one

18   principal investigator.  And then they're called principal

19   investigators because of a technicality that somebody has to

20   be there.  The PI that usually people calls it.

21   Q.    So the first funding award was for -- that you noted

22   here was for $297,000 and change, correct?

23   A.    Correct.

24   Q.    And the second one where you were the sole PI was for a

25   little over $100,000, correct?

```
1    A.    Correct.

2    Q.    And the third one, was that -- the third one done at

3    TSU?

4    A.    Yes, it was.

5    Q.    Okay.  Were the first -- the first one was done at TSU

6    as well, correct?  It says right here, at Tennessee State

7    University?

8    A.    Yes.  All of them were at TSU.

9    Q.    All of them were at TSU?

10   A.    Yes.

11   Q.    Okay.  The third one was also TSU like you said, and

12   that was for $424,834?

13   A.    Yes, it was.

14   Q.    Okay.  And then you had a travel grant from the

15   Louisiana Education Quality Support Fund, correct?

16   A.    Correct.

17   Q.    Now, tell me about that.  It says for visiting and then

18   it talks about a bunch of stuff.  Tell the jury that, if you

19   will.  Explain that.

20   A.    That was what I was referring before, the travel that I

21   did over like a semester in which the university, the travel

22   grant actually paid for lodging, food, transportation,

23   airfare.

24   Q.    Okay.

25   A.    So it was -- it was very nice.
```

1  Q.    And then it has a travel grant, second travel grant,

2  correct?

3  A.    Yes.

4  Q.    Now, if you total the first three things up, it's a

5  little over $800,000, if my math is correct.  Is my math

6  right, Professor?

7  A.    Yes.

8  Q.    Okay.  And if you were to put a number on the

9  additional funding awards, the two travel grants, if you were

10  to combine all five, what would -- I'm not holding you to a

11  specific number.  Around about what number would it be of

12  dollars?

13  A.    900 to a million.

14  Q.    900 to a million dollars?

15  A.    Uh-huh.

16  Q.    Okay.  And this is what you submitted to the committee,

17  correct?

18  A.    Yes.

19  Q.    Okay.  After that, after it talks about the securing

20  the external funding, it talks about publications, correct?

21  A.    Correct.

22  Q.    And when I say "it talks about," your CV addresses

23  publications, correct?

24  A.    Correct.

25  Q.    And it has a publication in a -- I guess it's a book or

1  a journal: *Neural, Parallel, and Scientific Computations*.

2  Is that a --

3  A.    That's a --

4  Q.    -- journal?

5  A.    Yes.

6  Q.    Okay.  And then another one, *Rational Inversion of the*

7  *Laplace Transform*?

8  A.    Yes.

9  Q.    And then more, *Rational Approximation Schemes For*

10  *Solutions* for the Cauchy problem?  You like Cauchy, I guess?

11  A.    Yes.

12  Q.    Is Cauchy a pretty big deal in the math world?

13  A.    Cauchy is, yeah.

14  Q.    Okay.

15  A.    It's a problem that's been studied extensively and has

16  shown to be very, very difficult to crack it.  That's why

17  there is a lot of publications on the subject and that's why

18  that one was in the proceedings of the American Mathematical

19  Society.

20  Q.    And the next one is *Rational Approximation Schemes for*

21  *Bi-continuous Semigroups*?

22  A.    Yes.

23  Q.    And then you have another publication on the next page,

24  correct?

25  A.    I believe so.

1  Q.    Let me make it easier for people to see.

2       Rational approximation of schemes for this one.  More

3  Cauchy.

4  A.    That was my dissertation.

5  Q.    Okay.  And then you had two articles in preparation,

6  correct?

7  A.    Yes, sir.

8  Q.    And after that, you have a section called "Refereeing."

9  What is refereeing?

10 A.    So as I explained before, one publishes, right, by

11 submitting to an editor.  The editor picks professors around

12 the world and sends them the document and asks if you will

13 please review this.  Obviously, they have to be experts in

14 the field.  So refereeing means when you are actually the one

15 reviewing it.

16       So obviously, this is a -- it's not paid.  Nobody gets

17 a penny.  And you actually are not supposed to divulge

18 what -- what -- you can say what I have listed there, but not

19 about who was I reviewing.

