```
1              IN THE UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF TENNESSEE
2                      NASHVILLE DIVISION

3
   PATRICIO JARA,                    )
4                                    )
        Plaintiff,                   )
5                                    )
        v.                           ) 3:20-cv-00131
6                                    ) JUDGE RICHARDSON
                                     )
7  TENNESSEE STATE UNIVERSITY,       )
                                     )
8        Defendant.                  )
                                     )
9                                    )
   -----------------------------------------------------------
10

11

12

13

14     BEFORE THE HONORABLE ELI J. RICHARDSON, DISTRICT JUDGE

15                    TRANSCRIPT OF PROCEEDINGS

16                         NOVEMBER 4, 2022

17

18                      TRIAL VOLUME IV of IV

19

20

21

22 -----------------------------------------------------------

23 DEBORAH K. WATSON, RPR, CRR
   Official Court Reporter
24 713 Church Street, Suite 2300
   Nashville, TN 37203
25 debbie_watson@tnmd.uscourts.gov
```

```
1    APPEARANCES:

2


3    For the Plaintiff:

4              ROBERT CHARLES BIGELOW
               Bigelow Legal, PC
5              4235 Hillsboro Pike
                 Suite 217
6              Nashville, TN 37215
               (615) 829-8986
7              rbigelow@bigelowlegal.com

8


9    For the Defendant:

10             E. ASHLEY CARTER
               Tennessee Attorney General's Office
11             P O Box 20207
               Nashville, TN 37202-0207
12             (615) 741-7932
               ashley.carter@ag.tn.gov
13
               JOHN W. DALTON
14             Tennessee Attorney General's Office
               P O Box 20207
15             Nashville, TN 37202
               (615) 741-3491
16             john.dalton@ag.tn.gov

17

18

19

20

21

22

23

24

25
```

1                       I  N  D  E  X

2                                                     Page

3
    JURY CHARGE AND VERDICT FORM (Not Transcribed)    32
4

5   JURY RETIRES TO DELIBERATE                         32

6
    QUESTION FROM THE JURY                             33
7

8   VERDICT OF THE JURY                                36

9
    POLLING OF THE JURY                                37
10

11  JURY DISCHARGED FROM FURTHER SERVICE               40

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                              *    *    *

          The above-styled cause came on to be heard at

9:23 a.m. on November 4, 2022, before the Honorable Eli J.

Richardson, District Judge, when the following proceedings

were had, to-wit:


          THE COURT:  All right.  We are here for Day 4 of

trial in *Jara vs. Tennessee State University*.  Getting a late

start because there was a motion filed this morning,

plaintiff's motion to modify jury instructions and verdict

form.

          Has the defendant had an opportunity to review

this?

          MS. CARTER:  Yes, Your Honor.  We got a copy from

the Court when we got here.

          THE COURT:  All right.  Have you been able to form

an opinion on your view about this?

          MS. CARTER:  We can speak to it.

          THE COURT:  Okay.  All right.  Let me make a few

comments and we'll go from there.  The first thing that I

want to note is this:  One thing about this, the defendant is

referred to as the (capital G) government, and that's

problematic.  In federal litigation, I'm just going to say

every single time capital G is referenced, the proper

reference is only to the United States of America.  And I do

1  think it's not -- in this case, it's not just sort of a

2  formalism thing.  I do think federal judges, if you say "the

3  government," they going to think you're referring to the

4  federal government, period, and not an agency of a particular

5  state.

6          But substantively, this matters because the EEOC's

7  guidance is federal guidance.  It is not the State of

8  Tennessee's guidance, and it's certainly not TSU's guidance.

9          Would you agree with that, Mr. Bigelow?

10         **MR. BIGELOW:**  Your Honor, I would -- I will --

11  first of all, I appreciate the -- I obviously did not realize

12  that; otherwise, I wouldn't have done that.

13         **THE COURT:**  Yeah.  And I don't mean to -- you

14  know, I don't mean to sound like the smartest guy in the room

15  on that, but I do think it's a heads-up, and I think it will

16  be a helpful heads-up in the future but -- for you.

17         But on the substantive piece, right, this is

18  Tennessee State University's guidance, the EEOC's guidance.

19         **MR. BIGELOW:**  I believe it is.  In fact, the --

20  TSU has an EEOC office that follows EEOC procedures and

21  investigates based on the -- I mean, it's actually called the

22  EE -- I believe --

23         **THE COURT:**  But you cited me something from the

24  EEOC, right?

25         **MR. BIGELOW:**  That's correct.

1          **THE COURT:**  So it's from the EEOC, right?  It's

2     not Tennessee State -- now, if you'd have cited me something

3     from a TSU document, then I might say, well, it's their

4     guidance although even then, we could probably parse through

5     it and say it's just TSU passing on the EEOC's guidance.

6          But here, the only thing we have is a citation to

7     the EEOC.  And so I think, you know, whatever the merits of

8     your argument here -- and I think there is none, but we'll

9     talk about that.

10          But, you know, I just am concerned that in

11     addition to making your argument, you're like, you know,

12     treating the defendant like it's gone against its own

13     guidance.  And I think that that's not a fair way to put

14     this.  You know what I mean?

15          Like, if you want to make your argument, I think

16     that's great, but when you're accusing a party of, quote,

17     ignoring its own guidance, better be careful.  And I just

18     don't see where this is Tennessee State's own guidance.  I

19     mean, it's EEOC guidance.

20          **MR. BIGELOW:**  Your Honor, I believe that the --

21     which is why I made the argument, obviously -- that they

22     followed -- that Tennessee State University follows the

23     EEOC's guidance.  Now, I suppose I should have put in

24     document --

25          **THE COURT:**  But they're -- like, if they're

1    following the guidance, then I -- you know, it's probably

2    because they kind of feel that they have to do so.  But it's

3    still the EEOC's guidance, right?

4              Now, if you had cited me to something that really

5    was a TSU document, okay, so -- and I don't think we need to

6    spend more time on that; I'm just kind of a little bit

7    concerned.  I just didn't see where we had any guidance put

8    out by the defendant where they should be, you know,

9    upbraided for ignoring their own guidance.

10             But be that as it may, there still is a

11   substantive issue, and we'll talk about that and give each

12   party their say.

13             What's the defendant's take on this?

14             **MS. CARTER:**  We have a few points, Your Honor.

15             This idea of perception and perceiving a specific

16   person as foreign-born, if plaintiffs are going to argue

17   this, I would have expected to hear these types of questions

18   through the trial for the witnesses.