20 Q.    Okay.  And you have a number of talks that you gave,

21 one to -- let's see, one, two, three, four, five, six, seven,

22 eight, nine different talks that you gave that you had

23 written down, correct?

24 A.    Yes.

25 Q.    And some of those talks were at TSU and some were in

1  Germany and some were at Louisiana State; is that correct?

2  A.    Yes.

3  Q.    And one was in Chile?

4  A.    Yes.  I believe so, yes.

5  Q.    Second one from the bottom?

6  A.    Yes.

7  Q.    And then below that, you have a section called

8  "Teaching and Advising."  And it notes that there were some

9  graduate students that you taught and advised as well as some

10 undergraduate students; is that correct?

11 A.    Yes, that's correct.

12 Q.    And when you advise and teach graduate students, is

13 that to help them gain, ideally, a master's or a Ph.D.?

14 A.    Yeah, graduate student is -- yeah, either a master's or

15 a Ph.D.

16 Q.    Okay.  And what do you do when you advise undergraduate

17 students?  What are they -- is it like senior thesis or

18 senior projects?

19 A.    Yes.  It used to be like that in our program.  Now it's

20 no longer the case.

21 Q.    Okay.  And it's like a one-on-one?  It's a one-on-one

22 thing when you're helping them out?

23 A.    Yes.

24 Q.    Okay.  I'm not going to go into excruciating detail,

25 but the next portion talks about the courses you've taught at

1  TSU; LSU; Louisiana Resource Center for Educators; University

2  of Santiago, Chile; and Universidad de la Ciencias, de la

3  Informática en Chile, correct?

4  A.     Yes.

5  Q.     And at all of those places, did you ever have anyone

6  complain to you that they couldn't understand you?

7  A.     No.

8  Q.     Okay.  At all the other places, did anyone ever not pay

9  you on time?

10  A.     No.  They always pay me on time.

11  Q.     Okay.  At all of those other places, did anyone ever

12  question a time sheet and your signature?

13  A.     Actually, I've never had -- I didn't even know what a

14  time sheet was until interim chair -- I mean Interim Dean

15  Sharpe started demanding me to sign them.  I wasn't even

16  aware that they existed.

17  Q.     So the answer is no, though?

18  A.     No.

19  Q.     Okay.  The next section talks about service.  And this

20  is important, too, I think.  It says Academic Year 2016-2017.

21  You're the academic audit committee chair; is that correct?

22  A.     Yes, I was.

23  Q.     And then you also were on the curriculum committee?

24  A.     Yes, I was.

25  Q.     And the year before, you were the academic productivity

1   review and post-approval monitor of the committee chair,

2   correct?

3   A.    Yes, I was.

4   Q.    And then you were on the curriculum committee again

5   that year?

6   A.    Yes, I was.

7   Q.    And the year before that, you were faculty advisory

8   committee to academic affairs, the graduate program committee

9   chair, and enhanced mathematics courses committee, correct?

10  A.    Yes.

11  Q.    As well as the chair of the technology committee?

12  A.    Yes, I was.

13  Q.    And it just goes on and on, and you were involved with

14  lots of committees and leadership positions; is that correct?

15  A.    That's correct.

16  Q.    Okay.  And it talks -- the last thing it says, it talks

17  about your professional membership.  And you're a member of

18  the American Mathematical Society; is that correct?

19  A.    Yes.

20  Q.    Okay.  In your opinion, or actually just factually, I

21  suppose, did you meet the minimum requirements to be a chair?

22  A.    Yes.

23  Q.    Do you have any doubt about it?

24  A.    No.

25  Q.    Okay.  Briefly, I want you to look or I'm going to turn

1  your attention to Plaintiff's Exhibit 30 which was already

2  entered into evidence.  The jury will ultimately have this,

3  but approximately what was your GPA at LSU?

4  A.    3.84.

5  Q.    3 point what?

6  A.    3.84.

7  Q.    3.84?

8  A.    Uh-huh.

9  Q.    Are you ashamed that you, like, didn't get a 4.0?  Was

10 that like -- did that hurt you?