19             **THE COURT:**  And, of course, it's too late for them

20   to argue anything right now, right?

21             **MS. CARTER:**  Correct.

22             **THE COURT:**  So they don't get to argue anything.

23   It's only a question of what should go in the jury

24   instructions based on the law and what's happened, but go

25   ahead.

1    **MS. CARTER:** So I think it would be highly

2  prejudicial. At this point, the jury instructions include

3  what it appears plaintiff is attempting to argue, which is

4  Jury Instruction No. 2 speaks to the jury's duties. Jury

5  Instruction No. -- I can't remember if it's 4 or 6 now; I

6  apologize. I think it's 6 talks about attorneys' statements

7  not being evidence.

8           And, you know, the verdict form has already been

9  submitted to the jury. Obviously, it's highly prejudicial if

10  we change the wording of the jury verdict at this point. It

11  draws a -- it highlights, perhaps, something that the jury is

12  going to look at and go, oh, maybe we should be doing this.

13           Counsel, throughout his argument to the jury in

14  closing argument, talked about common sense and what the jury

15  should do with the evidence.

16           He hasn't told the jury anything about perception.

17  There is nothing that has been raised in this case using the

18  word "perception," but he has used that throughout his case.

19  So the defendant's position is this is not -- that the jury

20  instructions should stand as they are to the jury. The jury

21  was told to use their common sense. We believe they will do

22  that.

23           There is nothing here that talks about -- or, you

24  know, the jury instructions about treating government and

25  individuals equal, speaks to counsel's argument about them

```
1   believing my statements which, again, are not evidence in the
2   case over counsel's case.
3           And, you know, more importantly, I think this is
4   kind of late at this point.  If he had a question about
5   anything that I said to the jury, the time to have raised
6   that would have been in rebuttal.  They get the last word.
7   So this is all about oral argument to the jury, which is not
8   evidence in the case and which is not going to be considered
9   by the jury as evidence in the case.
10          And again, I just think it's really prejudicial.
11  Counsel wanted to use the verdict form as it was.  If he had
12  an issue with it, then it should have been changed before it
13  got published to the jury.
14          THE COURT:  All right.  Thank you.
15          I have a few thoughts.  First of all, I absolutely
16  believe this is too late.  And if it was necessary to -- I'll
17  allow Mr. Bigelow an opportunity to change my mind.  It would
18  be one thing if the instructions as written were wrong.  No
19  one thought they were wrong.  At best, this proposal would be
20  sort of an optional addition.  But it's nothing in there is
21  wrong as stated, nothing.  And making sort of an optional
22  change after counsel have, you know, made their arguments
23  based on what we had already, I think it is prejudicial.
24          Why would this not be too late, Mr. Bigelow?
25          MR. BIGELOW:  Your Honor, in -- my argument is
```

1    this:  In both defendant's Motion for Summary Judgment and,

2    frankly, in defendant's opening, there was no focus on this.

3    This focus was done literally --

4          **THE COURT:**  What focus?

5          **MR. BIGELOW:**  The focus on actually proving --

6    granted, we proved that Dr. Jara, that defendant knows

7    Dr. Jara is not from -- born in the United States.  We have

8    proven that.  But their argument is that we haven't proven

9    that the defendant knows all the -- where these other people

10   are from, which --

11         **THE COURT:**  But your instructions don't say

12   anything about that one way or the other, right?  They

13   don't -- they don't give any instructions about, you know,

14   about how to view all these other professors and how they

15   were treated that you had made part of your case.  They don't

16   say anything about that.

17         So adding actual or perceived, the instructions

18   don't address the point that you're making which is about,

19   you know, the relevance of the other professors.  The

20   instructions are all about whether the plaintiff was subject

21   to discrimination based on national origin.  And they don't

22   have any applicability to, you know, the arguments related to

23   other professors who supposedly were in the same boat.

24   That's the way I see it.  But --

25         **MR. BIGELOW:**  Fair enough, Your Honor.

1    THE COURT: You know, but like here's -- and
2  here's what I mean, and I'm going to -- let me back up for a
3  minute.  I do think on the issue of sort of it being late, I
4  think we all had -- you know, we had a few discussions about
5  this language.  Most of the language, even with all the
6  changes I proposed and made, almost all of it came, you know,
7  from the -- you know, from the parties or, at least, a lot of
8  it did.  No one was sort of focused on that.  And I do think
9  if there was a problem on the issue of, you know, the jury
10  not understanding that perceived rather than actual national
11  origin could have a role in this case, that could have been
12  brought up on closing.
13         But here's what I mean when I say the instructions
14  are about the -- whether the plaintiff was discriminated
15  against based on national origin.  And here's the thing:
16  There -- all right.  Let's look at it.  So Title VII provides
17  that it shall be an unlawful employment practice for an
18  employer -- reading from page 13 -- you know, to discriminate
19  based on national origin.
20         We're talking about whether there was unlawful
21  employment discrimination against Dr. Jara based on national
22  origin.
23         We're not talking about whether, you know,
24  other -- and that's the issue in this case.  It's not whether
25  other professors that, you know, the plaintiff wants to throw

1 into the mix to support the notion that the plaintiff was

2 treated badly on national origin, the jury instructions are

3 not about whether those people were discriminated against

4 based on national origin.  It's about -- they talk about what

5 the plaintiff must prove, and the statement in there is

6 accurate.

7 The next one there, there's another reference to

8 national origin in terms of what Title VII provides that's

9 accurate.

10 Then there are further instructions on page 13

11 defining national origin.

12 Page 15:  "To establish a claim of discrimination

13 based on national origin."  It doesn't speak to -- so in

14 other words, at this point, that instruction is saying here

15 is what the plaintiff needs to prove to establish a claim of

16 discrimination based on national origin.  It does not speak

17 to whether the jury can be suspicious of TSU and how they

18 treated Dr. Jara based on perceived, rather than actual

19 national origin of other professors.  It just doesn't speak

20 to that.

21 So that -- that's why I wouldn't -- that's why I

22 don't think it needs to go in there to support your argument

23 about other professors.

24 As to Dr. Jara, I have a few things to say, and I

25 will let you speak when I'm done here.  But a few things:

1　First of all, the notion of mere perception of national

2　origin is not even applicable to Dr. Jara, right?  Because he

3　actually has the national origin that places him in a

4　protected class.  This isn't one of these cases that the EEOC

5　is speaking to where someone is discriminated against because

6　of perceived national origin rather than real national

7　origin.