11 A.    No.  I'm okay with it.

12 Q.    Okay.  Do you know who ultimately received the job that

13 you applied for?

14 A.    I do.

15 Q.    And who is that?

16 A.    Dr. Nolan McMurray.

17 Q.    And he's here today, correct?

18 A.    Yes, he is.

19 Q.    And he's sitting with defense counsel?

20 A.    Yes, he is.

21 Q.    And is he your boss now or was he your boss then or

22 both?

23 A.    Both.  Ever since -- ever since Interim Lonnie Sharpe

24 retired, Dr. Nolan McMurray was promoted to the -- be the

25 interim dean of the college.

1  Q.    What's your understanding with regards of -- regards to

2  Dr. McMurray's application to become chair?

3              **MS. CARTER:**  Objection.

4              **MR. BIGELOW:**  He can testify as to his

5  understanding.

6              **THE COURT:**  Well, the question being what's your

7  understanding.  I'm going to sustain the objection and note

8  that you can establish a foundation for him having grounds

9  for an understanding.

10 **BY MR. BIGELOW:**

11 Q.    Do you believe that Dr. McMurray met the minimal

12 qualifications required to be the chair?

13             **MS. CARTER:**  Objection.

14             **THE COURT:**  Yeah, again, no basis.  I'm going to

15 sustain the objection.  No basis for a belief has been shown.

16             Tell you what.  Is this a good time to break for

17 the day?  We can go a few more minutes if you like, but . . .

18             **MR. BIGELOW:**  Could you just give me two more

19 minutes and then we can break?

20             **THE COURT:**  Sure.

21 **BY MR. BIGELOW:**

22 Q.    Okay.  If you would, turn to page -- or turn to

23 Plaintiff's Exhibit 31, please, Doctor.

24        Do you know what Plaintiff's Exhibit 31 is?

25 A.    It looks to be one of the statements of Dr. Nolan

1   McMurray.

2   Q.    Okay.  Do you -- do you have any knowledge as to

3   whether Dr. McMurray had any external funding prior to

4   applying to become the chair at TSU?

5   A.    The CV provided did not show any external funding.

6   Q.    Okay.

7              **MR. BIGELOW:**  I think that's a good time to stop.

8              **THE COURT:**  All right.  Very well.  Did you have

9   something, Ms. Carter?

10             **MS. CARTER:**  No, Your Honor.

11             **THE COURT:**  Okay.  All right.  Very well.  So what

12  we'll do right now is allow the jurors to step down.

13             Please do recall what I stated earlier,

14  admonitions about not talking about this case with anyone

15  else including each other, even sort of family members and so

16  forth, not doing your own research or investigation or

17  anything like that.

18             You know, if you want to tell someone you had jury

19  service today, of course, that's fine, but anything about the

20  case, please don't be discussing.

21             We'd ask that you report to the jury assembly room

22  at 9:00 a.m. tomorrow morning.

23             And yes, did you have something?

24             **MS. CARTER:**  Oh, no.

25             **THE COURT:**  No, you're just stretching?  All

1  right.  That's legit.  I just didn't want to miss anything.

2          And I did want to thank you again for your

3  continuing service.  If you show up at the jury room at 9:00,

4  we'll be prepared to start and call you up right after that

5  and we'll go from there and continue with the examination of

6  Dr. Jara.

7          So the jurors may step down at this time.  Thank

8  you.

9          (WHEREUPON, the jury was excused for the day, with

10  matters being heard in open court as follows:)

11          **THE COURT:**  All right.  Dr. Jara, you may step

12  down.

13          **THE WITNESS:**  Thank you, Your Honor.

14          **THE COURT:**  Yes, sir.

15          All right.  So, you know, my intention is to have

16  a draft jury charge to submit to the parties tomorrow

17  morning, and maybe Thursday, we can -- Thursday morning, do

18  the jury charge.  I wanted to -- yeah, please be seated.

19          I wanted to comment on something that I did there.

20  And really, to make clear, I wasn't putting my thumb on the

21  scale in favor of either side.

22          I was concerned or interested in the head of the

23  department.  There was something on there -- and I think you

24  know what I'm referring to -- that might indicate that

25  actually it's, I don't know, more of an administrative

1   position, didn't -- not necessarily a promotion because it

2   had on there, right, this language, hey, it's a tenure track

3   position, possibility for obtaining tenure.