8　　　　　That would be the case, you would want to rely on

9　that principle if Dr. Jara was saying, look, I'm

10　American-born but they perceive me as not American-born, and

11　it's no defense that they were wrong that I was not

12　American-born, because being discriminated against based on a

13　perception that I'm foreign-born is just as bad as

14　discriminating against me based on the true fact that I'm

15　foreign-born.

16　　　　　And that just doesn't apply in this case.  That's

17　the way I see it.  But you may try and change my mind on

18　that.

19　　　　　**MR. BIGELOW:**  I will briefly do my best to do

20　that, Your Honor.  My point was this:  For the first time

21　that I heard of -- and I may be wrong -- yesterday evening at

22　close, a lot of defendant's argument was based around the

23　argument that defendant doesn't know that the, quote,

24　internationals were actually internationals; not Dr. Jara,

25　but the internationals, the group of other professors who are

1  looked upon by some, as the testimony showed, as

2  internationals.

3            Now, on page 14 of the verdict form -- of the jury

4  charge, it says:  "Someone who is not born in the United

5  States is a member of a protected class for purposes of both

6  what I will call a general discrimination claim and a hostile

7  work environment claim under Title VII."

8            **THE COURT:**  The jury doesn't have to decide

9  whether anyone else was a member of a protected class to

10  render a verdict in favor of Dr. Jara.

11            **MR. BIGELOW:**  That is true.

12            **THE COURT:**  All right.

13            **MR. BIGELOW:**  But my contention, plaintiff's

14  contention, is that someone who is not born in the United

15  States or someone who is perceived as not being born in the

16  United States is a member of a protected class.  That is --

17  that is our contention and -- that's our contention.

18            **THE COURT:**  Okay.  Well, and, you know, I -- I

19  think -- and I do understand that.  And actually, I have a

20  few comments about that, that I'm going to make in a minute,

21  whether that perception is true or not because it's

22  debatable.

23            But, you know, the -- and I'll explain why I say

24  it's debatable whether the perceived national origin is as

25  good as, you know -- whether discrimination based on

1  perceived national origin is as actionable as discrimination

2  based on actual national origin.  But for now, I'll assume

3  that that's accurate.

4        I do think we have accurate instructions, and to

5  the extent -- and everyone agreed on them.  To the extent I

6  guess they could have been more specific by saying actual or

7  perceived, that doesn't matter here because we have a case

8  where the claim is not that he was discriminated against

9  based on perceived national origin, it's actual national

10  origin.  Right?

11        Like, in other words -- see if you agree and I'm

12  happy to have this discussion.  So in other words, like, this

13  is a case where he has a foreign national origin.  I guess on

14  the Dr. Jara piece, it sounds like your position is, look,

15  it's no defense -- and maybe this is what you're saying:

16  Like, it's no defense if they perceived him -- maybe what

17  you're saying is it's no defense to a claim that they

18  discriminated against him based on national origin to say

19  that they merely perceived him to be foreign-born without

20  actually knowing.  Is that your argument?

21        **MR. BIGELOW:**  That's absolutely -- in fact, to

22  that point, Your Honor, my argument is if Dr. Jara's parents,

23  who are from Chile, were flying over the United States on a

24  trip, and they just happened to stop when his mother was nine

25  months, you know, pregnant, and they just were happened to

1    fly into Canada and happened to stop in the United States and

2    he was actually born in the United States, then they went on

3    to Canada for their vacation and flew back to Chile, well,

4    that analysis would hold here.  Like, it wouldn't matter if

5    he was actually born in the United States or not.

6              **THE COURT:**  Well, but if we look at this case, you

7    know, all this, I think, goes to the third element of

8    discrimination based on national origin.  His national

9    origin, which everyone knows that his national origin is

10   foreign-born, right?  Everyone knows that.  So his actual

11   foreign origin.  So was a motivating factor.  The jury knows

12   that they need to find that his actual -- you know, here, it

13   says national origin.  He does have the actual national

14   origin being foreign-born.  Was a motivating factor.

15             Isn't it not built into that notion that if they

16   perceived him -- if they correct -- because if they perceived

17   the national origin, if TSU perceived the national origin, it

18   would be an accurate perception.  So his national origin was

19   a motivating factor.

20             I think that encompasses the notion his national

21   origin was -- it can't be a motivating factor unless they

22   knew or perceived.  Like, if they perceived it, it could be a

23   motivating factor, right?  Like no one said they have to

24   know.  Now, you're saying the defendant said that they had to

25   know.  I'm not sure they said that.  We'll talk about it in a

1   minute.  So maybe if we boil this down.

2           His national origin, foreign-born, was a

3   motivating factor.  A perception of what his national origin

4   is rather than knowledge would be enough to be a motivating

5   factor, and I think the jury would figure that out.  So

6   there's nothing in this instruction that tells them that the

7   defendant need to actually know his national origin.  Because

8   a perception, human nature, everyone knows a perception of

9   something can motivate actions even if people don't know.

10  Right?

11          And I think -- I think you argued it just fine.

12  And again, no one thought it was important, and I guess

13  you're saying, well, I didn't know until they argued this.  I

14  didn't know the need for the instruction.

15          But, I mean, I would think that would sort of -- I

16  mean, it would have always been on the table that the

17  defendant would say, well, we didn't know the national

18  origin.  I mean, didn't you have discovery in this case?  I

19  mean, like, is it a surprise to you that TSU's witnesses just

20  said I didn't know their national origin.  Is that a surprise

21  to you?  You know what I mean?  Like, because if it wasn't,

22  this sort of thing really needed to be accounted for on the

23  front end.

24          **MR. BIGELOW:**  I guess, Your Honor, a better

25  application is the list that I talked about in front of the

1    jury.

2            THE COURT:  Uh-huh.

3            MR. BIGELOW:  I do not believe that based on case

4    law -- not only the EEOC guidance but also based on case law,

5    that it matters whether the list of Dr. Najarian [phonetic]

6    and Kothahanden [phonetic] -- like the long -- like Dr. --

7    may I, Your Honor?

8            THE COURT:  Yeah.

9            MR. BIGELOW:  I don't believe it matters that the

10   list of Sathananthan, Badamdorj, and Jara, whether we can --

11   I don't think we needed to prove necessarily that

12   Sathananthan and Badamdorj were foreign-born professors.

13   They could be perceived of as --

14           THE COURT:  To this day, I don't know that they

15   were foreign-born, and I don't see any evidence that they

16   were perceived as foreign-born.  Was there a stitch of

17   evidence that anyone there was perceived as foreign-born?