4          But Dr. Jara, already having tenure, it could be

5   taken by someone as saying, well, gee, I'm not so sure that

6   this is actually a promotion rather than some sort of

7   administrative position that sounds nice, but in substance

8   isn't as big a deal as having the tenure that Dr. Jara

9   already has and that apparently a department head might wish

10  to attain.

11         So I was interested in wondering whether there was

12  reason to believe it was a promotion.  That's why I went the

13  direction I did.

14         Now, both sides with their proposed jury

15  instructions have assumed that this position would have been

16  a promotion.  And before making that assumption, which the

17  parties made by really not requiring the jury to find that

18  failure to give the position was an adverse employment

19  action, but instead, their jury verdict forms assumed that

20  failure to grant this position was a failure to promote and

21  thus constituted an adverse employment action.  In other

22  words, the parties have assumed this.

23         For the sake of defendant, I wanted to test that

24  assumption and see whether there was reason to believe that

25  this was, in fact, a promotion.  That's why I went the

1   direction I did, to see whether the parties' assumption was

2   valid.  Because if it wasn't, if there was no evidence to

3   support it, I don't know if I would have allowed any such

4   assumption to show up on a verdict form.

5          So if it sounded like I was firming up the

6   plaintiff's case on some point, that's not what I was doing,

7   and I wanted to be clear about that.

8          **MS. CARTER:**  Your Honor, may I speak to that?

9          **THE COURT:**  You may.

10         **MS. CARTER:**  And, in fact, that will be a strong

11  strain in the defendant's case, that it is not a position of

12  promotion.  That is the way it has been couched, but we don't

13  agree with that.  So that will be -- you know, that's --

14         **THE COURT:**  I think -- look, I think that that is

15  a fair argument to make, but I guess what I want to know,

16  though, is if that's the argument, could someone explain to

17  me why the proposed verdict form was -- particularly, I think

18  I called this issue to everyone's attention at the first

19  pretrial conference, right?  Like, what is being assumed

20  about what's an adverse employment action versus what isn't?

21  That proposed jury instruction says to me the defendant is

22  saying we are going to ask the jury to assume that this is a

23  failure to promote.

24         That's the only way to read that jury proposal.

25  Am I missing something?

1   **MS. CARTER:** Well, and that may be on me, because
2   I looked at it in terms of wanting to understand if the jury
3   was going to find it as a failure to promote, given the
4   evidence it will be presented, and because it is what
5   plaintiff says supports the compensatory damages award, so I
6   wanted to make sure that we could break those two out.
7           **THE COURT:** I think it's important to break them
8   out. I had thought, and I'd be curious what other folks'
9   memory is, I sort of think that I had alluded to the notion,
10  you know, let's pay attention to whether we need to break out
11  separately whether something is an adverse employment action
12  versus being assumed.
13          Do you think I did that, Mr. Bigelow?
14          **MR. BIGELOW:** I think you did that, Your Honor,
15  yes. But I think you did say to break that down; I think we
16  tried to break it down. But I will say with all due respect
17  until now -- and I think you're alluding to this -- neither
18  party has brought up it anywhere, including, frankly, in the
19  defendant's motion for summary judgment, that this was
20  somehow not a promotion.
21          **THE COURT:** Yeah. And I'm --
22          **MR. BIGELOW:** This is the first time that I've
23  even heard that argument, Your Honor. And I know it came
24  from you, but it's the first time I've heard this argument.
25  And I'm glad my -- I don't look at it as helping my side out.

1    I know you said, well, maybe -- I actually looked at it

2    helping their side out because in theory, Dr. Jara could have

3    said, oh, interestingly enough, Judge, you know what?  No.

4    This is --

5              THE COURT:  Right, right.

6              MR. BIGELOW:  -- not a fair -- and you would have

7    been like, well -- they would have jumped up and said, well,

8    kick this, there's no claim anymore.  And I would have said,

9    well, you're right.