18           MR. BIGELOW:  Absolutely.

19           THE COURT:  What was it?

20           MR. BIGELOW:  People saying that those professors

21   need -- and they call them the internationals.

22           THE COURT:  Were those professors mentioned by

23   name as falling into that category?

24           MR. BIGELOW:  Absolutely, yeah.

25           THE COURT:  Like, do you recall -- I don't

1   recall -- like -- believe me, and I don't mean to dispute it

2   if you could point me to it, but I don't remember a witness

3   saying, "You know what?  The reference to 'they who need to

4   speak better,' that -- you know, that was a reference to

5   Dr. So and So and Dr. So and So."

6           I don't recall that, but maybe you can refresh my

7   memory.

8           But again, why didn't this come up in rebuttal?

9           **MR. BIGELOW:**  That's fair.  I'll stop.  That's

10  fair.

11          **THE COURT:**  Yeah.  I mean, I do want you to -- and

12  really, I am happy to have further discussion.  But as I

13  think you can tell, I'm sort of, you know, I think,

14  struggling with these things.

15          I do think that if on the front end this had been

16  addressed, we could have had a discussion.  Maybe -- maybe

17  some language could have been included.  But I think what we

18  have is right.  And making changes after closing to change

19  instructions that are correct, even if, you know, they could

20  be done a little differently, I really think it's

21  problematic.  And I do -- you know, if you have -- I would be

22  interested if you have evidence saying, "The names on this

23  list were the people specifically targeted by those

24  comments," as opposed to the notion that, "Hey, there's a

25  group of internationals who need to improve their speech."

1    I didn't -- I didn't pick up a reference in the

2  testimony or don't recall a reference in the testimony to any

3  particular person being referred to as targeted by those

4  comments.

5    **MR. BIGELOW:**  My argument before the Court, I

6  believe, and in court was that I asked Dr. McMurray if he

7  noticed any difference between the list that includes those

8  professors who I just mentioned and the list of people like

9  Jones and Smith or what have you.  And he said:  No, I don't

10  see any difference between the two.

11    And that's a matter of fact admittedly.  He may

12  not.  We don't believe that, but he may not in reality see

13  any difference between the two or recognize a difference

14  between the two.

15    But our point is that whether they are actually

16  born elsewhere or not, it's a matter of perception.  And I

17  know like you said, that's the point.  I'm not just making

18  this up and saying it hasn't been argued; it has been argued.

19  I didn't realize that defendant was going to stand up and

20  say, hey, it doesn't matter if they were actually born here

21  or not.  There's no proof that they were not born here.

22    And I guess plaintiff's point, while it's -- you

23  know, admittedly I guess a little minutia, is not whether

24  they were actually born here or not, it's what they could --

25  were perceived.

1          I mean, he works with them.  Dr. Jara testified

2     that a number of -- he and a number of other, quote,

3     foreign-born professors, and mentioned names, had, you know,

4     gathered together and complained about things.  And that's my

5     point.

6          **THE COURT:**  Well, here's -- here's the way I see

7     it.  I think what you're referring to here is, you think the

8     jury should be able to infer that people on the one list were

9     treated worse and that they were perceived as foreign-born;

10    and that if those two things are true, that they were treated

11    worse and perceived as foreign-born, that helps Dr. Jara's

12    case because it would tend to indicate the kind of animus

13    against foreign-born folks.

14         These instructions give the jury plenty of

15    latitude to do exactly that even without your proposed

16    additions.  They really do.  Like, when I read this, I'm --

17    like, for example, on the key element, "His national origin

18    was a motivating factor," nothing in there that could prevent

19    the jury from saying something like this.

20         **MR. BIGELOW:**  Fair enough, Judge.  Thank you.

21         **THE COURT:**  Yeah.  And I'll make a couple more

22    comments about that and then move to a slightly different

23    topic.

24         But they definitely have room to say, you know

25    what?  When we're considering whether national origin was a

motivating factor, we're going to consider the names on that

list, and frankly, it would be sheer speculation. It would.

But they -- but that's to the plaintiff's benefit. They

actually have room to speculate if they want, because I can't

stop them. Even if, as judges, we don't like speculation,

whatever, you can't stop. They can go in the jury room and

say: You know what? We speculate that the people on this

list were perceived as being foreign-born.

And that would really -- in the United States in

2022, I don't think that's a safe assumption. But they have

the perfect leeway within these instructions to go along with

that argument and say: Yep, yep, we're suspicious about why

these people were treated differently. We think it could be

because they were perceived as foreign-born, whether or not

they were actually foreign-born. And that is going to

contribute to a finding on our end that Dr. Jara's national

origin, which is undisputed, was a motivating factor.

I think there's plenty of leeway, and I think you

made the argument for them to accept it if they want it.

I think you're sort of -- part of what you're

saying, Mr. Bigelow, I think, is that there was something

that the defendant referred to in terms of the law that was

sort of misleading that would indicate to them that they

can't do that.

I don't see it that way. I did --

1    Do you think that you imply that the law requires
2  for Dr. Jara to be liable, the law requires that TSU knew the
3  national origin of particular professors?
4    **MS. CARTER:**  No, Your Honor.  I don't think that's
5  what the defendant was implying at all.
6    **THE COURT:**  I took it more like this, Mr. Bigelow,
7  and I know that -- and I appreciate you're like, "Well, I'm
8  done.  I've made my peace," and I'm the one going on, so I
9  realize that.  But I do want you to know that in the limited
10  time I had, I thought about -- I continue to think about your
11  argument.
12    But, like, to me, it was more like, you know
13  what -- the argument sounded to me more like:  You know what?
14  Mr. Bigelow's gotten up and he said, you know, hey, listen,
15  the people on this list, you know, I thought it was more like
16  they were foreign-born rather than they were perceived as
17  foreign-born.
18    But either way, whichever way you were arguing --
19  maybe you were arguing it both ways -- that they were
20  foreign-born and treated differently or they're at least
21  perceived as foreign-born and treated differently; the state
22  gets up and says:  You know what?  You should reject that,
23  and one of the reasons you should reject it is that there's
24  no evidence that anyone knew it.
25    I didn't see them -- I didn't hear them say:  And

1    without actual knowledge of these other professors' national

2    origin, the law requires that you return a verdict for the

3    defendant.