10             THE COURT:  Exactly.  And so that's why, you know,

11   on the one hand, the answers that were given tended to

12   support sort of plaintiff's position that this was a

13   promotion.  But the risk was there, and that it could have

14   come out to indicate, well, you know what?  It's not really a

15   promotion, in which case the signals I was getting from both

16   sides, for whatever reason, that this is a promotion, we're

17   going to assume it, I'd have qualms submitting it to the jury

18   under that assumption.

19             And I don't want the jury sort of confused about

20   that because, you know, I'm not claiming to be the brightest

21   bulb in the bush.  That jumped out to me immediately:  How do

22   I know it's a promotion.  I mean, you don't even have to be a

23   tenured professor to get this.  And this tenured professor is

24   complaining about getting a job -- that we haven't heard

25   about the salary yet, and maybe we could talk about how that

1    would be a jump in salary.  But like, it would look for all

2    the world like maybe it's an administrative position, less

3    prestigious because you don't have to be an academic bigwig,

4    meaning a tenured professor to get it.  And I don't want the

5    jury confused.

6              And so I really thought the parties have been

7    assuming this in part because of what you say, Mr. Bigelow.

8    I didn't see anyone ever claiming that the failure to -- or

9    the decision -- and I won't call it a failure; that implies

10   something wrong and I'm not saying that it's something wrong.

11   We don't know.  That's what we're here to determine -- but

12   not giving him the position, I thought everyone was assuming

13   would be a failure to promote.

14             The question was whether the failure to promote

15   was based on national origin.  I thought that's what the

16   dispute was about.  And I don't know that the defendant is

17   prohibited from arguing it.  I am saying that they've -- they

18   have indicated as recently as this very recent jury verdict

19   form that there's nothing for the jury to decide here.  This

20   is a failure to promote.  The question is whether it's

21   justified.  There's the way I view it.

22             Yes, sir.

23             **MR. BIGELOW:**  Again, Your Honor, prior to 10

24   minutes ago, I -- the defendant has never indicated that this

25   was an argument that they were ever going to make, let alone

 1  could be made.  So it's new to the plaintiff based on your

 2  rationale, Judge.

 3          **THE COURT:**  All right.  Thank you, Mr. Bigelow.

 4          Yes, Ms. Carter?

 5          **MS. CARTER:**  So, Judge, I do not want to prejudice

 6  my client.  In light of Your Honor's comments, then perhaps I

 7  should not agree to that on the verdict form.

 8          **THE COURT:**  Well --

 9          **MS. CARTER:**  Because it is our intent -- I mean,

10  that -- have many questions about that, you know, and we do

11  have witnesses about that.  And it is an administrative

12  position, as I think even the chair guidelines suggest, that

13  were entered into evidence already by plaintiff's counsel.

14          **THE COURT:**  What would the evidence show?  Was

15  there going to be any evidence on, like, salary of this

16  position compared to the associate professor position?

17          **MR. BIGELOW:**  Absolutely, Your Honor.  I mean,

18  absolutely.  We're going to get in with Dr. McMurray as to

19  how much money he made and how much money he makes versus how

20  much money my client makes.

21          **THE COURT:**  What's the defendant's position?  Is

22  that chair position subject to a higher salary than the

23  associate professor position?

24          **MS. CARTER:**  That would be it depends.  And I'm

25  not trying to be flippant with the Court.

1   **THE COURT:**  No, I'm sure you're not.

2   **MS. CARTER:**  But there -- as the guidelines say,

3   which will be the testimony, there is a stipend.  Like, for

4   example, let's say for the interim chair that's there now:

5   The interim chair gets a stipend, a monthly stipend, just

6   like a permanent chair for three years would get.  But that's

7   the appointment.  It's for three years.  And then they either

8   promote up or they go to, you know, a professor position,

9   et cetera.

10   So it is an administrative position, and they get

11   release time for that, you know, from their workload and

12   stuff.  And so they negotiate -- whoever the chair is that

13   comes in, like a permanent chair for that three years,

14   negotiates a salary.  And it depends on -- and we did speak

15   to this in the damages briefing that we did.  A full

16   professor, you can negotiate for that.  A -- an associate

17   professor is not a full professor.  That's not a full

18   professor salary.