4            So that's how I see it.  I --

5            Yes, sir?

6        **MR. BIGELOW:**  I suppose one of the reasons why I

7    believe that, Your Honor, is because of what I believe to be

8    the rationale of the defendant's Rule 50 motion, which I

9    thought was based on that, which --

10       **THE COURT:**  Well --

11       **MR. BIGELOW:**  And I may be wrong about that, but

12   that was my understanding of it.

13       **THE COURT:**  Well, then we get -- so then we get

14   back to -- and their Rule 50 motion, I'm confident, doesn't

15   relate to the national origin of any other professors.

16   It's -- has something to do specifically with the third

17   element as it relates to Dr. Jara's national origin.  Fair to

18   say?

19       **MS. CARTER:**  Yes.

20       **THE COURT:**  Okay.  Are you saying that as a matter

21   of law, Tennessee State can't be liable unless they knew,

22   or -- that's Option A -- Option B is:  There is not

23   sufficient evidence that national origin was a motivating

24   factor.  And a big reason to believe there isn't sufficient

25   evidence that it was a motivating factor is the lack of

```
1   evidence that they knew, that lack of evidence that anyone
2   knew -- any decision-maker knew his national origin advances
3   the ball pretty far down the field as to whether national
4   origin was a motivating factor such that the state would have
5   to rely on inferences that he was correctly perceived as
6   being foreign-born and that -- that inference cannot be drawn
7   based on this evidence.  That's --
8            MS. CARTER:  Yes, Option B.
9            THE COURT:  Option B.  And I don't mean to make
10  your argument for you.  But I will say this:  Mr. Bigelow is
11  right because, you know, if it's based on the lack of
12  knowledge -- and I don't think I heard you say if the
13  defendant didn't know the jury -- the instructions the Judge
14  gives you means that the defendant can't be liable.  I took
15  it as a more holistic reason, set of reasons, as to why
16  national origin was not proven to be a motivating factor and
17  not just, well, they got no knowledge.  That's the end of it.
18            That's the way I took it.
19            MS. CARTER:  That's exactly right, Your Honor.
20            THE COURT:  So that's -- you know, and I do think,
21  Mr. Bigelow, like I -- it seemed to me like if you thought
22  they misstated the law, right -- you get to speak last.  And,
23  you know, I think probably it would seem to me you would have
24  said, "Ladies and gentlemen, they said X."  And I've done
25  this several times in trial when I was able to do rebuttal.
```

"Opposing counsel said X, and, ladies and gentlemen, you're going to hear from the Judge, and listen close. I bet you'll hear the Judge won't say anything like that. So you need to throw out what opposing counsel just said about the law and how it applies," you know.

And you didn't do that, and I think that's probably correctly, because I don't think they did enough for you to make that kind of argument.

**MR. BIGELOW:** That's fair, Judge.

**THE COURT:** All right. Now, let me just make a couple of final points, and then we'll call in the jury. This is from my opinion in Kostic v. United States [sic], 532 F. Supp 513-534, Note 27. And I just wanted to note this for the record. The parties assumed jointly -- and this is an assumption in the plaintiff's favor -- that discrimination based on being foreign-born is discrimination based on national origin.

That's debatable because, you know, national origin seems to be -- you know, can be interpreted to mean your origin from a particular nation and not just non-American. And, of course, I realize the counterarguments.

What I said in Kostic was this: There is authority on the issue of whether a claim of national origin discrimination can be premised on others' misguided belief

that the plaintiff belongs to a particular national origin
when, in fact, he or she does not.  Some authority suggests
that the answer is yes, that the claim can be premised on the
plaintiff being perceived as, rather than actually, having a
particular national origin.

And I'm sorry.  I teed up that quote by focusing
on the wrong thing.  That quote goes to Mr. Bigelow's
assertion in his brief that discrimination based on perceived
rather than actual national origin is actionable under
Title VII.

And the point that I wanted to make was -- and I
researched this pretty thoroughly, I thought, for the Kostic
opinion:  It wasn't entirely clear that "perceived as" would
do the trick, but there is some authority on that.  And,
therefore, for purposes of Mr. Bigelow's motion, even though
he wasn't able to cite binding authority, I have accepted
that as true, Mr. Bigelow.  It's not entirely clear.  There's
authority to support it.  I accepted it as true for purposes
of your motion.

Now, the other issue that I started to mention
before getting on track -- off track is I started to talk
about the other issue which is whether Title VII bars
discrimination based on being a foreigner generally rather
than being from a particular country.

This is, I think, debatable because as a case like

1  *John v. Walmart Stores E, Inc.*, which is an Eastern District

2  of Tennessee case, 2007, Westlaw 3180099 at Star 7, notes:

3  Nothing in Title VII makes it illegal to discriminate on the

4  basis of citizenship or alienage.

5          And then it cites *Espinoza v. Farah Manufacturing*

6  *Co., Inc.*, 414 U.S. 86-95, 1973, noting it would be unlawful

7  for an employer to discriminate against aliens because of

8  race, color, religion, sex, or national origin.

9          The assertion in this particular case is that

10  Espinoza, on the same page, supports the notion that

11  immigrant status is an unprotected class, which means if this

12  John case is correct and there are other cases that support

13  the notion that immigrant status is not a protected class,

14  that would mean being foreign-born is not a protected class

15  for persons in the U.S.  Because if you're foreign-born and

16  you're in the U.S., you are an immigrant.  If that's not a

17  protected class, then being a foreigner generally is not a

18  protected class.

19          John supports that notion.  There are other cases,

20  I've seen a bunch of them.

21          So I think the issue of whether being a foreigner

22  generally makes you a member of a protected class is

23  debatable.  Both parties assumed it.  I think it's a

24  reasonable assumption.  In my case of Benitez v. Tyson Fresh

25  Meats, Inc., which regrettably had 151 footnotes, I'm sorry

1  to say, Footnote 91, I talk about my view on this.  It's 2022
2  Westlaw 1283087.

3            The -- what I say here is:  The Court is inclined
4  to agree with those Courts that have recognized that national
5  origin discrimination includes not just disfavoring a single
6  national group relative to all others, but also favoring one
7  national group such as Americans over all others; and
8  moreover, includes discrimination on the basis of disfavored
9  treatment of foreigners generally.

10           So all I'm doing here at this point is to explain
11  that I do realize that the very premise that both sides
12  adopted, that being not American-born is a protected class,
13  not entirely settled.  I've accepted in the past.  I find it
14  persuasive.  I accepted it here.

15           My prior point just a moment ago was that, again
16  to summarize, that there is authority to support the notion
17  that a plaintiff can have a claim for national origin
18  discrimination even if they're incorrectly perceived as being
19  of the national origin that places them in a protected class.