19   And it also, when you're the chair, you get a

20   thousand-dollar-a-month stipend for that position.  But when

21   you are not the chair anymore, that thousand-dollar-a-month,

22   $12,000, goes away.  Like, if you just go back to teaching,

23   it goes away.

24   **THE COURT:** Does the defense have a view about

25   whether, in Mr. Jara's case, we know whether he would have

1   received more salary as the chair?

2           MS. CARTER:  So he would have received -- if he

3   had been appointed the chair, he would have received the

4   $12,000 -- you know, the thousand dollars a month stipend.  I

5   agree with that.

6           THE COURT:  Okay.

7           MS. CARTER:  And I would not -- I mean, I think

8   that's what the policy says when they -- you know, when

9   somebody takes that position.

10          In terms of the 12-month appointment versus -- and

11  it's 12-month appointment versus nine-month faculty salary,

12  there -- that's not a true comparison, right?  Because you're

13  working for 12 months, and you're getting a 12-month salary.

14  When you're working for nine months, you get a nine-month

15  salary, and so they're -- it's not comparable.

16          THE COURT:  Nine months, working nine months for

17  nine months' pay?

18          MS. CARTER:  Correct.

19          THE COURT:  As opposed to working 12 months for 12

20  months' pay?

21          MS. CARTER:  Correct.

22          THE COURT:  All right.

23          MS. CARTER:  So yes, I mean -- so I don't want to

24  prejudice my client because I was trying to understand or

25  provide the jury with something where I could understand if

1  they were going to give back pay, where that was going.

2          **THE COURT:**  Sure.  And I do understand that.

3          But, you know, I really -- you know, I thought I

4  had raised sort of this issue.  Hey, you know, you know,

5  let's be thoughtful about whether the jury needs to decide

6  whether something is an adverse employment action versus

7  well, it is, but if -- even if we break out adverse

8  employment action separately, we can just assume that

9  something is an adverse employment action and not have them

10  decide that it is.  You know, I thought I had done that.

11          You know, I -- I don't know that it's too late for

12  the defendant to argue that at this point.  Mr. Bigelow may

13  see it differently for whatever reason.  I do think -- the

14  only way to put it is this:  I see all kinds of cases.

15  There's nothing like employment discrimination trials for

16  confusion purposes.  They are just the way the law is, maybe

17  be even worse at summary judgment stage.

18          But part of the confusion is setting aside how

19  everything works at the summary judgment stage and doing it

20  how it needs to be done at the trial stage, but at the trial

21  stage, there are a lot of pitfalls.  So I've been working

22  hard to try and keep us focused in the jury instructions and

23  verdict form and otherwise on what's really an issue and what

24  isn't.  It seems to be sort of a shifting landscape, and it's

25  causing some, I think, some problems.

```
1          Mr. Bigelow, all right, what -- anything you want
2    to say on this for the time being?
3          MR. BIGELOW:  No, Your Honor, other than, you
4    know, as I stated to the Court before, defendant didn't have
5    this take during a motion for summary judgment that was
6    filed, you know, almost a couple years ago by now, nor did
7    they have it, frankly, this morning during their opening
8    argument.  Granted it's just opening argument, I get it.
9          THE COURT:  Sure.
10         MR. BIGELOW:  That doesn't mean they couldn't --
11   you know.  With that said, frankly, I hadn't thought about
12   failure to interview until we were talking about it in court,
13   and I raised it.  Admittedly, I lost, but I raised it, so it
14   goes.
15         THE COURT:  Well, these things do happen.  I would
16   say this, you know.  There's been a lot of discussion about
17   how a jury verdict form should look, and whatever my proposal
18   is, I'm going to be thinking about it and acting on it.  It's
19   going to take account on the need to just be clear about what
20   we're asking the jury to decide; how it may be helpful in
21   keeping an award of back pay separate from an award of
22   compensatory damages if liability is found; making sure we
23   don't assume things in a jury verdict form that one side or
24   the other says we can't assume in terms of the element.  All
25   these things gotta go into the mix.
```

1        I will say this, Mr. Bigelow:  You know, like I
2   say, I just -- I was really concerned someone could read that
3   as saying, you know, if the issue had not been raised, just
4   major confusion to the jury, like, this doesn't look like a
5   promotion.  And particularly depending on how the financial
6   information would have come out at trial, it looks like
7   someone with a lower rank, nontenured person, could get the
8   position.