20           All right.  So obviously, Mr. Bigelow's objection
21  to the Court's declination to amend the charge at this late
22  hour is preserved, but I do need to deny it because I think,
23  you know, substantively, it has the problems I had mentioned.
24  I think he doesn't need this remedy for the jury to do what
25  he wants it to be able to do.  And I do think it's

1 procedurally too late.

2         All right. Anything else we need to talk about at

3 this time before we bring in the jury?

4         **MR. BIGELOW:** No, Your Honor.

5         **THE COURT:** Nothing? All right.

6         **MS. CARTER:** No, Your Honor.

7         **THE COURT:** We can call in the jury. Thank you.

8         (WHEREUPON, the jury re-entered the courtroom,

9 with matters being heard in open court as follows:)

10         **THE COURT:** All right. Thanks, folks. Please be

11 seated. We got you in here I know an hour after we asked you

12 to report, and I do apologize for that. I think I've said it

13 before, I'll say it again: It's not a reflection that we

14 can't be bothered with being careful with your time. And it

15 doesn't mean that we were rolling in here way too late to

16 start on time because we were up late watching the World

17 Series, you know. It wasn't that, and I do want you to know

18 that. Sometimes things just come up for, you know, the Court

19 and the attorneys to talk about, and you can't always be sure

20 when and how long.

21         So if I'd known we would start at 10:00, I would

22 have told you that. Thank you for your continued attention

23 and service.

24         And at this point, we've come to the point where

25 the Court will provide you the instructions and will

1  additionally explain the verdict form to you.  So the -- the

2  way we'll proceed at this time, we'll hand out copies of the

3  jury instructions, which we call the jury charge, for you to

4  read along and follow as I read.

5           Okay.  So you've been provided a copy, and,

6  please, if you see fit to do so, read along with me.  That

7  can be very helpful.  You will have a copy of the jury charge

8  as well as for each of you, a copy of the jury verdict form

9  that can go back with you.

10           I'm going to read the jury charge verbatim until I

11  get to the part about just explaining the jury verdict form.

12  But this isn't a time for me to give a slick presentation.

13  It's just a time to read off the page so that we can ensure

14  that we provide the instructions just as they should be.

15           The Court wants to note that each of you, as I

16  say, has a jury verdict form.  As it happens, whoever is the

17  foreperson can use the copy that they got as what will

18  effectively be the original verdict form, the one that will

19  be filled out.

20           All right.  So you'll see that we have a cover

21  page and a page that's left intentionally blank and then a

22  Table of Contents.  After that, we have page 4, and I will

23  read as close to verbatim as possible the instructions in

24  this packet.

25                (WHEREUPON, the Court read the jury charge and

1   verdict form instructions to the jury.  Transcription was not

2   requested.  Further proceedings were had, as follows:)

3         **THE COURT:**  So that concludes our jury

4   instructions, and at this point, you will be free to head to

5   the jury room.  I'll ask you to step down in a minute.  We

6   will provide, as I indicated, the advised version of the

7   verdict form.  We will be providing also the exhibits to you

8   for your review.

9         And at this time, then, folks may step down and

10   head down to the deliberation room.  Thank you.

11         (WHEREUPON, the jury retired to the jury room to

12   deliberate, with the following matters being heard in open

13   court as follows:)

14         **THE COURT:**  All right.  Thank you.  Please be

15   seated.  All right.  Any objections to the jury charge as

16   read to the jurors?

17         **MR. BIGELOW:**  None here, Your Honor.

18         **MS. CARTER:**  None here, Your Honor.

19         **THE COURT:**  All right.  Thank you, counsel.

20         You know, one of the things about being the Judge

21   is, before it's too late, you need to sort of, I think, make

22   tweaks occasionally, and this one is on me.  We looked at

23   this jury form.  Those last three lines there in the middle

24   of page 2 that I wanted to strike, they were really

25   applicable only to a prior version of the jury verdict form.

1    They need to be just struck because they don't apply to this,

2    and so I'm confident counsel gathered that anyway, but that's

3    what we'll be doing.

4            What I'm going to do is ensure that -- that seven

5    copies of this revised verdict form, which we can distribute

6    at this time, goes in there, and we'll be distributing right

7    now a copy for each of you.

8            Okay.  Do we have any logistical matters that we

9    need to take up at this time, since I know that Ms. Jackson

10    is already on top of the cell phone notification situation

11    and I think you're probably aware to be within, say, 15

12    minutes of the courthouse?

13            **MR. BIGELOW:**  No logistics.

14            **THE COURT:**  Nothing from you, Mr. Bigelow?

15            Counsel?

16            **MS. CARTER:**  Nothing, Your Honor.

17            **THE COURT:**  All right.  We -- okay.  Yeah, we'll

18    lock up the courtroom in the meantime, so you're free to

19    leave or take your items as you see fit.  And when we get a

20    note from the jury, we'll let you know ASAP, be it a verdict

21    or a question.

22            All right.  If nothing further, at this time,

23    we'll stand in recess.  Thank you.

24            (Recess 10:50 a.m. to 12:12 p.m.)

25            **THE COURT:**  All right.  As it happens, we are in

```
1    receipt of a jury note.  And the Court had drafted a proposed
2    answer, so I will read the proposed draft answer which will
3    incorporate the substance of the jury's note:
4              "The Court is in receipt of a note from the jury
5    asking the following question:  If possible, may we see the
6    section of Dr. Jackson's deposition which refers to the
7    internationals comment?
8              "To this question, the Court provides the
9    following answer:  As the Court noted at trial, when a
10   witness's deposition testimony is read at trial, it should be
11   treated just like testimony provided by a witness in the
12   courtroom during the trial.
13             "This means that just as the Court cannot provide
14   a transcript of the testimony of a witness who testified in
15   the courtroom during the trial, the Court cannot provide a
16   transcript of the deposition testimony of a witness that was
17   read at trial."
18             It occurs to me that since -- well, I'm thinking
19   that I want them to know -- I think my answer should reflect
20   that I realize that they're only asking for a small portion
21   of the deposition, but what I'm saying applies even to a
22   small portion.
23             So I'm thinking to this draft, maybe instead, we
24   should say at the end:  "The Court cannot provide a
25   transcript of any portion of the deposition testimony of a
```

1    witness that was read at trial."

2             Does that work?

3        **MR. DALTON:**  Yes, Your Honor.