9        So I did want to raise it.  And in light of
10  what -- you know, what the defense is saying, and assuming
11  they're allowed to raise this defense, you know, I think
12  it's -- right now, where I'm coming from is the defendant can
13  make that argument, fair enough, and you are free to continue
14  your inquiry to try and make your case that whatever
15  promotion is, this is it.

16       Or, if you want to scrap failure to promote from
17  my view and say forget about that, maybe we can tie it
18  directly to a denial of a pay increase if you want.  Whatever
19  it is, I think the issue is teed up for the jury because they
20  may wonder how this is adverse not to get this when it could
21  be taken from that job description as being slightly less
22  than a tenured faculty position.

23       **MR. BIGELOW:**  I am -- not that it matters what I
24  think, but I am absolutely fine with defendant making that
25  argument.

1          THE COURT:  Okay.

2          MR. BIGELOW:  My client makes $65,000 a year.

3  Does not control what he teaches or doesn't teach, doesn't

4  get enough chance to do grants and opportunity to do any

5  grants, where I believe Dr. McMurray makes a little over 100

6  grand, if not significantly more over 100 grand, and has a

7  whole bunch of fringe benefits allowed to his job, and I

8  invite them to make that argument.

9          THE COURT:  All right.  Any final thoughts in

10  light of all this back and forth?  There's going to be

11  grounds for folks to argue all kinds of things.  Jury verdict

12  form, should it be general as between just the dichotomy

13  between general discrimination versus hostile work

14  environment, or do we want to break out adverse employment

15  actions?

16          Because, you know, parties' views on adverse

17  employment actions could still be shifting.  I just -- you

18  know, I -- I don't want to send the wrong message as to what

19  the parties' views even are in a jury verdict form.

20          MR. BIGELOW:  The defendant started with the

21  broken out and I agreed with the Court and that's why I

22  submitted -- submitted what we did.  I think that's

23  appropriate for all the reasons that this Court noted a few

24  days ago.  I think it makes a tremendous amount of sense.

25  And it also frankly breaks that down versus the world of just

1    hostile work environment, which is an appropriate thing.

2            **THE COURT:** All right. What I'll do, if the

3    defendant is still inclined to do that, I'm going to try and

4    draft a form that, you know, pegs what I think are the right

5    adverse employment actions being asserted and doesn't build

6    in any assumptions that shouldn't be built in because one

7    side or the other isn't assuming them.

8            So that's what the jury verdict form is going to

9    do, and the proposed jury instructions that I put out there

10   will probably reflect that as well.

11           All right. Anything else we need to discuss

12   before we reconvene? And I would suggest tomorrow at 8:30 to

13   discuss, you know, where the Court landed overnight on these

14   issues.

15           Mr. Bigelow, anything further?

16           **MR. BIGELOW:** Nothing from me, Your Honor.

17           **THE COURT:** Thank you. Ms. Carter or Mr. Dalton?

18           **MS. CARTER:** Nothing further.

19           **THE COURT:** No? All right. Then we'll see you

20   folks at 8:30.

21           Thank you. We stand in recess.

22           **IN UNISON:** Thank you.

23           (WHEREUPON, the foregoing proceedings were

24   adjourned for the day at 5:11 p.m., to be resumed November 2,

25   2022, at 8:30 a.m.)

REPORTER'S CERTIFICATE

I, Deborah K. Watson, Official Court Reporter for the United States District Court for the Middle District of Tennessee, with offices at Nashville, do hereby certify:

That I reported on the Stenograph machine the proceedings held in open court on November 1, 2022, in the matter of *PATRICIO JARA vs. TENNESSEE STATE UNIVERSITY*, Case No. 3:20-cv-00131; that said proceedings in connection with the hearing were reduced to typewritten form by me; and that the foregoing transcript (Trial Volume I-B of IV, pages 1 through 172) is a true and accurate record of said proceedings.

This the 12th day of February, 2023.

/s/ Deborah K. Watson
DEBORAH K. WATSON, RPR, CRR
Official Court Reporter