4        **MR. BIGELOW:**  I prefer you say that she mentioned

5    internationals twice, but that totally works for me, Your

6    Honor.

7             **THE COURT:**  Yeah.  Yeah, that's the thing about

8    these answers to questions.  If counsel was answering them by

9    themselves, they may provide a very different answer indeed.

10            If that one works -- and I understand that counsel

11   was able to see a draft of the Court's answer and the note

12   itself; is that right?

13            **MR. BIGELOW:**  Yes, Your Honor.

14            **THE COURT:**  Is that right?

15            **MR. DALTON:**  Correct.

16            **THE COURT:**  Okay.  Good.  Then it sounds like

17   we're on the same page, so I'm going to make that small

18   change after the word "of."  Before "the deposition," I'm

19   going to add "any portion of."  I will sign it and send it

20   back to the jury, and we'll keep you posted and let you know

21   when we get our next note, whatever the purpose of the note

22   may be.

23            All right.  If nothing further, thank you.  We'll

24   stand in recess.

25            (Recess 12:14 p.m. to 1:19 p.m.)

1       THE COURT:  I believe that counsel have been

2  informed that we got a note from the jury saying that they

3  have reached a verdict, so unless there is any reason to do

4  otherwise, we will bring them in.

5       Thank you.

6       (WHEREUPON, the jury re-entered the courtroom,

7  with matters being heard in open court as follows:)

8       THE COURT:  All right.  Thanks, folks.  Please be

9  seated.

10      Mr. Maxwell, looks like we've received a note from

11 you saying:  "Judge Richardson, the jury has reached a

12 verdict."  And is that, in fact, the case, the jury has

13 reached a verdict?

14      JURY FOREPERSON MAXWELL:  It is, Your Honor.

15      THE COURT:  All right.  Thank you, sir.  You may

16 hand it to the court security officer.

17      All right.  I'm going to read the jury verdict

18 form verbatim, and then I will poll the jury, and then I'll

19 publish the verdict form to counsel.

20      Jury Verdict.  We, the jury, answers the Questions

21 submitted by the Court as follows:

22      Questions as to liability.  Question 1:  Did

23 Plaintiff prove, by a preponderance of the evidence, his

24 general discrimination claim that Defendant discriminated

25 against him by failing to appoint him to the position of

```
1    Chair of the Department of Mathematical Sciences due in part

2    to (motivated by) his national origin?

3             No.

4             Question 2:  Did Plaintiff prove, by a

5    preponderance of the evidence, his general discrimination

6    claim that Defendant discriminated against him by diminishing

7    his options for advancement due in part to (motivated by) his

8    national origin?

9             No.

10            Question 3:  Did Plaintiff prove, by a

11   preponderance of the evidence, his general discrimination

12   claim that Defendant discriminated against him by withholding

13   his pay after questioning his signature on certain of his

14   time sheets due in part to (motivated by) his national

15   origin?

16            No.

17            Question 4:  Did Plaintiff prove, by a

18   preponderance of the evidence, that he was subjected to a

19   hostile work environment based on his national origin?

20            No.

21            The verdict is signed by the foreperson dated

22   November the 4th, 2022.

23            Now, here is what I'm going to do.  I'm going to

24   go juror by juror and ask whether it's your verdict.

25            Mr. Maxwell, is this your verdict?
```

1            **JURY FOREPERSON MAXWELL:**  It is, Your Honor.

2            **THE COURT:**  All right.  Mr. Michie, is this your

3    verdict?

4            **JUROR MICHIE:**  It is, Your Honor.

5            **THE COURT:**  Ms. Shockley, is this your verdict?

6            **JUROR SHOCKLEY:**  It is, Your Honor.

7            **THE COURT:**  Mr. Melcher, is this your verdict?

8            **JUROR MELCHER:**  It is, Your Honor.

9            **THE COURT:**  And, Mr. Daugherty, is this your

10   verdict?

11            **JUROR DAUGHERTY:**  Yes, Your Honor.

12            **THE COURT:**  And, Ms. Hobson, is this your verdict?

13            **JUROR HOBSON:**  It is, Your Honor.

14            **THE COURT:**  And, Ms. Hutchings, is this your

15   verdict?

16            **JUROR HUTCHINGS:**  It is, Your Honor.

17            **THE COURT:**  All right.  Thank you.  I will have

18   the verdict form published to counsel tables.  Thank you.

19            All right.  Mr. Bigelow, is there any reason why

20   this jury cannot be discharged at this time?

21            **MR. BIGELOW:**  None, Your Honor.

22            **THE COURT:**  All right.  And be it Mr. Dalton or

23   Ms. Carter, any reason why the jury cannot be discharged at

24   this time?

25            **MS. CARTER:**  No, Your Honor.

1          MR. DALTON:  No.

2          THE COURT:  All right.  Thank you.

3          All right, folks.  Wanted to thank you for your

4   service.  You've spent the better part of four days of your

5   life vindicating the plaintiff's and the defendant's right to

6   a jury trial in something that was, of course, very important

7   to each side.  And that system doesn't work and these people

8   are unable to have their rights vindicated unless you take

9   your time and set it aside to serve.  We're very, very

10  grateful for that.

11         What I would say at this point is as follows:  You

12  are welcome to leave as soon as we dismiss you.  On the other

13  hand, if you'd be willing to stick around for a few minutes

14  in the jury room, I'd love to come in and extend my thanks;

15  and also, what is important to me particularly in the early

16  days, which we're still in in this courthouse, see what your

17  experience was like in the building.  That helps us know how

18  things are going as we do things in terms of jury trials in a

19  somewhat different way in a new building compared to the one

20  that this Court was in since like 1937.

21         And that feedback would be very helpful, and we'd

22  like to know if there are things we can do to improve the

23  juror experience as well.

24         So again, it's not required at all, but if you'd

25  be willing to do that, I'd love to speak with you in just a

1    few minutes.

2              For those that are departing, I believe that we're

3    still doing the process of them checking out in the jury

4    assembly room on the first floor, and you may have your cell

5    phones there as well.

6              So at this time, the jurors may step down, again,

7    with our thanks.

8              (WHEREUPON, the jury was excused from the

9    courtroom and discharged from further service, with the

10   following matters being heard in open court as follows:)

11             **THE COURT:**  Thanks.  Please be seated.  Just a few

12   more things here.  And the way these things sometimes go, one

13   side is disappointed and the other side is very satisfied.

14             I want to not keep anyone here longer than is

15   necessary, but I do want to make a couple of comments about

16   the trial.  I think the issues here were able to be vetted in

17   an appropriate manner, and the jury has spoken how it's

18   spoken.

19             I wanted to commend counsel for, you know, I think

20   conducting themselves in trial in a civil manner.  And I

21   think the other thing is that both sides, it seemed to me,

22   were never really fighting just to fight.  They were able to

23   agree on certain things like the initial jury instructions.

24   They didn't seem to be deciding to dig in their heels on

25   something just to make a point, and that was certainly

1   noticed and appreciated by the Court.

2           You know, and I think Mr. Bigelow alluded a few

3   times, and I think as he put it, he was just trying to be

4   nice.  The way I would put it from his side, and sometimes

5   from the defense side as well, you know, he was making

6   reasonable accommodations that I think are helpful to the

7   process, so kudos to counsel for that.

8           The other thing I did want to just say, and it's

9   something to keep in mind for future trials:  What I saw here

10  was a case where it mattered to the parties whether something

11  had been on an exhibit or a witness list.  There were a lot

12  of documents coming up to the witness stand that were not

13  admitted into evidence or offered into evidence, and some of

14  those were not on an exhibit list.

15          And for that reason, because I wasn't sure what

16  some of these documents were doing coming up to the exhibit

17  stand, I wanted to know and keep track of that.  I was a bit

18  of a stickler on what was being done with documents, if it

19  wasn't strictly being just offered into evidence.

20          It probably seemed at times like I was being a

21  stickler, but I think it's important for the Court to know,

22  keep everyone clear, if a document that's not just, hey, it's

23  a document being offered for admission, if it's coming up to

24  the witness stand, appropriate for the Court to clarify what

25  it's coming in for and that -- or what it's being used for

1  and to make sure that sort of the process of it being used is

2  reasonably followed.

3          And so that's, I think, important to notice to why

4  this particular trial was a little bit more, in my

5  experience, a little bit more noteworthy in terms of me sort

6  of managing some of the stuff that happened up at the witness

7  stand between the witness and counsel.

8          All right.  As I say, the jury has spoken, and I

9  wanted to ask whether anyone anticipated any post-trial

10  motions as to which it would behoove the Court at this time

11  to set a briefing schedule.

12          **MR. BIGELOW:**  Just for the record, we ask your

13  judgment notwithstanding the verdict, Your Honor.  Just

14  preserve that.

15          **THE COURT:**  Just to preserve it.  All right.  And

16  that -- for preservation purposes, that is -- that is

17  preserved.

18          I would say this:  I will deny the motion at this

19  time on the grounds that, you know, the plaintiff presented

20  evidence, and I don't think I have to say whether the

21  evidence was sufficient to support a plaintiff's verdict.  I

22  will say there was evidence admitted by the plaintiff that

23  certainly goes towards each of the four counts -- well, four

24  claims.  We have three that were general claims of

25  discrimination, one for each of three different adverse

1    employment actions, and then the fourth that was the hostile

2    work environment.  So the -- you know, the plaintiff

3    submitted evidence that certainly went towards each of those

4    counts.

5                 And without saying, oh, the evidence would have

6    been sufficient, I don't need to speculate about that.

7                 I will say that the way the evidence came in, that

8    a reasonable jury could have found that the plaintiff did not

9    meet the burden that the plaintiff bears, even though it's

10   only by a preponderance.

11                And the third element of each of the three general

12   discrimination claims, you know, does require a finding of a

13   particular motivation, particular adverse employment actions

14   motivated by Dr. Jara's national origin being born outside

15   the United States, and a reasonable jury could find it wasn't

16   a motivating factor that each and every motivating factor was

17   something else, and I think a reasonable jury could have

18   found that.

19                On hostile work environment, certainly, there were

20   some things that the plaintiff offered that would go towards

21   a claim like that.  On the other hand, a reasonable jury

22   could have found that not all elements were met.  I think it

23   could have found that not many of the circumstances that

24   plaintiff thought contributed to a hostile work environment

25   were based on national origin, and that for any that were --

1          Let's put it this way:  A reasonable jury could,

2    even if it did find that some instances of unpleasant conduct

3    were based on hostile work environment, a reasonable jury

4    could find it didn't rise to the level of pervasiveness and

5    severity of negative employment experience and ridicule and

6    so forth based on national origin.  It didn't have that level

7    of severity and pervasiveness for a jury to find that it

8    resulted in a hostile work environment based on national

9    origin.

10         And again, that's not to say that a reasonable

11   jury could not have gone the other way.  It is to say that a

12   reasonable jury could have reached the defense verdict it did

13   on each of the four claims here.

14         All right.  Anything further, Mr. Bigelow?

15         **MR. BIGELOW:**  Nothing here, Your Honor.

16         **THE COURT:**  All right.  Thank you.

17   Counsel?

18         **MR. DALTON:**  Thank you.

19         **MS. CARTER:**  Thank you.

20         **THE COURT:**  All right.  Thank you, counsel.  And

21   this matter, I will note, will be at the point where the

22   Court will enter a judgment on the jury verdict in the

23   forthcoming days, so you can look for that in terms of the

24   documentation of this case and how it was terminated.

25         Yes, Mr. Bigelow?

1    **MR. BIGELOW:**  No, I'm just listening to

2  Your Honor.

3    **THE COURT:**  Okay, gotcha.  Just standing up.

4  Okay.

5    Again, counsel, I am gratified to say that I think

6  we were able to give each side its day in court and allow the

7  jury to speak, and that's our system.

8    All right.  Thank you, counsel.  We stand in

9  recess.

10    (WHEREUPON, the foregoing proceedings were

11  concluded at 1:34 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    REPORTER'S CERTIFICATE

2

3            I, Deborah K. Watson, Official Court Reporter for

4    the United States District Court for the Middle District of

5    Tennessee, with offices at Nashville, do hereby certify:

6            That I reported on the Stenograph machine the

7    proceedings held in open court on November 4, 2022, in the

8    matter of *PATRICIO JARA vs. TENNESSEE STATE UNIVERSITY*, Case

9    No. 3:20-cv-00131; that said proceedings in connection with

10   the hearing were reduced to typewritten form by me; and that

11   the foregoing transcript (Trial Volume IV of IV, pages 1

12   through 45) is a true and accurate record of said

13   proceedings.

14           This the 11th day of February, 2023.

15

16                        /s/ Deborah K. Watson
                          DEBORAH K. WATSON, RPR, CRR
17                        Official Court Reporter

18

19

20

21

22

23

24

25